Sean M. Sullivan (Bar No. 254372)
E-mail: sean.sullivan@procopio.com
Justin M. Martin (Bar No. 329004)
E-mail: justin.martin@procopio.com
PROCOPIO, CORY, HARGREAVES & SAVITCH LLP
525 B Street, Suite 2200
San Diego, CA 92101
Telephone: 619.238.1900
Facsimile: 619.235.0398

Attorneys for Plaintiff
Aaron Stanz

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Plaintiff AARON STANZ, individually and derivatively on behalf of Jet Genius Holdings, Inc.,<br><br>Plaintiff,<br><br>v.<br><br>Defendants JORDAN BROWN; JET GENIUS HOLDINGS, INC.; JET GENIUS FLORIDA HOLDINGS, INC.; C3JETS LLC; BOWMAN AVIATION, INC.; JET AGENCY GLOBAL, LLC; C3 LIMO LLC; JETCHARTER.COM LLC; and DOES 1-20,<br><br>Defendants,<br><br>and<br><br>JET GENIUS HOLDINGS, INC.,<br><br>Nominal Defendant.<br><br>AND RELATED COUNTERCLAIM | Case No. 3:22-cv-01164-GPC-JLB<br><br>**VERIFIED SECOND AMENDED COMPLAINT**<br><br>**JURY DEMAND** |

## INTRODUCTION

1. Plaintiff Aaron "Angel" Stanz ("Plaintiff") and Defendant Jordan Brown ("Brown") are the two primary shareholders of Jet Genius Holdings, Inc. ("JGH"), a private jet charter broker. Plaintiff served as the Chief Technology Officer and had principal responsibility for designing and implementing the software on which JGH

operates to connect jet operators with clients. Since 2018, Brown has been JGH's CEO and sole director.

2. While JGH should be a thriving business, Brown's use of the business as his personal piggy bank threatens its collapse. Brown has raided JGH's assets through phony transactions, indefensible self-approved compensation, and wrongful diversion of corporate assets. Brown finances an extravagant lifestyle of exotic vacations, luxury vehicles, and glamorous fashion by siphoning JGH's revenues. The total amount that Brown has wrongfully extracted from JGH likely exceeds millions of dollars. Brown simply uses JGH funds to maintain his lifestyle.

3. In contrast, Plaintiff has received virtually no shareholder benefits, profits, distributions or dividends.

4. Brown also employs a shell game of entities to avoid paying Plaintiff amounts due to him and to avoid other company obligations. In so doing, Brown disregards nearly all corporate formalities and just shifts assets from one entity to another, all for his personal gain and benefit. Brown uses his shell game to evade liability arising from JGH's business operations. In particular, he seeks to avoid millions in assessed federal excise taxes ("FET") related to chartering aircrafts. Brown has failed to timely and fully pay the FET related to JGH's operations. Instead, he took actions to saddle Plaintiff personally with much of that burden—$1.3 million in unpaid FET—, despite assurances Brown would account for those taxes, while also shifting JGH's operations and assets to a new entity to avoid payments. Plaintiff believes Brown's plan is to continue repeating that cycle all for his personal gain. To date, JGH has refused to defend or indemnify Plaintiff for the FET liability, Brown has refused to acknowledge JGH's obligations to Plaintiff, and Brown has even attempted to use the enormous tax burden as leverage to obtain concessions from Plaintiff.

5. Brown escalated his pattern of outrageous conduct even after Plaintiff filed this lawsuit. On information and belief, in or around December 2022, Brown convinced the carrier of Plaintiff's cell phone to transfer Plaintiff's phone number to

Brown, asserting that the account belonged to the company account. Brown then used his access to Plaintiff's cell phone number to call Plaintiff's then-attorney, feigning to be Plaintiff himself, and sought to engage in conversations regarding matters within the ambit of the attorney-client privileged.

6. On information and belief, Brown also texted Plaintiff's friends and acquaintances while impersonating Plaintiff. To this day, Plaintiff still has not recovered his account, and he is not fully aware of the extent of Brown's actions, but is informed and believes and on that basis alleges, Brown sought to impersonate him through access to Plaintiff's former cell phone number.

7. Plaintiff is the victim of an ongoing wrongful scheme by Brown to strip JGH of assets, saddle Plaintiff with personal liability for business obligations, conceal his financial mismanagement and wrongdoings, and to divert and abscond with significant business opportunities and large sums of money. Brown never intended to fulfill his obligations to JGH and its shareholders, or the promises he made to Plaintiff personally.

**PARTIES**

8. Plaintiff Aaron Stanz, also known as "Angel" ("Plaintiff") is an individual and a citizen of the State of Kansas. In March 2022, Plaintiff moved his domicile from California to Kansas. When he did so, he ended his residence in California and established his new physical residence in Kansas. Plaintiff's sole residence is now in Kansas, and Plaintiff intends to reside there permanently. For the purposes of diversity jurisdiction, Plaintiff is a citizen of the State of Kansas.[1]

9. Defendant Jordan Brown ("Brown") is an individual, who on information and belief, is a citizen of the State of Florida.

10. Defendant Jet Genius Holdings Inc. ("JGH") is a corporation

---

[1] A prior version of Plaintiff's complaint stated: "[Plaintiff] has not yet made his primary residency in the State of Kansas." *See* ECF No. 1 ⁋ 5. This allegation was inaccurate, as by March 2022, Plaintiff had finished moving to Kansas and physically resided there and intended to remain there indefinitely.

incorporated in the State of California with its principal place of business in the State of Florida. JGH operates throughout the United States in its capacity as an air charter broker to match client travel needs with available air charter operators. Since December 18, 2018, Brown has been the sole Director and CEO of JGH.

11. Defendant Jet Genius Florida Holdings Inc. ("JGFH") is a corporation incorporated in the State of Florida with its principal place of business in the State of Florida. On information and belief, Brown has been the sole Director and CEO of JGFH since its inception. JGFH's principal address is registered with the Florida Secretary of State as 1900 Glades Road, Suite 301, Boca Raton, FL 33431.

12. Defendant C3jets LLC ("C3 Jets") is a limited liability company organized under the laws of the State of Idaho. C3 Jets operates private aircraft for commercial purposes. C3 Jets' manager is Brown. On information and belief, C3 Jets' sole member is Brown. C3 Jets' principal address is registered with the Florida Secretary of State as 1900 Glades Road, Suite 301, Boca Raton, FL 33431.

13. Defendant Bowman Aviation, Inc. ("Bowman Aviation") is a Florida corporation with its principal place of business in the State of Florida where it performs contract services for JGH and JGFH which, upon information and belief, include air charter broker services and aircraft sales for commercial purposes. On information and belief, Bowman Aviation's President, Secretary, and sole Director is Brown. Bowman Aviation's principal address is registered with the Florida Secretary of State as 1900 Glades Road, Suite 301, Boca Raton, FL 33431.

14. Defendant Jet Agency Global LLC ("Jet Agency") is a limited liability company organized under the laws of the State of Florida. On information and belief, Jet Agency's sole member and manager is Brown.

15. Defendant C3 Limo LLC ("C3 Limo") is a limited liability company organized under the laws of the State of Florida. C3 Limo's original manager was Stacy Brown, Brown's wife. On March 15, 2022, C3 Limo changed its manager to Chasen Dobos, Brown's stepson. From March 15, 2022, to March 25, 2023, C3 Limo

listed its principal place of business as 1900 Glades Road, Suite 301, Suite 406, Boca Raton, FL 33431. C3 Limo's mailing address has been 1900 Glades Road, Suite 301, Boca Raton, FL 33431 since March 15, 2022, and remains the current mailing address. On information and belief, C3 Limo's members are Brown, Stacy Brown, and/or Chasen Dobos. Upon information and belief, Stacy Brown and Chasen Dobos are citizens of the State of Florida.

16. Defendant Jetcharter.com LLC ("Jetcharter") is a limited liability company organized under the laws of the State of Florida. On information and belief, Brown is Jetcharter's manager and sole member.

## ALTER EGO ALLEGATIONS

17. Plaintiff is ignorant of the true names and capacities of defendants sued as DOES 1-20, inclusive, and therefore sues these defendants by these fictitious names. Plaintiff will seek leave to amend to allege their true names and capacities when they have been determined. Plaintiff is informed and believes and, on that basis, alleges that each of the fictitiously named defendants is in breach of some contract or is tortiously or otherwise legally responsible in some manner for the occurrences alleged in this Second Amended Complaint ("SAC") and for Plaintiff's damages.

