November 7, 2018

Aaron Stanz
Via E-mail

Dear Aaron:

This letter agreement (this "Agreement") confirms the following agreements by between you and Jet Genius Holdings, Inc., a California corporation (the "Company"):

1. **Contribution of Stock to the Company**. You and the Company acknowledge that immediately prior to giving effect to the transactions contemplated hereby, you held 2,445,000 shares of the common stock of the Company, free and clear of any liens or encumbrances. You hereby contribute 1,485,385 shares of the common stock held by you back to the Company for no consideration. As a result of the foregoing, you hold 959,615 shares of the common stock of the Company. You agree that you will not transfer such shares (a) to a direct competitor of the Company or (b) to any third party without first providing the Company written notice and a 30 day right of first refusal (which the Company may assign to one or more stockholder or investors); provided, however, that the foregoing transfer restrictions shall not apply to a transfer in connection with a Corporate Event (as defined below). In the event of any transfer to a third party pursuant to the foregoing clause (b), the transferee must agree to the foregoing transfer restrictions and must execute any agreement among the Company's shareholders (covering things such as additional restrictions on transfer, lockups, drag-along, and the like) but will not be entitled to any of your rights or benefits under this Agreement.

| | Initial Shares Held | % | | Shares Held After Stanz Contrib. | % |
|---|---|---|---|---|---|
| Jordan Brown | 2,445,000 | 49.5% | | 2,445,000 | 63.7% |
| Aaron Stanz | 2,445,000 | 49.5% | | 959,615 | 25.0% |
| Alexander Wolf | 50,000 | 1.0% | | 50,000 | 1.3% |
| Incentive Plan | - | 0.0% | | 383,846 | 10.0% |
| TOTAL | 4,940,000 | 100.0% | | 3,838,461 | 100.0% |

2. **Required Approval**. The Company will refrain from taking any of the following actions without your prior written consent:

   a. reserve or issue greater than 383,846 shares of the common stock of the Company pursuant to an equity incentive plan;

b. authorize or issue additional shares of common stock or any other class or series of capital stock in the Company, other than shares issued to investors in a bona fide financing conducted to raise capital at a share price based on a pre-money valuation of at least $5,000,000 (a "Qualified Financing");

c. amend the Company's Articles of Incorporation or bylaws in a way that adversely affects the rights, preferences or privileges of the common stock of the Company; provided, that an amendment to authorize capital stock to be issued to investors in a Qualified Financing (i.e., at a share price based on a pre-money valuation of at least $5,000,000) shall not be deemed adverse to the common stock even if such newly authorized stock has preferences or privileges senior to the common stock;

*d.* create or hold securities in an entity other than a wholly-owned subsidiary, other than a company or joint venture established with one or more partners for the primary purpose of owning and operating aircraft*;*

e. loan money to or accept loans from a shareholder or its assigns; or

f. amend this Agreement, terminate this Agreement without Cause (as defined below), or take corporate action intended to circumvent or adversely affect your rights pursuant to this Agreement.

3. **Voting Agreement**. Upon request by Jordan Brown, you will cast your vote as a director and/or shareholder, as applicable, to (i) remove Alexander Wolf as a director; (ii) resign as a director; (iii) elect as director(s) any individual(s) designated by Jordan Brown; and (iv) approve, and waive any dissenter or appraisal rights in connection with, any Corporate Event approved by the Company's Board of Directors so long as you receive the payment specified in Section 4 in connection with such Corporate Event.

4. **Corporate Event Payment**. Upon the closing of a Corporate Event on or before November 1, 2023, the Company will make a lump sum payment to you in accordance with the following:

| <u>Closing Date of Corporate Event</u> | <u>Payment Amount</u> |
|---|---:|
| Date of this Agreement – November 1, 2019 | $909,451.00 |
| November 2, 2019 – November 1, 2020 | $727,561.00 |
| November 2, 2020 – November 1, 2021 | $545,671.00 |
| November 2, 2021 – November 1, 2022 | $363,780.00 |
| November 2, 2022 – November 1, 2023 | $181,890.00 |
| On or after November 2, 2023 | $0.00 |