18. Plaintiff is informed and believes and on that basis alleges that at all relevant times, each of the Defendants, including DOES 1-20, inclusive, was the agent, representative, employee, partner, joint venturer, co-conspirator, alter ego, or otherwise working on behalf of each of the remaining Defendants and, in doing the things alleged, was acting within the scope of that agency, employment, partnership, conspiracy or other relationship, and that each principal ratified each act of each agent.

19. Plaintiff is informed and believes, and on that basis alleges, that at all times mentioned in this SAC that Brown operated JGFH, C3 Jets, Bowman Aviation, Jet Agency, Jetcharter, and DOES 1 through 20 (collectively, the "Alter Egos"), as a single entity, and they were at all times relevant the alter egos of each other. Plaintiff is further informed and believes, and on that basis alleges, that:

a. at all times mentioned in this SAC, Brown operated the Alter Egos as a single enterprise; that Brown disregarded corporate formalities and did not distinguish between the Alter Egos; that Brown comingled funds, made undocumented loans, and unilaterally transferred assets amongst the Alter Egos.

b. at all times mentioned in this SAC, there existed and now exists a unity of interest and ownership between the defendants and each of the Alter Egos; the individuality and separateness of the defendants and each of the Alter Egos have ceased or never existed;

c. at all times mentioned in this SAC, and at all times since the incorporation or inception of each Alter Ego, each Alter Ego has been and now is a mere shell and naked framework for pursuing a single enterprise and scheme;

d. at all times mentioned in this SAC, each of the Alter Egos was created and continued pursuant to a fraudulent plan, scheme, and device conceived and operated by Brown, whereby the income, revenue and profits of each of the Alter Egos were diverted by Brown to himself or to serve his personal interests;

e. Plaintiff is informed and believes, and on that basis alleges, that one or more of the Alter Egos is undercapitalized and/or insolvent;

f. Plaintiff is informed and believes, and on that basis alleges, that the monies held by each of the Alter Egos have been commingled to the extent that assets, revenues, loans, and liabilities of each have been interchanged and are indistinguishable from the assets, revenues, loans, and liabilities of the other Alter Egos; and by virtue of the foregoing, adherence to the fiction of the existence of each of the Alter Egos as separate entities would, under the circumstances, sanction a fraud and promote injustice in that Plaintiff would be unable to realize upon any judgment in its favor, among other reasons. Allowing

the Alter Egos to maintain the corporate entity would promote injustice, as it would sanction a fraud against Plaintiff.

20. Plaintiff is informed and believes, and on that basis alleges, that at all times mentioned in this SAC that Brown was the sole or majority shareholder (in the cases of corporations) or sole member (in the cases of LLCs) JGFH, C3 Jets, Bowman Aviation, Jet Agency, Jetcharter.com LLC, and DOES 1 through 20. Brown was also the sole director and majority shareholder of JGH at times relevant herein.

21. Plaintiff is further informed and believes, and on that basis alleges, that:

a. Brown dominated, influenced and controlled each of the Alter Egos and the officers thereof as well as the business, property, and affairs of each of said Alter Egos;

b. at all times mentioned in this SAC, there existed and now exists a unity of interest and ownership between Brown and each of the Alter Egos; the individuality and separateness of Brown and each of the Alter Egos have ceased;

c. at all times mentioned in this SAC, each of the Alter Egos was organized by Brown as a device to avoid individual liability and for the purpose of substituting financially irresponsible entities in the place and stead of himself, and accordingly, each Alter Ego was formed with capitalization totally inadequate for the business in which said entity was engaged;

d. the revenues and monies held by each of the Alter Egos have been drained from the Alter Ego by Brown;

e. that at all times mentioned in this SAC, the Alter Egos and Brown acted for each other in connection with the conduct hereinafter alleged and that each of them performed the acts complained of herein or breached the duties herein complained of as agents of each other and each is therefore fully liable for the acts of the other;

f. that Brown failed to adhere to corporate formalities that would have been required to take the purported action of the Alter Egos; and by virtue

of the foregoing, adherence to the fiction of the existence of each of the Alter Egos as separate entities from Brown would, under the circumstances, sanction a fraud and promote injustice in that Plaintiff would be unable to realize upon any judgment in its favor, among other reasons.

## JURISDICTION AND VENUE

22. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(a)(1) as complete diversity among the parties exists. Plaintiff is a citizen of the State of Kansas, and no Defendant is a citizen of the State of Kansas.

23. For the purposes of Plaintiff's claims brought derivatively on behalf of JGH, JGH is properly aligned as a Defendant for the purposes of diversity jurisdiction. "[W]hen a corporation's officers or directors are 'antagonistic' to the interests of the shareholder plaintiff(s)[,]" the corporation is considered a defendant in a derivative lawsuit. *In re Digimarc Corp. Derivative Litig.*, 549 F.3d 1223, 1234 (9th Cir. 2008). "A corporation is generally antagonistic to a shareholder plaintiff where management is aligned against the stockholder and defends a course of conduct which he attacks, or merely where management—for good reasons or for bad—is definitely and distinctly opposed to the institution of the derivative litigation," *Id.* at 1235 (quotations, citation, and alteration omitted).

24. Here, JGH's management, Brown, as sole director and CEO, is "definitely and distinctly opposed to the institution of the derivative litigation" because the claims all seek recovery directly from him or one of the entities over which he exerts direct or indirect control. JGH is therefore properly considered a defendant for the purposes of diversity analysis.

25. Plaintiff is informed and believes and on that basis alleges that the amount in controversy in this matter exceeds $75,000.00, exclusive of interest and costs.

26. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims in this action occurred in this judicial district.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

27. Plaintiff brings certain claims in this action derivatively in the right and for the benefit of JGH.

28. Plaintiff is the holder of twenty-five percent of the outstanding and issued shares of JGH.

29. Plaintiff has continuously held his shares of JGH at all times relevant to the wrongdoing identified in this SAC. Plaintiff continues to hold his shares of JGH.

30. Plaintiff will adequately and fairly represent the interests of JGH in enforcing and prosecuting its rights identified herein.

31. This is not a collusive derivative action to confer jurisdiction that would otherwise not exist in this Court.

32. Pursuant to Fed. R. Civ. P. 23.1 and Cal. Corp. Code § 800(b)(1), Plaintiff is excused from making a demand on the Board of Directors of JGH to obtain the relief sought in Plaintiff's derivative claims since a demand would have been futile because it would have required Brown to assert and pursue claims against himself or against entities solely controlled by him or his family.

33. At the time of filing of Plaintiff's Complaint, Brown served as the sole director of JGH's Board and CEO. Demand that JGH initiate claims against Brown personally would have been futile, and is therefore excused, because Brown personally engaged in, directed, and is responsible for all of the misconduct that injured JGH and its shareholders as alleged in this SAC, and to date Brown has refused to take action contrary to his personal interests.

34. Brown could not have made a disinterested decision to initiate a lawsuit against himself because he is personally responsible for his breaches of fiduciary duties to the corporation and has rejected prior efforts to address these alleged breaches and acts. Therefore, demand is excused as to Plaintiff's derivative claims against Brown.

35. Brown could not have made a disinterested decision to initiate a lawsuit

against JGFH, C3 Jets, Bowman Aviation, Jet Agency, Jetcharter, or DOES 1 through 20 because those entities are entities that he directly controls and personally benefits from the tortious acts and schemes, as alleged herein, that they participated in. On information and belief, Brown is personally responsible for the actions and decisions of those entities. Therefore, demand is excused as to Plaintiff's derivative claims against Brown.

36. Brown could not have made a disinterested decision to initiate a lawsuit against C3 Limo because he or his immediately family directly controls that entity and personally benefits from the tortious acts, as alleged herein, that they and it participated in. On information and belief, either Brown and/or his immediate family is personally responsible for the actions and decisions of that entity. Further, the beneficiary of the tortious acts was either Brown or his immediate family and could lead to a judgment against Brown or his immediate family. Therefore, demand is excused as to Plaintiff's derivative claims against Brown.

37. Pursuant to Cal. Corp. Code § 800(b)(2), Plaintiff has either informed JGH, or its board, comprised solely of Brown, in writing of the ultimate facts underlying the causes of action set forth in this SAC. Such writings have consisted of, among others, pre-lawsuit correspondence, meetings and communications, prior complaints, motions, declarations (including Plaintiff's Declaration at ECF No. 16-3) filed in this matter and extensive written exchanges between the parties and their counsel, including those described in this SAC.