"Corporate Event" means (i) the consummation of a merger or consolidation of the Company with or into another entity or (ii) the sale, transfer, or exclusive license of significant assets of the Company outside the ordinary course of business, in whole or in part, including but not limited to its developed technology (such as desktop applications, web applications, mobile applications, backend applications, machine-learning applications and database structures), and data derived from or contributed to the Company (such as client data, pricing data, inventory data, industry directory data, aircraft data, company performance data, and other data

contributing to Company revenue generation). The foregoing notwithstanding, a merger or consolidation of the Company shall not constitute a "Change in Control" if immediately after such merger or consolidation a majority of the voting power of the capital stock of the continuing or surviving entity, or any direct or indirect parent corporation of such continuing or surviving entity, will be owned by the persons who were the Company's shareholders immediately prior to such merger or consolidation in substantially the same proportions as their ownership of the voting power of the Company's capital stock immediately prior to such merger or consolidation. In no event shall a Qualified Financing constitute a Change in Control.

5. **Personal Property**. In the event that the Company purchased all or a portion of any items of personal property that are in your possession as of the date of this Agreement, such items are hereby deemed your personal property subject to any applicable withholding taxes and other deductions. For clarity, the foregoing does not include intangible or intellectual property or the Tesla Model X that you are currently using (the "Company Car").

6. **Excise Taxes**. As the Company receives revenue subject to federal excise taxes, the Company will estimate in good faith the amount of federal excise taxes anticipated to be due on such revenue and will hold such estimated tax amount in a separate bank account. Funds from such account will only be used to pay federal excise taxes. The Company will continue to work toward a settlement with the IRS related to past excise taxes that avoids personal liability of the Company's past and current officers and directors in connection therewith.

7. **Employment**. You will continue to provide services as an employee of the Company on an "at will" basis, subject to the terms and conditions set forth herein. Such services are described in more detail on Exhibit A hereto. Your initial title will be Chief Technology Officer, and you will report to the Company's Chief Executive Officer. While you render services to the Company, you will not engage in any other employment, consulting or other business activity (whether full-time or part-time) in the charter aircraft brokering industry that would create a conflict of interest with the Company. By signing this Agreement, you confirm to the Company that you have no contractual commitments or other legal obligations that would prohibit you from performing your duties for the Company.

8. **Cash Compensation**. As consideration for your employment, the Company will pay you a salary at the rate of $75,000 per year, payable in accordance with the Company's standard payroll schedule. This salary will be subject to any applicable withholding taxes and other deductions.

9. **Employee Benefits**. As further consideration for your employment, you will be entitled to the following benefits, in each case subject to any applicable withholding taxes and other deductions:

    a. medical insurance benefits through the Company's insurance plan (at the current rate of benefit in effect as of the date of this Agreement), so long as you remain eligible pursuant to the terms of such plan, and if you are not eligible pursuant to the terms of such plan then the Company will pay you the amount it would have paid on your behalf under such plan;

b. car allowance of $2,000 per month, applied directly to the lease and expenses related to the Company Car (or, after expiration of such lease, applied directly to the lease and expenses related to a comparable car), where "expenses" include but are not limited to repair, maintenance, insurance and state registration fees, and if the Company is not able to enter into a new lease for a comparable car then the Company will pay the car allowance directly to you;

c. phone hardware allowance to purchase or lease a top tier Apple phone selected by you on or after September 2019 and each two years thereafter, and which you may retain following any termination of your employment;

d. phone service allowance for calling and unlimited data plan;

e. laptop allowance to purchase a top tier Macbook Pro with premium display size, memory, CPU, GPU, storage and peripherals options selected by you on or after the date of this Agreement and each two years thereafter, and which you may retain following any termination of your employment (provided that any Company information stored in your laptop has been returned to the Company and then permanently deleted from such laptop);

f. paid vacation day on each Wednesday that (i) is within 2 days of July 4th (e.g., July 3, 2019, July 6, 2022, and July 5, 2023), (ii) is the day before Thanksgiving, (iii) falls between December 22 and January 7, (iv) falls on your birthday (i.e. April 5); (v) is selected by you after at least 2 weeks' e-mail notice to the Company (not to exceed 4 Wednesdays per year under subsection (v)); or (vi) you notify the Company you need to attend to emergency medical care for a family member or domestic partner (each a "Wednesday Vacation Day");

g. 4 weeks of paid bereavement leave (for clarity, meaning 4 calendar weeks, which would include 4 Wednesday, and not meaning 28 Wednesdays) following a death of any of your immediate family members or your domestic partner ("Bereavement Leave"); and

h. continued payment of premiums for the life insurance policy that the Company currently maintains for your benefit.