## FACTUAL ALLEGATIONS

38. Plaintiff is the creator and developer of the software and systems that simplify and accelerate aircraft charter brokering, including JetXchange, The Grid, and the Charter Flight Group website, which are also supported by custom applications, reports, lead generations tools, databases, business analytics, and certain client lists (the "JGH Platform"). The JGH Platform allows a charter aviation brokerage company to operate more efficiently by facilitating more trips per staff

member than any charter brokerage competitor.

39. In 2016, Plaintiff partnered with Brown and non-party Alexander Wolf to form JGH, doing business as Charter Flight Group, to provide air charter broker services to the private aviation market. Plaintiff contributed the JGH Platform to JGH and received a 49.5% ownership interest in the company. Brown agreed to act as CEO and received a 49.5% ownership interest. Wolf received the remaining 1% interest.

40. JGH adopted its bylaws on January 20, 2017 (the “Bylaws”).

41. The Bylaws provide for the election of directors at annual shareholder meetings and the procedure to fill Board vacancies.

42. The Bylaws also require JGH to defend and indemnify its directors and officers for any expenses incurred by the director or officer as a result of the individual’s work for the company. Article VI provides in relevant part:

> The Corporation shall, to the maximum extent permitted by the General Corporation Law of California, indemnify each of its directors and officers against expenses, judgments, fines, settlements and other amounts actually and reasonably incurred in connection with any proceedings arising by reason of the fact any such person is or was a director or officer of the Corporation and shall advance to such director or officer expenses incurred in defending any such proceeding to the maximum extent permitted by such law. For purposes of this Article VI, a “director” or “officer” of the Corporation includes any person who is or was a director or officer of the Corporation, or is or was serving at the request of the Corporation as a director or officer of another corporation, . . . .

43. At formation, JGH had a three-member Board of Directors, comprised of Plaintiff, Brown, and Wolf.

44. Plaintiff served as the Chief Technology Officer (“CTO”), as he had the technical expertise to operate, enhance, and optimize the performance of the JGH Platform. His work enabled JGH to significantly decrease the time and costs associated with buy-side and sell-side actions to complete complex broker transactions to charter aircraft at all stages, including initial client contact, aircraft availability, pricing, contract generation, financial transactions (including pre-flight ground transportation, and post-flight ground transportation), and more. Plaintiff’s work was integral to the

success of the business.

45. The company succeeded at obtaining significant market share and demonstrating growth.

46. As a business that collected payment for commercial domestic transportation of persons, JGH was subject to an assessment of federal excise tax ("FET"). *See* 26 U.S.C. § 4261; *see also* 26 C.F.R. pt. 49.

47. As CTO, Plaintiff played no part in the collection or distribution of revenues of JGH, nor did he have a role in ensuring payment of or compliance with JGH's FET obligations, and instead he was solely tasked with the software development and operations.

48. In fact, when forming the business, Brown demanded that Plaintiff have no involvement with the financial affairs of JGH, but rather that Plaintiff would agree to leave that to Brown so Plaintiff could focus solely on the technical/software side of the company. Plaintiff agreed to Brown's demand, as that naturally fit his skillset and he relied on Brown to handle the business and financial side of the company.

49. While Plaintiff had no control of or involvement with the financial operations of the business, soon after forming the company, Brown asked Plaintiff to accept an appointment as the company's "Secretary," so that Plaintiff could assist with opening an urgently needed bank account. Through the assistance of JGH's corporate counsel, JGH removed Wolf as JGH's Secretary and appointed Plaintiff to that role for the sole purpose of opening a bank account. On December 19, 2016, while Brown was on vacation, Brown directed Plaintiff to open a bank account for JGH. But after opening the bank account, Plaintiff did not oversee or handle JGH's finances, and continued with the plan to handle the technical side of the business.

50. Plaintiff thought JGH was operating successfully until the summer of 2018, when Plaintiff learned that JGH had incurred significant unpaid FET. FET is required tax when a customer books a chartered flight, including through a broker like JGH. Plaintiff learned that JGH was either collecting the FET associated with

purchased flights, but was not then paying it to the IRS, or was simply not adding the FET to the purchase price and was not collecting it from the customer. Plaintiff was surprised that JGH had unpaid taxes given that he understood and believed that it had adequate capital to pay the FET at the time such became due.

51. The revelation that JGH had unpaid FET obligations alarmed Plaintiff, and it caused Plaintiff and Wolf to investigate. In doing so, they learned of confusing financial transactions and accounting issues, so they obtained proposals from auditors for performing a professional audit of the business.

52. In August 2018, Plaintiff and Wolf confronted Brown about his management of the company and the questions they had about the financial issues.

53. In particular, Plaintiff questioned Brown about a loan that was on JGH's books, which Brown admitted that he had taken for "personal reasons." Plaintiff and Wolf discovered other transactions that seemed to drain resources from JGH with no legitimate business purpose, which they asked Brown about.

54. As Plaintiff and Wolf continued asking questions about the company's operations and finances, Brown grew hostile, and assured them he would "take care of it." The situation between the parties grew more tense.

55. Brown said that he would address the FET issue and other financial and operating questions of the company. To do so, he asked for more control of the company. In part, he said Plaintiff's service as a director complicated fundraising and operations, because Plaintiff had a prior SEC order against him. Plaintiff was willing to agree to reduce his role in the company if it would lead to better business prospects and based on Brown's assurances that he would perform his leadership duties effectively and properly.

56. Plaintiff, Brown and Wolf began negotiating a way to provide Brown more control, but still protect Plaintiff's interests. Plaintiff's primary concerns were (1) ensuring that the FET would be collected and paid, (2) ensuring that the assets of the company, i.e., the JGH Platform and financial resources, remained with the

company, and (3) ensuring that Plaintiff would be appropriately compensated for his significant contribution to the business, including ensuring that he would be paid properly if the business was sold to a third party, which was an event he eventually anticipated.

57. Plaintiff would not agree to a contract that reduced his ownership of JGH without these protections and without commitment from Brown that he intended to operate the business properly and effectively. As Plaintiff and Brown discussed a potential agreement, Brown repeatedly assured Plaintiff that he would ensure the FET was collected and paid so that none of the shareholders would risk personal liability, and that Brown would operate the business for the benefit of all its shareholders. He also repeatedly assured Plaintiff he would not form another entity or business in an effort to transfer JGH operations or assets to it, or somehow leave JGH as an empty shell with only liabilities, like the FET.

58. In August 2018, the company retained legal counsel to formalize the arrangement between the parties. Plaintiff again clarified that any agreement needed to protect his stated priorities, and Brown repeated his assurances that Plaintiff had no reason to be concerned and that Brown would efficiently operate the company for the benefit of all shareholders and not take the actions Plaintiff voiced concern about. Brown made statements:

- "Just trust me";
- "Don't worry about it";
- "Why are we wasting time with lawyers negotiating this, there is no reason to worry"; and
- "I won't do those things," specifically avoid paying FET, form entities or transfer assets or money out of JGH.

59. Based on Brown's emphatic reassurances and representations that he would operate the business properly and effectively and in the best interests of the shareholders, Plaintiff reasonably relied on Brown's statements, and they eventually

reached agreement on the discussed terms.

60. On information and belief, Brown's statements, including his reassurances and representations to Plaintiff, were false when made, and he had no intention of ever respecting the terms he said he would. On information and belief, Brown intended to do the exact opposite of what he promised Plaintiff he would not do—effectively raid the company for his own benefit. Further, Brown did not intend to collect and pay the FET, because he intended to use those funds for his own personal purposes.

61. Based entirely on Brown's false representations, Plaintiff agreed to effectively reduce his ownership interest in JGH, based on assurances he would still (1) be adequately compensated for his contributions to the company, and (2) would ensure that the company—not the individual shareholders or officers—would pay off the FET then owing and going forward.

62. In exchange. Plaintiff agreed to significant concessions, including (1) transferring 1,485,385 shares of his stock in JGH back to the company, thereby reducing his stake from 49.5% to 25%; (2) stepping down from JGH's Board of Directors (Wolf also resigned from the Board at that time); and (3) assigning rights in the JGH Platform to JGH.

63. The results of the negotiations between Plaintiff and JGH (through Brown and company counsel) was a document that was signed on November 7, 2018 (the "Letter Agreement"). A true and correct copy of the Letter Agreement is attached as Exhibit 1.

64. The Letter Agreement had several clauses aimed at protecting Plaintiff's interests and imposing obligations on Brown and JGH in exchange.