10. **Severance Benefits**. If the Company terminates your employment for any reason other than Cause or you become medically disabled, and you have returned all Company property in your possession (other than your phone and laptop, provided that any Company information stored in your laptop has been returned to the Company and then permanently deleted from such laptop) and executed a general release of all claims that you may have against the Company or persons affiliated with the Company, then you will be entitled to the following benefits:

a. The Company will continue to pay your base salary after your separation through November 1, 2023. Your base salary will be paid at the rate in effect at the time of your separation and in accordance with the Company's standard payroll procedures. For purposes of Section 409(A) of the Internal Revenue Code of 1986, as amended (the "Code"), each salary continuation payment under this Subsection (a) is hereby

designated as a separate payment. If the Company determines that you are a "specified employee" under Section 409A(a)(2)(B)(i) of the Code at the time of your separation, then (i) the salary continuation payments under this Subsection (a), to the extent not exempt from Section 409A of the Code, will commence on the earliest practicable date that occurs more than six months after your separation and (ii) the installments that otherwise would have been paid during the first six months after your separation will be paid in a lump sum on the first day of the seventh month after your separation. The amount of the salary continuation payments under this Subsection (a) will be reduced by the amount of any severance pay or pay in lieu of notice that you receive from the Company under a federal or state statute (including, without limitation, the WARN Act).

b. If you elect to continue your health insurance coverage under the Consolidated Omnibus Budget Reconciliation Act ("COBRA") following your separation, then the Company will pay the same portion of your monthly premium under COBRA as it pays for active employees until the earliest of (i) the five year anniversary of this Agreement, (ii) the expiration of your continuation coverage under COBRA or (iii) the date when you become eligible for substantially equivalent health insurance coverage in connection with new employment or self-employment.

"Cause" means (a) your unauthorized use or disclosure of the Company's confidential information or trade secrets, (b) your material breach of any agreement between you and the Company, (c) your material failure to comply with the Company's written policies or rules, (d) your conviction of, or your plea of "guilty" or "no contest" to, a felony under the laws of the United States or any State, (e) your gross negligence or willful misconduct, (f) your continuing failure to perform assigned duties after receiving written notification of the failure from the Company's Board of Directors and a reasonable opportunity to cure the failure following such notification or (g) your failure to cooperate in good faith with a governmental or internal investigation of the Company or its directors, officers or employees, if the Company has requested your cooperation; provided, however, that in no event will obligations or judgments related to the Company's excise tax obligations be deemed "Cause" for any purpose under this Section 10 or otherwise.

11. **Proprietary Information and Inventions Agreement**. You will, as a condition of your employment with the Company, sign a Proprietary Information and Inventions Agreement, a copy of which is attached hereto as Exhibit B.

12. **Employment Relationship**. Employment with the Company is for no specific period of time. Your employment with the Company will be "at will," meaning that either you or the Company may terminate your employment (including any post-termination obligations pursuant to Sections 7-9) at any time and for any reason, with or without Cause (subject to the severance benefits described in Section 10 for a termination by the Company without Cause). Any contrary representations that may have been made to you are superseded by this letter agreement. This is the full and complete agreement between you and the Company on this term. Although your job duties, title, compensation and benefits, as well as the Company's personnel policies and procedures, may change from time to time, the "at will" nature of your employment may only be changed in an express written agreement signed by you and a duly authorized officer of the Company (other than you).

13. **Taxes**. All forms of compensation referred to in this letter agreement are subject to reduction to reflect applicable withholding and payroll taxes and other deductions required by law. You agree that the Company does not have a duty to design its compensation policies in a manner that minimizes your tax liabilities, and you will not make any claim against the Company or its officers or directors related to tax liabilities arising from your compensation.