65. First, the Letter Agreement prohibited certain actions without Plaintiff's written consent:

> 2. **Required Approval**. The Company will refrain from taking any of the following actions without your prior written consent:

> a. reserve or issue greater than 383,846 shares of the common stock of the Company pursuant to an equity incentive plan;
>
> b. authorize or issue additional shares of common stock or any other class or series of capital stock in the Company, other than shares issued to investors in a bona fide financing conducted to raise capital at a share price based on a pre-money valuation of at least $5,000,000 (a "Qualified Financing");
>
> . . .
>
> d. create or hold securities in an entity other than a wholly-owned subsidiary, other than a company or joint venture established with one or more partners for the primary purpose of owning and operating aircraft;
>
> e. loan money to or accept loans from a shareholder or its assigns; or
>
> f. amend this Agreement, terminate this Agreement without Cause (as defined below), or take corporate action intended to circumvent or adversely affect your rights pursuant to this Agreement.

66. The Letter Agreement also contained a "Corporate Event Payment" clause that required payment to Plaintiff of specified amounts upon the occurrence of certain events, which included a corporate merger or consolidation with another entity or the transfer or exclusive licensing of the company's technology (including the JGH Platform) to any other party:

> 4. **Corporate Event Payment**. Upon the closing of a Corporate Event on or before November 1, 2023, the Company will make a lump sum payment to you in accordance with the following:

| Closing Date of Corporate Event | Payment Amount |
|---|---|
| Date of this Agreement – November 1, 2019 | $909,451.00 |
| November 2, 2019 – November 1, 2020 | $727,561.00 |
| November 2, 2020 – November 1, 2021 | $545,671.00 |
| November 2, 2021 – November 1, 2022 | $363,780.00 |
| November 2, 2022 – November 1, 2023 | $181,890.00 |
| On or after November 2, 2023 | $0.00 |

> "Corporate Event" means (i) the consummation of a merger or consolidation of the Company with or into another entity or (ii) the sale, transfer, or exclusive license of significant assets of the Company outside the ordinary course of business, in whole or in part, including but not limited to its developed technology (such as desktop applications, web

> applications, mobile applications, backend applications, machine-learning applications and database structures), and data derived from or contributed to the Company (such as client data, pricing data, inventory data, industry directory data, aircraft data, company performance data, and other data contributing to Company revenue generation). The foregoing notwithstanding, a merger or consolidation of the Company shall not constitute a "Change in Control" if immediately after such merger or consolidation a majority of the voting power of the capital stock of the continuing or surviving entity, or any direct or indirect parent corporation of such continuing or surviving entity, will be owned by the persons who were the Company's shareholders immediately prior to such merger or consolidation in substantially the same proportions as their ownership of the voting power of the Company's capital stock immediately prior to such merger or consolidation. In no event shall a Qualified Financing constitute a Change in Control.

67. The Letter Agreement specified that any personal property that JGH had paid for would become Plaintiff's personal property. This clause applied to Plaintiff's cell phone, which became his personal property:

> 5. **Personal Property**. In the event that the Company purchased all or a portion of any items of personal property that are in your possession as of the date of this Agreement, such items are hereby deemed your personal property subject to any applicable withholding taxes and other deductions. For clarity, the foregoing does not include intangible or intellectual property or the Tesla Model X that you are currently using (the "Company Car").

68. Critically to Plaintiff, the Letter Agreement required the establishment of a separate bank account dedicated for the purpose of collecting and holding funds to pay the FET (the "FET Clause"):

> 6. **Excise Taxes**. As the Company receives revenue subject to federal excise taxes, the Company will estimate in good faith the amount of federal excise taxes anticipated to be due on such revenue and will hold such estimated tax amount in a separate bank account. Funds from such account will only be used to pay federal excise taxes. The Company will continue to work toward a settlement with the IRS related to past excise taxes that avoids personal liability of the Company's past and current officers and directors in connection therewith.

69. As a part of the Letter Agreement, Plaintiff and Wolf each resigned from JGH's Board of Directors.

70. Upon execution of the Letter Agreement, Brown became the sole director of JGH and continued to act as its CEO. Further, due to Plaintiff transferring

approximately half of his shares back to JGH, Brown became the majority shareholder in JGH, owning 63.7% of JGH's shares.

71. Having consolidated his power and control over JGH, Brown proceeded to operate JGH like his personal piggy bank to fund his extravagant lifestyle at the expense of the company and the shareholders. As detailed below, Brown proceeded to leverage the company and use the cash for personal purposes, made loans to his family members on terms favorable to those family members, and authorized exorbitant commission payments to himself. Further, he authorized $1.9 million in distributions to himself as a shareholder, while only distributing $23,000 to the other two shareholders, in wild disproportion to their respective actual shareholder percentages.

72. Simultaneously, Brown and JGH breached the Letter Agreement by establishing other entities and transferring JGH's assets to those companies, breaking every promise made to Plaintiff.

73. All the while, Brown continued to fail and refused to pay the FET, in blatant disregard of the contractual and statutory obligation to do so. Brown never allocated funds to pay the company's FET nor did he set up the separate bank account for that purpose that he promised he would. Thereafter, JGH's outstanding FET obligation ballooned to more than $5 million.

74. On information and belief, after execution of the Letter Agreement to approximately December 2019, Brown used assets properly belonging to JGH to fund personal loans that he never repaid.

75. On information and belief, after execution of the Letter Agreement up to approximately December 2019, Brown took excessive commissions from JGH's sale of brokered aircraft trips and its sales of aircraft. The commissions from aircraft sales are particularly substantial given the high value of the transactions. In these circumstances, on information and belief, Brown simply kept the entire profit without accounting to the company or the shareholders.

76. On August 6, 2019, on information and belief, while still CEO and the

only director of JGH, Brown (acting for himself and/or for JGH) formed an identically named entity, Jet Genius Holdings, Inc., as a Florida corporation. This new entity was not a wholly owned subsidiary of JGH as JGH did not own 100% of the stock of the new entity.

77. Two weeks later, on August 20, 2019, Brown changed the new entity's name to Jet Genius Florida Holdings, Inc. ("JGFH")

78. On April 27, 2020, JGFH filed its first annual report which disclosed that Brown was the President, Secretary, Treasurer, and sole Director of JGFH.

79. Plaintiff is informed and believes, and on that basis alleges, that Brown formed JGFH to pursue the identical business as JGH, and to continue or conduct such business operations using the JGH Platform.

80. Plaintiff is informed and believes, and on that basis alleges, that Brown formed JGFH to avoid liabilities of JGH, including with respect to the FET obligations and moneys owed to Plaintiff and Wolf.

81. By creating an entity that was not a wholly owned subsidiary of JGH and that also was not a company or joint venture established with one or more partners for the primary purpose of owning and operating aircraft, Brown breached the Letter Agreement and express promises he made to Plaintiff.

82. On September 16, 2019, on information and belief, Brown formed Jet Agency in the State of Florida. The Article of Organization of Jet Agency identified Brown as Jet Agency's manager.

83. Every Annual Report to date filed by Jet Agency indicates that Brown is Jet Agency's manager. On information and belief, Brown is Jet Agency's sole member.

84. By creating an entity that was not a wholly owned subsidiary of JGH that also was not a company or joint venture established with one or more partners for the primary purpose of owning and operating aircraft, Brown breached the Letter Agreement and express promises he made to Plaintiff.

85. On August 29, 2019, all JGH employees received an email from JGH's Chief Financial Officer, Cindy Grotsky ("Grotsky"). In the email, Grotsky announced that all JGH employees would become employees of JGFH, such that the employee structure for the business remained identical and there would be no material changes to the operation of the business, except formalities in payroll. Grotsky's email to the staff stated: "Over the last several weeks it was decided that a new entity would be created -- Jet Genius Florida Holdings, Inc. d/b/a Charter Flight Group. This will occur on October 1, 2019, and beginning on that data all activity of Charter Flight Group will be recorded in the new entity."

86. On information and belief, at this time, Brown, as CEO and the sole Director of JGH, moved JGH's entire revenue stream to JGFH. He did so without any benefit to JGH or its shareholders. In doing so, Brown breached his fiduciary duties to the JGH shareholders, including Plaintiff.

87. On information and belief, at this time, as CEO and the sole Director of JGH, Brown purported to transfer ownership of or licensed rights in and to the JGH Platform to JGFH without adequate consideration, simply for the purpose of benefitting another entity for which he was, on information and belief, the sole shareholder. In doing so, Brown breached his fiduciary duties to the JGH shareholders, including Plaintiff.

88. Transferring the rights in and to the JGH Platform to another entity constituted a "Corporate Event" under the Letter Agreement. Since the Corporate Event took place before November 1, 2019, Plaintiff was due a lump sum payment of $909,451.00, yet he received nothing.