14. **Interpretation and Enforcement**. This Agreement and the Proprietary Information and Inventions Agreement constitute the complete agreement between you and the Company, contain all of the terms of your employment with the Company and supersede any prior agreements, representations or understandings (whether written, oral or implied) between you and the Company. This Agreement and the resolution of any disputes as to the meaning, effect, performance or validity of this Agreement or arising out of, related to, or in any way connected with, this Agreement, your employment with the Company or any other relationship between you and the Company (the "Disputes") will be governed by California law, without regard to application of its laws relating to conflicts or choice of law, and you and the Company agree to venue in any state or federal court located in San Diego, California. If one or more provisions of this Agreement are held to be illegal or unenforceable under applicable law, such illegal or unenforceable portion(s) shall be limited or excluded from this Agreement to the minimum extent required so that this Agreement shall otherwise remain in full force and effect and enforceable in accordance with its terms. If any party to this Agreement seeks to enforce its rights under this Agreement by legal proceedings, the non-prevailing party shall pay all costs and expenses incurred by the prevailing party, including, without limitation, all reasonable attorneys' fees.

15. **Advice of Counsel**. You acknowledge that, in executing this Agreement, you have been advised by your own counsel, or you have had the opportunity to seek the advice of independent legal counsel, and you have read and understood all of the terms and provisions of this Agreement.

16. **Binding on Successors**. The parties agree that this Agreement shall be binding on, and inure to the benefit of his or its successors, heirs and/or assigns.

17. **Good Faith**. The parties agree to do all things necessary and to execute all further documents necessary and appropriate to carry out and effectuate the terms and purposes of this Agreement.

18. **Counterparts**. This Agreement may be executed in counterparts and shall be binding on all parties when each has signed either an original or copy of this Agreement by hand or by electronic signature.

Sincerely,
**Jet Genius Holdings, Inc.**

By:______________________________
Jordan Brown, Chief Executive Officer

AGREED AND ACCEPTED:

______________________________
Aaron Stanz

EXHIBIT A
EMPLOYMENT AND SUPPORT DUTIES

Your regular course employment duties will include the following, to be performed at the Company's main office during the Company's regular working hours on Wednesdays (other than your Wednesday Vacation Days) and such additional times as you may agree at your discretion (but not as a substitute for your time in the office on Wednesdays other than Wednesday Vacation Days):

- Advise on strategy and implementation of business models, web applications, desktop applications, database structure, data submittal, and data retrieval (API) applications, server infrastructure as related to jet charter brokering, including client-facing applications, staff-facing applications, and analytics thereof.
- Direct design, programming, and development on above listed systems, as needed.
- Management of staff assigned to complete work on the above listed systems.

In addition to the regular course employment duties above, you will provide emergency technical support for the above listed systems by phone, in person, or remotely through electronic connection.

The Company may issue support requests outside of working Wednesdays ("Support Requests") on any day and at any time by at least one of the following methods: (i) at least two calls to your cell phone number with oral communication or voice message indicating "support request"; (ii) both SMS to your cell phone number and e-mail to your Company e-mail address, with such SMS and e-mail indicating "support request"; or (iii) any form of communication between you and Jordan Brown that you both reasonably understand to be a Support Request.

You will use reasonable efforts to respond to each Support Request within one hour and in any event will respond within 24 hours. Any failure to timely respond to a Support Request that was (i) properly issued by the Company in accordance with one of the methods described above, (ii) issued outside of your Wednesday Vacation Days and Bereavement Leave, and (ii) documented in e-mail to you within five days following such failure shall be deemed a "Support Failure". Five or more Support Failures during any twelve month period shall be deemed a material breach of this Agreement constituting Cause.

Without limiting your obligation to timely respond to a Support Request, you will not be required to work on issues identified by Support Requests (i) for greater than eight hours per month, (ii) for greater than one hour between 9:00 am – 6:00 pm on any Monday, Tuesday, Thursday, or Friday, (iii) during a Wednesday Vacation Day, or (iv) during Bereavement Leave, in each case unless otherwise agreed by you. Time working on such issues will include time to discuss the issues and time to strategize, research, implement, and test solutions.

In the event that the Company requests your physical presence at a location greater than 50 miles from the Company's main office to perform your regular course duties or respond to a Support Request, the Company will reimburse travel to such location and return travel to your original destination. If you desire to return to an alternate location, the Company will reimburse you the

lesser of (i) the cost to return to such alternate location and (ii) the amount it would have cost for you to return to your original location.

EXHIBIT B
PROPRIETARY INFORMATION AND INVENTIONS AGREEMENT

(see attached)