89. On information and belief, at this time, as CEO and the sole Director of JGH, Brown transferred ownership of or licensed rights in and to the JGH Platform to Jet Agency without adequate consideration simply for the purpose of benefitting another entity for which he was, on information and belief, the sole member. In doing so, Brown breached his fiduciary duties to the JGH shareholders, including Plaintiff.

90. Again, transferring the rights in and to the JGH Platform to another entity constituted a "Corporate Event" under the Letter Agreement. Since the Corporate Event took place before November 1, 2019, Plaintiff was due a lump sum payment of $909,451.00, yet he received nothing.

91. In December 2019, having been excluded from the company decision making for approximately one year, Plaintiff learned that JGH's FET obligation was still growing despite Brown's repeated assurances he would ensure it was paid.

92. On December 2, 2019, Plaintiff attended a call with Brown and Wolf, amongst several others. On the call, staff confirmed that JGH's outstanding FET liability was approximately $2.5 million. Brown stated that he had established a fund to pay the FET, but it only had $50,000 in it. Brown did not and would not explain where the rest of the money went.

93. On the same call, Brown said that he planned to move the company to Florida before the IRS could put a lien on JGH.

94. Thereafter, Brown continued to grow his shell game of entities that he used for only his benefit. On September 11, 2020, C3 Limo, LLC is formed with Stacy Brown, Brown's wife, listed as its manager. Six months later, they change the manager to Chasen Dobos, Brown's stepson.

95. On information and belief, at this time, as CEO and the sole Director of JGH, Brown transferred ownership of or licensed rights in and to parts of the JGH Platform to C3 Limo, including the client data and purchase history, and conducted joint marketing with it, without paying adequate consideration to JGH, all for his and his family's sole benefit. In doing so, Brown breached his fiduciary duties to the JGH shareholders, including Plaintiff.

96. On information and belief, Brown transferred cash belonging to JGH or to which it was entitled in undocumented transactions to C3 Limo to fund C3 Limo's operations without any expectation of being repaid.

97. On April 23, 2021, on information and belief, Brown formed C3 Jets.

98. On information and belief, Brown transferred $100,000 per month (and potentially more), which was cash belonging to JGH or to which it was entitled, to C3 Jets to help fund its operations. On information and belief, Brown formed and pursued C3 Jets with the intent and plan to shift the customers, clients, opportunities, assets, and revenues, and other business interests to which JGH is rightfully entitled to C3 Jets.

99. On information and belief, JGH is not receiving any compensation for these payments.

100. On information and belief, throughout his control tenure, as Plaintiff has now learned, Brown has used the assets (tangible and intangible), bank accounts, and revenues of JGH, either directly or through JGFH, or the Alter Egos, to fund his extravagant lifestyle. He has done so in any number of ways that serve his personal interest and harm JGH.

101. On information and belief, Brown has used the assets rightly belonging to or originating from JGH, either directly or through JGFH, or the Alter Egos, including planes and vehicles, for personal use that did not serve any business purpose.

102. On information and belief, Brown has taken funds rightly belonging to or originating from JGH, either directly or through JGFH, or the Alter Egos, in undocumented transactions or improperly documented transactions for personal use.

103. On information and belief, Brown has made $1.9 million in distributions of JGH funds to himself while only distributing $23,000 to the other JGH shareholders, in wild disproportion to shares held by the shareholders of JGH.

104. On information and belief, Brown has taken excessive and indefensible commissions from sales made by or through JGH or which were corporate opportunities belonging to JGH. The commissions taken by Brown deprived JGH and its shareholders of their entitled interests in profits or benefits from the transactions and opportunities.

105. On information and belief, Brown has made undocumented or improperly

documented "loans" to the Alter Egos from JGH to fund their respective operations. Brown has built these businesses to serve his own personal purposes. Brown has made these loans with no expectation that they would ever be repaid.

106. Brown has taken at least one loan for JGH, JGFH, and/or the Alter Egos, from his family members. On information and belief, that loan was repaid on terms that benefited Brown's family and was to the detriment of the company.

107. On information and belief, Brown has taken out loans on behalf of JGH, JGFH, and/or the Alter Egos, all of which involve money or assets rightly belonging to JGH, and used the funds for personal uses. On information and belief, Brown has not repaid such loans, and creditors have now asserted liens against JGH, or assets which it rightly has an interest in, to the detriment of JGH's shareholders.

108. On information and belief, Brown has used the funds that should have been used to pay the FET for personal use, including using the assets or funds of JGH, either directly or through JGFH and the Alter Egos, to subsidize his opulent lifestyle, including regularly taking vacations to the Caribbean, Monaco, Africa, Maldives, and St. Barts, attending Formula 1 races, indulging in the highest fashion, adorning himself with Louis Vuitton, Hermes, and high-end watches, and maintaining homes in locations like Palm Beach, Florida, Aspen, Colorado, and Del Mar, California.

109. In June of 2021, the IRS escalated pressure against JGH for its unpaid FET. IRS agents contacted the original JGH shareholders, Brown, Plaintiff, and Wolf, and stated that JGH had an outstanding FET liability of over $5 million. Plaintiff worried that the IRS would attempt to collect this amount from the shareholders personally.

110. Brown attempted to use this opportunity to leverage Plaintiff to release Brown from his many breaches of fiduciary duties as the CEO and sole director of JGH.

111. By this time, Brown had breached his fiduciary duties to JGH and Plaintiff by effectively stripping JGH of its most meaningful and valuable asset by

transferring or licensing the JGH Platform to other entities Brown owned and/or controlled, and by continuously moving the sources of revenue amongst his shell companies.

112. Brown attempted to cover his tracks by coercing Plaintiff to sign a new proposed shareholder agreement for JGFH (the "JGFH Agreement"). The JGFH Agreement would have awarded Plaintiff shares in JGFH, but those shares were not identical in value and corporate priority as his shares in JGH.

113. Moreover, the proposed JGFH Agreement contained a release of all claims that Plaintiff would have against JGH or its directors or officers, including Brown. Of course, Plaintiff refused to sign the JGFH Agreement.

114. In the following months, Plaintiff tried to resolve JGH's outstanding FET issues. Brown refused to discuss resolving the FET issues until Plaintiff signed the JGFH Agreement and released all claims against him.

115. Brown further sought to use the FET as leverage against Plaintiff by, on information and belief, attempting to influence (and potentially succeeding in influencing) the IRS to pursue collection of the FET from Plaintiff personally.

116. At this time, JGH had been contacted by an IRS Revenue Officer ("IRS RO"). Brown pointed to the period from the formation of JGH up to the Letter Agreement—when Plaintiff owned 49.5% of JGH—and Plaintiff's signature to open the bank account as JGH's secretary to suggest Plaintiff had responsibility for JGH's finances during that time, even though Plaintiff did not truly serve in that role or have that responsibility.

117. In fact, Brown knew these suggestions were patently false. He knew that he excluded Plaintiff from having oversight over JGH's finances as Brown wanted and gained exclusive control over that role. Brown also knew that the only reason that Plaintiff opened the bank account was at Brown's request, claiming he could not do so since he had been on vacation (or purported to be). It was only due to Brown's request (whether based on truth or not) that Plaintiff had even been named Secretary

of JGH for the technical and one-time purpose of opening the bank account.

118. In or around October of 2021, the IRS RO contacted Plaintiff regarding JGH's unpaid FET and informed Plaintiff that he could be held personally responsible for the uncollected and unpaid tax.

119. Plaintiff then sought protection of JGH. JGH had already provided counsel to Wolf with respect to the FET, and the counsel had succeeded in obtaining a final result that the IRS was not investigating Wolf for personal liability for the FET.

120. When Plaintiff confronted Brown about the FET, Brown admitted on November 4, 2021: "I am responsible for the FET mess. I will have to answer to this."

121. Plaintiff sought the same legal defense and indemnification from the company that it provided to Wolf and Brown. On a call with JGH's counsel on November 18, 2021, Plaintiff requested defense representation and indemnification for the tax dispute. Indisputably, JGH owed it to Plaintiff under its Bylaws to defend and indemnify Plaintiff for the tax liability because it was an "expense[], judgment[], fine[],settlement[] and other amount[]" that was actually incurred by reason of the fact Plaintiff was a director or officer of JGH. In blatant breach of the duty to defend and indemnify Plaintiff, Brown refused to provide the requested defense and denied Plaintiff's request for indemnification.

122. Without representation, Plaintiff had to fend for himself in his negotiations with the IRS to try to avoid personal liability. That effort failed, and in or around May 2022, he was personally assessed a trust fund recovery penalty of $1.3 million.

123. On October 28, 2022, Brown formed Jetcharter and serves as its manager. The website domain www.jetcharter.com was and rightfully is an asset of JGH. On information and belief, JGH had purchased the domain for $50,000. On information and belief, Brown has now transferred or licensed the domain to Jetcharter, all to the detriment of JGH and its shareholders.

124. Brown's unscrupulous, belligerent, and devious behavior reached

extraordinary new levels in late 2022.

125. On information and belief, Brown saw an opportunity to commandeer Plaintiff's cell phone and injure Plaintiff's reputation by impersonating him in cell phone communications.

126. When the parties formed JGH, Plaintiff was given a company cell phone. On information and belief, Brown purchased and registered the cell phone with the cell phone carrier under an account belonging to JGH.

127. Pursuant to section 5 of the Letter Agreement, that cell phone became Plaintiff's personal property upon execution of that agreement.

128. In or around December 2022, in the midst of the parties' disagreements over company operations, disputes over resolving the FET obligation, and this litigation, on information and belief, Brown convinced the cell phone carrier that Plaintiff's cell phone number actually belonged to Brown. On information and belief, Brown succeeded in convincing the carrier to transfer Plaintiff's cell phone account to a new cell phone that Brown possessed. This effectively gave Brown control over all the information in Plaintiff's cell phone, including text messaging services.

129. At the same time, Plaintiff's cell phone service stopped working. Plaintiff could not regain access to his phone account, so he purchased a new phone and was assigned a new phone number. Ever since, Plaintiff has used his new cell phone and new number.

130. Late one night in December 2022, Wade A. Miller ("Miller"), Plaintiff's then-counsel in this litigation, received a call from Plaintiff's cell phone number. The caller identified himself as Plaintiff, which is what the caller-id showed. Miller thought the speaker sounded inebriated. Miller and the caller, who he still believed to be Plaintiff, spoke at length, including as to legal strategy and advice related to this litigation. Miller had never received a call from Plaintiff so late in the night, so the next morning, Miller contacted Plaintiff to make sure he was alright and to discuss the conversation they had the night prior. Plaintiff was surprised by Miller's description

of the call since Plaintiff had not made that call.

131. On information and belief, Brown used Plaintiff's former cell phone number to call Miller and impersonated Plaintiff with the express purpose and intent of learning privileged and confidential information about Plaintiff and this litigation. Plaintiff was aghast upon learning of this violation.

132. In the following days and weeks, Plaintiff was contacted by various friends and colleagues who told him that they were receiving strange text messages purportedly from him. Some of these recipients engaged in exchanges or conversations with the person purporting to be Plaintiff. Some of these recipients eventually suspected (or affirmatively learned) they were not communicating with Plaintiff, and others eventually believed that they were texting with Brown using Plaintiff's cell phone number.

133. On information and belief, Brown texted and/or called Plaintiff's contacts from his cell phone while impersonating Plaintiff.

134. On information and belief, Plaintiff still does not know the full extent of Brown's text messages or impersonation efforts with his contacts.

135. Plaintiff has and continues to suffer emotional distress and extreme embarrassment, including when he has to contact or disclose to his friends and colleagues that he lost access to his phone and someone appears to have been impersonating him. Further, Plaintiff fears further embarrassment and ridicule if forced to indiscriminately contact his contacts, friends and colleagues to ask if they have been contacted by a person impersonating him.

136. The stress and embarrassment caused by the phony conversations with Plaintiff's contacts, and the unknown extent of those acts which could still be occurring, has caused Plaintiff severe emotional distress and anxiety. Plaintiff further suffers stress, anxiety, and emotional distress and trauma because he does not know the full extent of unauthorized access to and use of his personal cell phone and data contained therein.

**FIRST CAUSE OF ACTION**

**Express Indemnity**

**(Against JGH)**

137. Plaintiff incorporates by reference each and every allegation contained in each paragraph above and below as though the same were set forth in full herein.

138. Pursuant to its Bylaws, JGH owes an obligation to indemnify Plaintiff for all expenses, judgments, fines, settlements and other amounts actually incurred by reason of the fact that Plaintiff was a director or officer of JGH.

139. The IRS assessed a $1.3 million tax liability against Plaintiff by reason of his past performance of his duties or service as a director or officer of JGH.

140. Plaintiff demanded that JGH indemnify him for the $1.3 million tax liability.

141. Plaintiff has incurred other expenses as a result of defending against the IRS and its FET collection efforts against JGH and Plaintiff personally.

142. JGH refused to indemnify Plaintiff for the $1.3 million tax liability.

143. As a direct and proximate result of JGH's breach of its duty, Plaintiff has been damaged, plus interest thereon, in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**

**Equitable Indemnity**

**(Against JGH and Brown)**

144. Plaintiff incorporates by reference each and every allegation contained in each paragraph above and below as though the same were set forth in full herein.

145. By reason of JGH's failure to pay the FET, which Brown intentionally avoided despite assurances he would arrange for its payment, Plaintiff has been assessed a $1.3 million tax liability by the IRS.

146. Brown and JGH's conduct, whether intentional or negligent, was a substantial factor, and the direct and proximate cause, of causing Plaintiff harm.

147. Brown is liable as, from the time that Brown was JGH's sole director and

majority shareholder, Brown dominated, influenced and controlled JGH and made the decision for JGH to avoid paying the FET obligation it owed.

148. Brown is liable as, from the time that Brown was JGH's sole director and majority shareholder, there existed and now exists a unity of interest and ownership between Brown and JGH; the individuality and separateness of Brown and JGH have ceased to exist.

149. Brown is liable for JGH as, from the time that Brown was JGH's sole director and majority shareholder, JGH has been and now is a mere shell and naked framework which Brown used and continues to use as a conduit for the conduct of his personal business, property and affairs.

150. As a direct and proximate result of Brown's and JGH's acts, Plaintiff has been damaged, plus interest thereon, in an amount to be proven at trial.

## THIRD CAUSE OF ACTION

### Breach of Duty to Defend

### (Against JGH)

151. Plaintiff incorporates by reference each and every allegation contained in each paragraph above and below as though the same were set forth in full herein.

152. Pursuant to the Corporations Code and its Bylaws, JGH had an obligation to defend Plaintiff for all expenses, judgments, fines, settlements and other amounts actually incurred by reason of the fact that Plaintiff was a director or officer of JGH.

153. Plaintiff incurred expenses defending against the IRS efforts to collect JGH's unpaid FET.

154. Plaintiff demanded that JGH defend him for in the IRS collection action.

155. Plaintiff has incurred other expenses as a result of defending against the IRS and its FET collection efforts and will continue to incur expenses defending against the IRS and FET collection efforts.

156. JGH refused to defend Plaintiff against the IRS collection action.

157. As a direct and proximate result of JGH breach of its duty, Plaintiff has

been damaged, plus interest thereon, in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION

### Breach of Fiduciary Duty

### (Plaintiff, Derivatively on behalf of JGH, Against Brown)

158. Plaintiff incorporates by reference each and every allegation contained in each paragraph above and below as though the same were set forth in full herein.

159. As the CEO and Director of JGH, Brown had a fiduciary duty to act in the best interest JGH and its shareholders.

160. Plaintiff is informed and believes, and on that basis alleges, that Brown breached his fiduciary duties by:

a. failing to pay JGH's FET obligations;

b. transferring the revenue and profits of JGH to other entities or his personal accounts;

c. taking out loans from JGH for improper and personal purposes without adequate documentation;

d. taking excessive and exorbitant commissions, salaries, and bonuses, including after the sales of chartered flights or for aircraft sales;

e. making undocumented loans to other entities controlled by Brown, believed to include but perhaps not be limited to JGFH, C3 Jets, Bowman Aviation, Jet Agency Global, and C3 Limo; and

f. transferring, licensing or otherwise monetizing the JGH Platform to other entities controlled by Brown for the benefit of those other persons or entities and to the detriment of JGH and its shareholders.

161. As a direct and proximate result of the acts alleged above, Plaintiff has suffered damage, plus interest thereon, according to proof at trial.

162. In doing the acts alleged in this Cause of Action, Brown acted with oppression, fraud, malice and in conscious disregard of Plaintiff's rights. As a result, to the Court should award punitive damages according to proof at the time of trial.

## FIFTH CAUSE OF ACTION

**Breach of Contract**

**(Against JGH and Brown)**

163. Plaintiff incorporates by reference each and every allegation contained in each paragraph above and below as though the same were set forth in full herein.

164. The Letter Agreement is a valid and enforceable contract.

165. Plaintiff fully performed under the terms of the Letter Agreement, or performance was excused.

166. JGH and Brown breached the Letter Agreement by:

a. creating securities in an entity other than a wholly-owned subsidiary, other than a company or joint venture established with one or more partners for the primary purpose of owning and operating aircraft without Plaintiff's written permission;

b. loaning money to or accepting loans from a shareholder;

c. failing to make a lump sum payment to Plaintiff after the occurrence of a corporate event as defined in Section 4 of the Letter Agreement;

d. failing to collect and hold revenue in a separate bank account dedicated towards all applicable FET; and

e. failing to continue to work towards a settlement with the IRS for FET that would avoid the personal liability of Plaintiff.

167. As a direct and proximate result of the breaches of the Letter Agreement, Plaintiff has been damaged in an amount to be proven at time of trial and is entitled to all reasonable attorneys' fees, expenses, and costs incurred pursuant to the Letter Agreement.

## SIXTH CAUSE OF ACTION

**Fraud**

**(Against Brown)**

168. Plaintiff incorporates by reference each and every allegation contained in

each paragraph above and below as though the same were set forth in full herein.

169. Brown made intentionally false statements to Plaintiff to consolidate his control over JGH.

170. Brown made these statements in order to obtain Plaintiff's agreement to fundamentally change the ownership structure and management of JGH. Plaintiff was concerned that Brown may take advantage of his position to act to his benefit and to the detriment of Plaintiff.

171. Brown made false statements intending to address Plaintiff's concerns and convince him to sign the Letter Agreement. Brown's false statements to Plaintiff included saying:

- "Just trust me."
- "Don't worry about it."
- "Why are we wasting time with lawyers negotiating this, there is no reason to worry."
- "I won't do those things," specifically, avoid paying FET, form entities or transfer assets or money out of JGH.

172. On information and belief, at the time Brown made his statements, he knew they were false and Brown never intended to abide by his assurances and promises to Plaintiff, including to ensure that the FET was paid, that he would protect the assets of JGH to serve the interests of JGH's other shareholders, or otherwise act in JGH's best interests.

173. Brown made his statements with the intention of consolidating his control of JGH and intended to induce Plaintiff's reliance to agree to such terms.

174. Plaintiff reasonably relied on Brown's statements that he would do as promised, including that he would take all appropriate measures to pay the FET, protect JGH's assets, and serve the interest of JGH's other shareholders. As a consequence, Brown obtained Plaintiff's consent based on such reliance.

175. As a result of Brown's fraudulent statements, Plaintiff has been damaged

in an amount to be proven at trial.

176. In doing the acts alleged in this Cause of Action, Brown acted with oppression, fraud, malice and in conscious disregard of Plaintiff's rights. As a result, to the Court should award punitive damages according to proof at the time of trial.

**SEVENTH CAUSE OF ACTION**

**California Corporations Code § 316(a)**

**(Plaintiff, Derivatively on Behalf of JGH, Against Brown)**

177. Plaintiff incorporates by reference each and every allegation contained in each paragraph above and below as though the same were set forth in full herein.

178. Brown made corporate distributions to himself that violated California Corporations Code section 500(a).

179. Brown authorized loans that violate California Corporations Code section 315(a).

180. Due to Brown's unlawful conduct, JGH is entitled to recover the amount of the illegal distributions or, to the extent Brown improperly transferred JGH's property, including the JGH Platform, the fair market value of that property at the time of the illegal distribution, plus interest thereon from the date of the distribution at the legal rate on judgments until paid, together with all reasonably incurred costs of appraisal or other valuation, if any, of that property or loss suffered by the corporation.

**EIGHTH CAUSE OF ACTION**

**Aiding and Abetting Breach of Fiduciary Duty**

**(Plaintiff, Derivatively on Behalf of JGH, Against the Alter Egos & C3 Limo)**

181. Plaintiff incorporates by reference each and every allegation contained in each paragraph above and below as though the same were set forth in full herein.

182. By the acts described herein, Brown breached his fiduciary duties to JGH.

183. Plaintiff is informed and believes, and on that basis alleges, that the Alter Egos had actual knowledge of the fiduciary duties owed by Brown to JGH and its shareholders.

184. Plaintiff is informed and believes, and on that basis alleges, that the Alter Egos substantially assisted and encouraged Brown's breach of fiduciary duties by taking out undocumented loans that benefited the Alter Egos, misappropriating and using JGH assets, misappropriating and using the JGH Software, and receiving cash payments that would never be returned to JGH that were used by the Alter Egos for purposes unrelated to the operations of JGH.

185. The Alter Egos's conduct was a substantial factor in causing harm to Plaintiff.

## NINTH CAUSE OF ACTION

**Conspiracy to Breach Fiduciary Duty**

**(Plaintiff, Derivatively on Behalf of JGH, Against Brown, the Alter Egos & C3 Limo)**

186. Plaintiff incorporates by reference each and every allegation contained in each paragraph above and below as though the same were set forth in full herein.

187. Brown, the Alter Egos, and C3 Limo had a common purpose and design to benefit by the breach of Brown's fiduciary duties to JGH.

188. Plaintiff is informed and believes, and on that basis alleges, that collectively, Brown, the Alter Egos, and C3 Limo agreed to and acted in concert to achieve an unlawful plan of benefiting from the breach of Brown's fiduciary duties to JGH.

189. Plaintiff is informed and believes, and on that basis alleges, that Brown, the Alter Egos, and C3 Limo intentionally acted and achieved this plan by comingling funds, accepting and using the JGH Software, and accepting undocumented loans from Brown.

190. As a result of the conspiracy, Brown, the Alter Egos, and C3 Limo are all liable for Brown's breaches of his fiduciary duties.

191. As a direct and proximate result of the acts alleged above, Plaintiff has suffered damage, plus interest thereon, according to proof at trial.

192. In doing the acts alleged in this Cause of Action, Brown, the Alter Egos, and C3 Limo acted with oppression, fraud, malice and in conscious disregard of Plaintiff's rights. As a result, to the Court should award punitive damages according to proof at the time of trial.

**TENTH CAUSE OF ACTION**

**Unjust Enrichment**

**(Plaintiff, Derivatively on Behalf of JGH, Against Brown)**

193. Plaintiff incorporates by reference each and every allegation contained in each paragraph above and below as though the same were set forth in full herein.

194. Brown accepted money in the form of JGH assets, unauthorized commissions and loans that have not been repaid to JGH.

195. It would be inequitable for Brown to retain these assets without any compensation to JGH.

196. Justice requires JGH receive the value that Brown has taken from JGH at an amount to be proven at trial.

**ELEVENTH CAUSE OF ACTION**

**Quasi-Contract/Promissory Estoppel**

**(Against Brown)**

197. Plaintiff incorporates by reference each and every allegation contained in each paragraph above and below as though the same were set forth in full herein.

198. Brown made promises to Plaintiff that were clear and unambiguous in their terms. Brown promised that if Plaintiff entered into the Letter Agreement and ceded control of JGH to Brown, that Brown would ensure that JGH would handle payment of the FET obligations, not transfer JGH's assets to other entities, and act in the best interests of JGH's shareholders, including Plaintiff.

199. In reliance on Brown's promises, Plaintiff signed the Letter Agreement and otherwise agreed to Brown's demands to control JGH as CEO and sole director.

200. Plaintiff's reliance was both reasonable and foreseeable. In fact, Brown

encouraged and induced that reliance and repeatedly assured Plaintiff that Brown was both capable of addressing the business issues that were the subject of his promises, but also that it would be to Plaintiff's benefit in doing so.

201. Plaintiff has been injured by his reliance on Brown's promises. Plaintiff has been assessed personal liability of $1.3 million in FET that Brown promised he would accept responsibility for paying and has been denied payments to which he was otherwise entitled, and denied other entitlements to which he is entitled.

202. As a direct and proximate result of Brown's acts and failures to act, Plaintiff has been injured in an amount to be proven at time of trial, which sum exceeds the jurisdictional amount of this Court.

**TWELFTH CAUSE OF ACTION**

**Conversion**

**(Plaintiff, Derivatively on Behalf of JGH, Against Brown)**

203. Plaintiff incorporates by reference each and every allegation contained in each paragraph above and below as though the same were set forth in full herein.

204. JGH owned the cash, money, revenue or other assets that was in the possession of or received by JGH.

205. Plaintiff is informed and believes, and on that basis alleges, that Brown converted JGH's cash, money, revenue or other assets by:

a. keeping revenue that should have been used to pay FET;

b. transferring the revenue and profits of JGH to other entities or his personal accounts;

c. taking out loans from the company for personal purposes;

d. taking excessive and exorbitant commissions, salaries, and bonuses, including after the sales of chartered flights or for aircraft sales; and

e. transferring, licensing or otherwise monetizing the JGH Platform to other entities controlled by Brown.

206. As a direct and proximate result of Brown's acts and failures to act,

Plaintiff has been injured in an amount to be proven at time of trial.

**THIRTEENTH CAUSE OF ACTION**

**Conspiracy to Commit Conversion**

**(Plaintiff, Derivatively on Behalf of JGH, Against Brown, the Alter Egos & C3 Limo)**

207. Plaintiff incorporates by reference each and every allegation contained in each paragraph above and below as though the same were set forth in full herein.

208. Plaintiff is informed and believes, and on that basis alleges, that Brown, the Alter Egos, and C3 Limo had a common purpose and design to benefit by converting JGH's assets.

209. Plaintiff is informed and believes, and on that basis alleges, that collectively, Brown, the Alter Egos, and C3 Limo agreed to and acted in concert to achieve an unlawful plan of converting JGH's assets.

210. Plaintiff is informed and believes, and on that basis alleges, that Brown, the Alter Egos, and C3 Limo achieved this plan by transferring assets, through multiple mechanisms, from JGH to themselves.

211. As a result of the conspiracy, Brown, the Alter Egos, and C3 Limo are all liable for the conversion of JGH's assets.

**FOURTEENTH CAUSE OF ACTION**

**Money Had and Received**

**(Plaintiff, Derivatively on Behalf of JGH, Against Brown, the Alter Egos & C3 Limo)**

212. Plaintiff incorporates by reference each and every allegation contained in each paragraph above and below as though the same were set forth in full herein.

213. As described herein, Brown, the Alter Egos and C3 Limo have received money which belongs to JGH.

214. Brown, the Alter Egos, and C3 Limo have not used these moneys for the benefit of JGH.

215. As a direct and proximate result of the acts alleged above, JGH has suffered damage, plus interest thereon, according to proof at trial.

**FIFTEENTH CAUSE OF ACTION**

**California Penal Code § 502**

**(Against Brown)**

216. Plaintiff incorporates by reference each and every allegation contained in each paragraph above and below as though the same were set forth in full herein.

217. California Penal Code, Section 502 states: any person who commits any of the following acts is guilty of a public offense: (1) Knowingly accesses and without permission alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data. (2) Knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network.

218. California Penal Code § 502(e) permits a private civil action by the owner of any computer, computer system, or other data who suffers loss by reason of a violation of section 502

219. Plaintiff was and is the rightful owner of his cell phone, which is a mobile device, including all data contained therein, which is a "computer system" as defined in California Penal Code section 502(b).

220. Brown knowingly accessed and used Plaintiff's cell phone and the data contained therein.

221. Brown knowingly used the computer systems on Plaintiff's cell phone.

222. Brown knowingly caused the disruption of the computer services on Plaintiff's cell phone.

223. Plaintiff is entitled to injunctive or other equitable relief as a result of

these Penal Code violations. Further, any computer, computer network, computer system, or any software or data owned by Brown that is used in the commission of a public offense, or any computer impermissibly used as a repository for the storage of software or data illegally obtained in violation of Penal Code section 502 shall be subject to forfeiture.

224. By accessing and using Plaintiff's cell phone and the computer systems on the cell phone, Brown acted with oppression, fraud, or malice.

225. Due to Brown's conduct, Plaintiff is entitled to compensatory damages, punitive damages, injunctive relief and other equitable relief.

226. Penal Code section 502 also entitles Plaintiff to reasonable attorneys' fees.

## SIXTEENTH CAUSE OF ACTION

### Intentional Infliction of Emotional Distress

### (Against Brown)

227. Plaintiff incorporates by reference each and every allegation contained in each paragraph above and below as though the same were set forth in full herein.

228. Brown's conduct of convincing Plaintiff's cell phone carrier to transfer the cell phone account to a different phone in his possession was extreme and outrageous.

229. Brown's conduct of contacting Plaintiff's attorney and impersonating Plaintiff for the purpose of deceptively engaging in legal discussions with that attorney was extreme and outrageous.

230. Brown's conduct of contacting Plaintiff's friends, relatives, and colleagues and impersonating Plaintiff and engaging in personal discussions was extreme and outrageous.

231. In engaging in the above conduct, Brown intended to cause Plaintiff extreme emotional distress or recklessly disregarded the probability of causing Plaintiff extreme emotional distress.

232. After Brown's conduct, Plaintiff suffered extreme emotional distress.

233. In the above conduct, Brown acted with oppression, fraud, or malice.

234. Brown's conduct was a substantial factor in causing Plaintiff's extreme emotional distress.

**SEVENTEENTH CAUSE OF ACTION**

**Intrusion into Private Affairs**

**(Against Brown)**

235. Plaintiff incorporates by reference each and every allegation contained in each paragraph above and below as though the same were set forth in full herein.

236. Plaintiff had a reasonable expectation of privacy in the information on his cell phone.

237. Brown intentionally intruded into Plaintiff's cell phone.

238. Brown's intrusion into Plaintiff's cell phone would be highly offensive to a reasonable person.

239. As a result of Brown's conduct, Plaintiff has been harmed in an amount to be proven at trial.

240. In the above conduct, Brown acted with oppression, fraud, or malice.

241. Brown's conduct was a substantial factor in causing Plaintiff's harm.

**EIGHTEENTH CAUSE OF ACTION**

**Accounting**

**(Against Brown and JGH and the Alter Egos)**

242. Plaintiff incorporates by reference each and every allegation contained in each paragraph above and below as though the same were set forth in full herein.

243. A relationship exists between Plaintiff and Brown by virtue of Plaintiff being a shareholder in JGH.

244. By virtue of Brown's relationship with the Alter Egos, Plaintiff has a relationship with the Alter Egos that requires an accounting.

245. The accounts and assets of JGH and the Alter Egos are so complicated

that an ordinary action demanding a fixed sum is impracticable.

**NINETEENTH CAUSE OF ACTION**

**Declaratory Relief**

**(Against Brown and JGH and the Alter Egos)**

246. Plaintiff incorporates by reference each and every allegation contained in each paragraph above and below as though the same were set forth in full herein.

247. An actual controversy has arisen and now exists between the parties as to the operations of JGH, including with respect to the rights of shareholders, obligations of the company owed to directors and officers, and the use of company funds, distributions, Board management, and the present status or use or ownership of the JGH Platform.

248. A judicial declaration is necessary and appropriate at this time so Plaintiff may enforce his rights.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

a. For actual damages according to proof;

b. For special damages according to proof;

c. For punitive damages;

d. For restitution and/or disgorgement of ill-gotten gains;

e. For an accounting;

f. For interest at the maximum legally permissible rate;

g. For a judicial declaration that;

   i. The Alter Egos are a single enterprise and there is no distinction among or between them; and

   ii. The Alter Egos are the alter ego of Brown, and there is no distinction or separateness between the Alter Egos and Brown;

h. For all appropriate injunctive relief;

i. For interest at the maximum legally permissible rate;

j. For attorneys' fees and costs of suit incurred herein; and

k. For such other and further relief as the Court deems just and proper.

DATED: August 21, 2023

PROCOPIO, CORY, HARGREAVES & SAVITCH LLP

By: */s/Sean M. Sullivan*
Sean M. Sullivan
Justin M. Martin
Attorneys for Plaintiff
Aaron Stanz

## JURY DEMAND

Pursuant to the Federal Rules of Civil Procedure, Rule 38(b), and Civ.LR 38.1, Plaintiff requests a trial by jury on all claims and issues raised in the Complaint which are so triable.

DATED: August 21, 2023

PROCOPIO, CORY, HARGREAVES & SAVITCH LLP

By: */s/Sean M. Sullivan*
Sean M. Sullivan
Justin M. Martin
Attorneys for Plaintiff
Aaron Stanz

**VERIFICATION**

I, Aaron "Angel" Stanz, declare as follows:

I am an individual and a shareholder of Jet Genius Holdings, Inc., Plaintiff to this action, and I make this verification in that capacity. I have read the foregoing Second Amended Complaint, and I know its contents. I am informed and believe that the matters stated in the foregoing Second Amended Complaint are true.

I declare under the penalty of perjury, under the laws of the United States, that the foregoing is true and correct.

Executed on August 21, 2023, at Derby, Kansas.

DocuSigned by:
Aaron Stanz
CD40856DA3A94B9...

Aaron "Angel" Stanz