Wade Miller Law
Wade A. Miller CBN 208980 5072 Mount Casas Drive San Diego, CA92117

Attorneys for Plaintiff
Aaron Stanz

Sean M. Sullivan (Bar No. 254372)
E-mail: sean.sullivan@procopio.com
Justin M. Martin (Bar No. 329004)
E-mail: justin.martin@procopio.com
PROCOPIO, CORY, HARGREAVES & SAVITCH LLP
525 B Street, Suite 2200
San Diego, CA 92101
Telephone: 619.238.1900
Facsimile: 619.235.0398

Attorneys for Plaintiff
Aaron Stanz

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

**Plaintiff Aaron Stanz, individually and on behalf of Jet Genius Holdings, Inc. and Jet Genius Florida Holdings, Inc. as a shareholder,**

**Plaintiff,**

**v.**

**Defendants Jordan Brown (individually and in his capacity as CEO, Director, and Chairman of co-defendants Jet Genius Holdings, Inc. and Jet Genius Florida Holdings, Inc.), Jet Genius Holdings, Inc., Jet Genius Florida Holdings, Inc., CSjets LLC, Bowman Aviation, Inc., Jet Agency Global LLC, C3 Limo LLC, Brown Family Trust, and Does 1-20,**

**Defendants.**

**Case No. 3:22-cv-01164-GPC-JLB**

**First Amended Complaint for Injunctive Relief and Damages for Violation of the Racketeer Influenced and Corrupt Organization Act, Defend Trade Secrets Act of 2016, California Uniform Trade Secrets Act, Breach of Contract, Breach of Fiduciary Duty, Fraud, Conspiracy, Accounting, Unjust Enrichment, Equitable Indemnity**

~~FIRST AMENDED COMPLAINT OF PLAINTIFF AARON STANZ~~

~~**NOW COMES,** Plaintiff Aaron Stanz ("Plaintiff"), individually and on behalf of Jet Genius Holdings, Inc. and Jet Genius Florida Holdings, Inc. as a shareholder, by and through his undersigned counsel, and hereby files this First Amended Complaint pursuant to F.R.C.P. 15 and alleges causes of action against Defendants Jordan Brown (individually and in his capacities as CEO, Director, and Chairman of both of co-defendants Jet Genius Holdings, Inc. and Jet Genius~~

| | |
|---|---|
| ~~Florida Holdings, Inc.), Jet Genius Holdings, Inc.,~~ Jet Genius Florida Holdings, Inc.~~, C3jets LLC, Bowman Aviation, Inc., Jet Agency Global LLC, C3 Limo LLC, Brown Family Trust, and Does 1-20 (collectively, "Defendants"), and in support thereof avers as follows:~~ Plaintiff AARON STANZ, individually and derivatively on behalf of Jet Genius Holdings, Inc.,<br><br>Plaintiff,<br><br>v.<br><br>Defendants JORDAN BROWN; JET GENIUS HOLDINGS, INC.; JET GENIUS FLORIDA HOLDINGS, IND.; C3JETS LLC; BOWMAN AVIATION, INC.; JET AGENCY GLOBAL, LLC; C3 LIMO LLC; JETCHARTER.COM LLC; and DOES 1-20,<br><br>Defendants,<br><br>and<br><br>JET GENIUS HOLDINGS, INC.,<br><br>Nominal Defendant. | Case No. 3:22-cv-01164-GPC-JLB<br><br>**VERIFIED SECOND AMENDED COMPLAINT**<br><br>**JURY DEMAND** |
| AND RELATED COUNTERCLAIM | |

## INTRODUCTION

~~1. This action stems from a years-long business relationship in companies~~

in the private aviation industry between the Plaintiff and Defendants, which through Defendant Jordan Brown's greed and illegal actions devolved into a coordinated scheme orchestrated by Defendant Jordan Brown to siphon off the assets of the companies and defraud its clients, whilst ignoring its tax obligations and enriching Defendant Jordan Brown personally with millions of dollars. This scheme misappropriated the intellectual property which rightfully belonged to the company Plaintiff co-founded and rightfully owns 49.5% of, which enabled Defendant Jordan Brown to create an enterprise which misdirected over $125,000,000 in revenue from Plaintiffs company. Defendant Jordan Brown fraudulently directed the assets and revenue to support his lavish lifestyle under a scheme where the enterprise defrauded its clients by charging them for more than $5,000,000 in taxes which were illegally kept for the enterprise instead of remitting to the Internal Revenue Service as required by law. Defendant Jordan Brown oversaw this scheme to expand this enterprise into new ventures while severely indebting the company he and Plaintiff co-founded with millions of dollars of unpaid taxes owed to the Internal Revenue Service, including nearly $1,300,000 which it has individually assessed against Plaintiff.

2. The company Plaintiff co-founded with Defendant Jordan Brown ("Brown" or "Defendant Brown"), Defendant Jet Genius Holdings, Inc., was independently valued by Defendants' own professionals at approximately $67,000,000. Plaintiff first learned there might be unremitted taxes during events leading up to a failed attempt by the shareholders to wrest control of the business from Brown. Through intimidation and under duress from Brown's threats to destroy Plaintiffs company, and Plaintiffs fear of Brown's volatile temper, Plaintiff was fraudulently induced into an agreement to surrender his Board oversight, remove his rights as a shareholder, and reduce his equitable shareholdings and years long efforts in his own company.

3. Plaintiff was fraudulently induced to surrender these rights through a

series of false promises and a contract from Defendants Jet Genius Holdings, Inc. and Brown where they falsely agreed to implement corporate controls and good faith efforts to segregate funds for owed taxes and begin payment towards millions of dollars already owed to the Internal Revenue Service ("IRS") for unpaid Federal Excise Tax ("FET"). Defendants Jet Genius Holdings, Inc. and Brown instead took the opportunity, after fraudulently inducing the Plaintiff to agree, to cancel a financial audit in progress, ignore the FET, and disregard the required corporate formalities and oversight for a properly re-constituted Board comprised of three Directors as required by California law.

4. This unilaterally enabled Brown to wrongfully take invalid sole control of the Board, and he used this position to direct the breach of agreements, establishment of unauthorized subsidiaries and new companies, approval of self-dealing contracts, misappropriation of trade secrets and intellectual property, and orchestration of an elaborate enterprise scheme to defraud the clients and business partners of the company. This scheme grew to over $5,000,000 collected for FET over the course of several years through contracts and charges which the clients and business partners of the business were falsely informed was for remittance to IRS, when in reality it was unlawfully invested into the enterprise.

5. This scheme enabled Defendant Brown to take at least $1,000,000 in base salary, millions of dollars in additional commissions on client bookings, an additional $2,000,000 in disproportionate "distributions" to Brown only as a shareholder in comparison to $23,500 aggregate to **all** other shareholders, as well as hundreds of thousands of dollars' worth of sham "loans" sent to the businesses in the enterprise designed to benefit Defendant Brown and his family. Brown oversaw this siphoning of millions of dollars for himself and the enterprise while ignoring the past due FET and incurring additional FET, including from charges collected from his own clients' trips which he used to enhance his commissions rather than fulfilling his obligations to remit to IRS as required by Federal law. The Defendants' actions have

now subjected the Plaintiff to imminent irreparable injury.

6. Defendants misappropriated Plaintiffs intellectual property and invalidly set up new companies to evade FET and dilute Plaintiffs shareholder value. Brown, as orchestrator of this enterprise by way of his control over the actions of all Defendants, directed Plaintiffs misappropriated intellectual property to be embedded throughout the enterprise, thus enabling him to defraud his business partners, shareholders, clients, and the Federal Government. The fraudulently charged FET collected from customers - who ultimately may be responsible for FET assessed against purchasers of air travel - was not held in trust for the IRS as required both by law and as fraudulently promised by Defendant Brown and Jet Genius Holdings, Inc. in the agreements they induced Plaintiff to cede his rights under, but instead used by Brown to preside over, fund, and operate the enterprise. This enabled Brown to breach the contractual obligations of the companies, his fiduciary duties to the Plaintiff and fellow shareholders, and pay himself millions of dollars while ignoring requisite corporate formalities, while exploiting his position as Chairman, CEO, and fiduciary of Plaintiff s company to misappropriate its intellectual property and funnel millions of dollars throughout interstate commerce into new companies and holdings controlled by Defendant Brown and his immediate family in the private aviation industry.

7. Brown illegally collected FET for his own benefit and operation of the enterprise, leading to the current imminent irreparable injury faced by the Plaintiff by actions of the IRS which have assessed nearly $1,300,000 against Plaintiff individually. Brown admitted that the IRS's pending actions against the Plaintiff are Brown's own responsibility due to the wrongful and fraudulent actions of the Defendants, and have left Plaintiff with no remedy available other than to seek a Preliminary Injunction in the instant case to force Defendants to cease their criminal actions and misappropriation of Plaintiff s intellectual property, address their FET obligations to the IRS, and to cease their ongoing use of the platform and technology

misappropriated by the Defendants to facilitate their criminal collection of FET from air passengers without remittance to IRS

**PARTIES**

8. Plaintiff is a competent adult and was a citizen of the State of California until March 1, 2022, when he obtained a leasehold in the State of Kansas and now is a resident of the State of Kansas. Plaintiff is the co-founder, Chief Technology Officer, major shareholder, and former Director of JGH, and a major shareholder of JGFH. Plaintiff currently owns 25% of the shares of JGH and JGFH, and is the rightful owner of 49.5% of both JGH and JGFH after being fraudulently induced by Defendants Brown and JGH to relinquish 24.5% of the equity as detailed in the Shareholder Agreement, and he seeks rescission of such relinquishment and enforcement of the valid provisions of the Shareholder Agreement due to Defendants' actions in this matter.

9. Defendant Jet Genius Florida Holdings Inc. ("JGFH") is a company incorporated and with its principal place of business in the State of Florida. JGFH operates throughout the United States in its capacity as an air charter broker to match client travel needs with available air charter operators for commercial purposes in interstate commerce.

1. Plaintiff Aaron "Angel" Stanz ("Plaintiff") and Defendant Jordan Brown ("Brown") are the two primary shareholders of Jet Genius Holdings, Inc. ("JGH"), a private jet charter broker. Plaintiff served as the Chief Technology Officer and had principal responsibility for designing and implementing the software on which JGH operates to connect jet operators with clients. Since 2018, Brown has been JGH's CEO and sole director.

2. While JGH should be a thriving business, Brown's use of the business as his personal piggy bank threatens its collapse. Brown has raided JGH's assets through phony transactions, indefensible self-approved compensation, and wrongful diversion of corporate assets. Brown finances an extravagant lifestyle of exotic vacations, luxury

vehicles, and glamorous fashion by siphoning JGH's revenues. The total amount that Brown has wrongfully extracted from JGH likely exceeds millions of dollars. Brown simply uses JGH funds to maintain his lifestyle.

3. In contrast, Plaintiff has received virtually no shareholder benefits, profits, distributions or dividends.

4. Brown also employs a shell game of entities to avoid paying Plaintiff amounts due to him and to avoid other company obligations. In so doing, Brown disregards nearly all corporate formalities and just shifts assets from one entity to another, all for his personal gain and benefit. Brown uses his shell game to evade liability arising from JGH's business operations. In particular, he seeks to avoid millions in assessed federal excise taxes ("FET") related to chartering aircrafts. Brown has failed to timely and fully pay the FET related to JGH's operations. Instead, he took actions to saddle Plaintiff personally with much of that burden—$1.3 million in unpaid FET—, despite assurances Brown would account for those taxes, while also shifting JGH's operations and assets to a new entity to avoid payments. Plaintiff believes Brown's plan is to continue repeating that cycle all for his personal gain. To date, JGH has refused to defend or indemnify Plaintiff for the FET liability, Brown has refused to acknowledge JGH's obligations to Plaintiff, and Brown has even attempted to use the enormous tax burden as leverage to obtain concessions from Plaintiff.

5. Brown escalated his pattern of outrageous conduct even after Plaintiff filed this lawsuit. On information and belief, in or around December 2022, Brown convinced the carrier of Plaintiff's cell phone to transfer Plaintiff's phone number to Brown, asserting that the account belonged to the company account. Brown then used his access to Plaintiff's cell phone number to call Plaintiff's then-attorney, feigning to be Plaintiff himself, and sought to engage in conversations regarding matters within the ambit of the attorney-client privileged.

6. On information and belief, Brown also texted Plaintiff's friends and acquaintances while impersonating Plaintiff. To this day, Plaintiff still has not

recovered his account, and he is not fully aware of the extent of Brown's actions, but is informed and believes and on that basis alleges, Brown sought to impersonate him through access to Plaintiff's former cell phone number.

7. Plaintiff is the victim of an ongoing wrongful scheme by Brown to strip JGH of assets, saddle Plaintiff with personal liability for business obligations, conceal his financial mismanagement and wrongdoings, and to divert and abscond with significant business opportunities and large sums of money. Brown never intended to fulfill his obligations to JGH and its shareholders, or the promises he made to Plaintiff personally.

**PARTIES**

8. Plaintiff Aaron Stanz, also known as "Angel" ("Plaintiff") is an individual and a citizen of the State of Kansas. In March 2022, Plaintiff moved his domicile from California to Kansas. When he did so, he ended his residence in California and established his new physical residence in Kansas. Plaintiff's sole residence is now in Kansas, and Plaintiff intends to reside there permanently. For the purposes of diversity jurisdiction, Plaintiff is a citizen of the State of Kansas.[1]

9. Defendant Jordan Brown ("Brown") is an individual, who on information and belief, is a citizen of the State of Florida.

10. ~~10.~~Defendant Jet Genius Holdings Inc. ("JGH") is a ~~company~~ corporation incorporated in the State of California ~~and~~ with its principal place of business in the State of Florida. ~~Prior to 2020, JGH's principal place of business was in the State of California.~~ JGH operates throughout the United States in its capacity as an air charter broker to match client travel needs with available air charter operators~~ for commercial purposes in interstate commerce.~~. Since December 18, 2018, Brown has been the sole Director and CEO of JGH.

[1] A prior version of Plaintiff's complaint stated: "[Plaintiff] has not yet made his primary residency in the State of Kansas." *See* ECF No. 1 ⁋ 5. This allegation was inaccurate, as by March 2022, Plaintiff had finished moving to Kansas and physically resided there and intended to remain there indefinitely.

11. Defendant Jet Genius Florida Holdings Inc. ("JGFH") is a corporation incorporated in the State of Florida with its principal place of business in the State of Florida. On information and belief, Brown has been the sole Director and CEO of JGFH since its inception. JGFH's principal address is registered with the Florida Secretary of State as 1900 Glades Road, Suite 301, Boca Raton, FL 33431.

~~11. Defendant Brown is a natural person and citizen of the State of Florida. Defendant Brown is the Chairman and CEO of JGH and JGFH, the sole Member of Defendant C3jets EEC, and upon information and belief the sole member of Defendant Jet Agency Global EEC, the sole shareholder of Defendant Bowman Aviation, Inc., and along with his wife Stacy Brown a Trustee of Defendant Brown Family Trust defined below.~~

12. ~~12.Defendant C3jets EEC~~ Defendant C3jets LLC ("C3 Jets") is ~~an Idaho~~ a limited liability company ~~with~~ its principal place of business ~~in the State of Idaho and throughout the United States, where it~~ organized under the laws of the State of Idaho. C3 Jets operates private aircraft for commercial purposes ~~in interstate commerce~~. ~~Defendant C3 Jets is believed to be engaged in an aircraft lease or lease-purchase agreement for a certain aircraft, a 2000 year Hawker 800XP, Serial Number 258448, Tail Number N15RY~~C3 Jets' manager is Brown. ~~Defendant C3 Jets is further believed to be engaged in a lease or lease-purchase agreement for a certain aircraft, a 1998 year Hawker 800XP, Serial Number 258354, Tail Number N789HA. Upon~~ On information and belief, C3 Jets' sole member is ~~Defendant Brown~~Brown. C3 Jets' principal address is registered with the Florida Secretary of State as 1900 Glades Road, Suite 301, Boca Raton, FL 33431.

13. ~~13.~~Defendant Bowman Aviation, Inc. ("Bowman Aviation ~~FL~~") is a Florida corporation with its principal place of business in the State of Florida where it performs contract services ~~(via Defendant Brown)~~ for JGH and JGFH which~~,~~, upon information and belief~~,~~, include air charter broker services and aircraft sales for commercial purposes ~~in interstate commerce~~. ~~Upon~~ information and belief, Bowman

Aviation FL is the corporate successor in interest to a Bowman Aviation, Inc. of California incorporated by Defendant Brown in California in 2011, inactive in 2020, and suspended by California in 2021 ("Bowman Aviation CA"). The details and corporate formalities which combined the operations of Bowman Aviation CA with Bowman Aviation FL are known to Defendant Brown and unknown to Plaintiff. Actions throughout the events in this complaint were undertaken by either Bowman Aviation FL or Bowman Aviation CA, which are together referred to herein as "Bowman Aviation"On information and belief, Bowman Aviation's President, Secretary, and sole Director is Brown. Bowman Aviation's principal address is registered with the Florida Secretary of State as 1900 Glades Road, Suite 301, Boca Raton, FL 33431.

14. 14.Defendant Jet Agency Global LLC ("Jet Agency") is a limited liability company domiciled and with its principal place of business in organized under the laws of the State of Florida. Upon On information and belief-, Jet Agency is operated by Defendant Brown as its 's sole member and manager. Brown has admitted that Jet Agency is considered the "same company" as Defendants JGH and JGFH is Brown.

15. Defendant C3 Limo LLC ("C3 Limo") is a limited liability company domiciled and with its principal place of business in the State of Florida, which is managed by its managing member, Chasen Dobos, who is Defendant Brown's stepson as well as the VP of Operations for JGFH. Defendant Brown's wife Stacy was the managing member at its formation in September 2020 and Chasen Dobos is listed as the managing member as of March 2022 on its annual report. According to the most recent public filing with the State of Florida, C3 Limo utilized the official JGFH and JGH company address in Florida as C3 Limo's registered office until April 14, 2022 and the official email address which remains on file with the State of Florida for the business to receive annual report filings from the State of Florida remains a "FlyCFG.com" domain email address, which is part of the JGH Intellectual Property defined herein.

16. Defendant Brown Family Trust, upon information and belief, is a Florida Trust referred to as Brown Family Trust dated July 26, 2021 ("Brown Family Trust") which is the name listed on the share certificates of Defendant JGFH which were improperly assigned to the Brown Family Trust despite the JGH requirement in the Shareholder Agreement defined herein to establish an employee equity incentive plan.

17.Does 1 through 20 are the agents, employees, co-trustees, or employees of the named defendants and acted within the scope of that agency, employment, or trusteeship. The capacities of Does 1 through 20 are unknown to plaintiff.

15. Defendant C3 Limo LLC ("C3 Limo") is a limited liability company organized under the laws of the State of Florida. C3 Limo's original manager was Stacy Brown, Brown's wife. On March 15, 2022, C3 Limo changed its manager to Chasen Dobos, Brown's stepson. From March 15, 2022, to March 25, 2023, C3 Limo listed its principal place of business as 1900 Glades Road, Suite 301, Suite 406, Boca Raton, FL 33431. C3 Limo's mailing address has been 1900 Glades Road, Suite 301, Boca Raton, FL 33431 since March 15, 2022, and remains the current mailing address. On information and belief, C3 Limo's members are Brown, Stacy Brown, and/or Chasen Dobos. Upon information and belief, Stacy Brown and Chasen Dobos are citizens of the State of Florida.

16. Defendant Jetcharter.com LLC ("Jetcharter") is a limited liability company organized under the laws of the State of Florida. On information and belief, Brown is Jetcharter's manager and sole member.

## ALTER EGO ALLEGATIONS

17. Plaintiff is ignorant of the true names and capacities of defendants sued as DOES 1-20, inclusive, and therefore sues these defendants by these fictitious names. Plaintiff will seek leave to amend to allege their true names and capacities when they have been determined. Plaintiff is informed and believes and, on that basis,

alleges that each of the fictitiously named defendants is in breach of some contract or is tortiously or otherwise legally responsible in some manner for the occurrences alleged in this Second Amended Complaint ("SAC") and for Plaintiff's damages.

18. Plaintiff is informed and believes and on that basis alleges that at all relevant times, each of the Defendants, including DOES 1-20, inclusive, was the agent, representative, employee, partner, joint venturer, co-conspirator, alter ego, or otherwise working on behalf of each of the remaining Defendants and, in doing the things alleged, was acting within the scope of that agency, employment, partnership, conspiracy or other relationship, and that each principal ratified each act of each agent.

19. Plaintiff is informed and believes, and on that basis alleges, that at all times mentioned in this SAC that Brown operated JGFH, C3 Jets, Bowman Aviation, Jet Agency, Jetcharter, and DOES 1 through 20 (collectively, the "Alter Egos"), as a single entity, and they were at all times relevant the alter egos of each other. Plaintiff is further informed and believes, and on that basis alleges, that:

a. at all times mentioned in this SAC, Brown operated the Alter Egos as a single enterprise; that Brown disregarded corporate formalities and did not distinguish between the Alter Egos; that Brown comingled funds, made undocumented loans, and unilaterally transferred assets amongst the Alter Egos.

b. at all times mentioned in this SAC, there existed and now exists a unity of interest and ownership between the defendants and each of the Alter Egos; the individuality and separateness of the defendants and each of the Alter Egos have ceased or never existed;

c. at all times mentioned in this SAC, and at all times since the incorporation or inception of each Alter Ego, each Alter Ego has been and now is a mere shell and naked framework for pursuing a single enterprise and scheme;

d. at all times mentioned in this SAC, each of the Alter Egos was created and continued pursuant to a fraudulent plan, scheme, and device

conceived and operated by Brown, whereby the income, revenue and profits of each of the Alter Egos were diverted by Brown to himself or to serve his personal interests;

e. Plaintiff is informed and believes, and on that basis alleges, that one or more of the Alter Egos is undercapitalized and/or insolvent;

f. Plaintiff is informed and believes, and on that basis alleges, that the monies held by each of the Alter Egos have been commingled to the extent that assets, revenues, loans, and liabilities of each have been interchanged and are indistinguishable from the assets, revenues, loans, and liabilities of the other Alter Egos; and by virtue of the foregoing, adherence to the fiction of the existence of each of the Alter Egos as separate entities would, under the circumstances, sanction a fraud and promote injustice in that Plaintiff would be unable to realize upon any judgment in its favor, among other reasons. Allowing the Alter Egos to maintain the corporate entity would promote injustice, as it would sanction a fraud against Plaintiff.

20. Plaintiff is informed and believes, and on that basis alleges, that at all times mentioned in this SAC that Brown was the sole or majority shareholder (in the cases of corporations) or sole member (in the cases of LLCs) JGFH, C3 Jets, Bowman Aviation, Jet Agency, Jetcharter.com LLC, and DOES 1 through 20. Brown was also the sole director and majority shareholder of JGH at times relevant herein.

21. Plaintiff is further informed and believes, and on that basis alleges, that:

a. Brown dominated, influenced and controlled each of the Alter Egos and the officers thereof as well as the business, property, and affairs of each of said Alter Egos;

b. at all times mentioned in this SAC, there existed and now exists a unity of interest and ownership between Brown and each of the Alter Egos; the individuality and separateness of Brown and each of the Alter Egos have ceased;

c. at all times mentioned in this SAC, each of the Alter Egos was organized by Brown as a device to avoid individual liability and for the purpose of substituting financially irresponsible entities in the place and stead of himself, and accordingly, each Alter Ego was formed with capitalization totally inadequate for the business in which said entity was engaged;

d. the revenues and monies held by each of the Alter Egos have been drained from the Alter Ego by Brown;

e. that at all times mentioned in this SAC, the Alter Egos and Brown acted for each other in connection with the conduct hereinafter alleged and that each of them performed the acts complained of herein or breached the duties herein complained of as agents of each other and each is therefore fully liable for the acts of the other;

f. that Brown failed to adhere to corporate formalities that would have been required to take the purported action of the Alter Egos; and by virtue of the foregoing, adherence to the fiction of the existence of each of the Alter Egos as separate entities from Brown would, under the circumstances, sanction a fraud and promote injustice in that Plaintiff would be unable to realize upon any judgment in its favor, among other reasons.

## JURISDICTION AND VENUE

18. This Court has original subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331 (federal questions jurisdiction), because Plaintiff s federal claims, pursuant to 18 U.S.C. § 1836(c) and 18 U.S.C. § 1962 arise under the Constitution and laws of the United States. This Court has supplemental jurisdiction over the state law claims alleged herein pursuant to 28 U.S.C. § 1367(a), where supplemental jurisdiction exists "over all other claims that are so related to claims in this action . . . that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

19.This Court has further proper jurisdiction under 28 U.S.C. § 1332(a), based

on the diversity of the parties. Plaintiff is a citizen of the State of Kansas, Brown is a citizen of the State of Florida, JGH is a corporation domiciled in California with its principal place of business in the State of Florida, JGFH is a corporation domiciled and with its principal place of business in the State of Florida, C3 Jets is a limited liability company domiciled and with its principal place of business in the State of Idaho, Bowman Aviation, is a corporation domiciled and with its principal place of business in the State of Florida and is the successor in interest to Bowman Aviation CA which conducted its business primarily in the State of California, C3 Limo is a limited liability company domiciled and with its principal place of business in the State of Florida, Jet Agency is a limited liability company domiciled and with its principal place of business in the State of Florida, and Brown Family Trust upon information and belief is a Florida Trust.

22. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(a)(1) as complete diversity among the parties exists. Plaintiff is a citizen of the State of Kansas, and no Defendant is a citizen of the State of Kansas.

23. For the purposes of Plaintiff's claims brought derivatively on behalf of JGH, JGH is properly aligned as a Defendant for the purposes of diversity jurisdiction. "[W]hen a corporation's officers or directors are 'antagonistic' to the interests of the shareholder plaintiff(s)[,]" the corporation is considered a defendant in a derivative lawsuit. *In re Digimarc Corp. Derivative Litig.*, 549 F.3d 1223, 1234 (9th Cir. 2008). "A corporation is generally antagonistic to a shareholder plaintiff where management is aligned against the stockholder and defends a course of conduct which he attacks, or merely where management—for good reasons or for bad—is definitely and distinctly opposed to the institution of the derivative litigation," *Id.* at 1235 (quotations, citation, and alteration omitted).

24. Here, JGH's management, Brown, as sole director and CEO, is "definitely and distinctly opposed to the institution of the derivative litigation" because the claims all seek recovery directly from him or one of the entities over which he

exerts direct or indirect control. JGH is therefore properly considered a defendant for the purposes of diversity analysis.

25. 20. The Plaintiff is informed and believes and on that basis alleges that the amount in controversy is more than in this matter exceeds $75,000.00, exclusive of interest and costs.

21. Venue is proper in this court because the contract was consummated in this jurisdiction, Plaintiff Stanz was damaged in this jurisdiction, the intellectual property in dispute was primarily developed in this jurisdiction and subject to this jurisdiction, and the crimes alleged predominantly were sent through the wires from this jurisdiction. Additionally, JGH had its principal place of business in this jurisdiction, and along with Defendant Brown and Plaintiff consented to hear disputes relating to the agreements in question in the courts of this jurisdiction, and Defendants C3 Jets, Bowman Aviation, Jet Agency, and C3 Limo all received the misappropriated intellectual property that was developed in this jurisdiction and governed by the contract which subjects them to this jurisdiction.

26. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims in this action occurred in this judicial district.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

27. Plaintiff brings certain claims in this action derivatively in the right and for the benefit of JGH.

28. Plaintiff is the holder of twenty-five percent of the outstanding and issued shares of JGH.

29. Plaintiff has continuously held his shares of JGH at all times relevant to the wrongdoing identified in this SAC. Plaintiff continues to hold his shares of JGH.

30. Plaintiff will adequately and fairly represent the interests of JGH in enforcing and prosecuting its rights identified herein.

31. This is not a collusive derivative action to confer jurisdiction that would otherwise not exist in this Court.

32. Pursuant to Fed. R. Civ. P. 23.1 and Cal. Corp. Code § 800(b)(1), Plaintiff is excused from making a demand on the Board of Directors of JGH to obtain the relief sought in Plaintiff's derivative claims since a demand would have been futile because it would have required Brown to assert and pursue claims against himself or against entities solely controlled by him or his family.

33. At the time of filing of Plaintiff's Complaint, Brown served as the sole director of JGH's Board and CEO. Demand that JGH initiate claims against Brown personally would have been futile, and is therefore excused, because Brown personally engaged in, directed, and is responsible for all of the misconduct that injured JGH and its shareholders as alleged in this SAC, and to date Brown has refused to take action contrary to his personal interests.

34. Brown could not have made a disinterested decision to initiate a lawsuit against himself because he is personally responsible for his breaches of fiduciary duties to the corporation and has rejected prior efforts to address these alleged breaches and acts. Therefore, demand is excused as to Plaintiff's derivative claims against Brown.

35. Brown could not have made a disinterested decision to initiate a lawsuit against JGFH, C3 Jets, Bowman Aviation, Jet Agency, Jetcharter, or DOES 1 through 20 because those entities are entities that he directly controls and personally benefits from the tortious acts and schemes, as alleged herein, that they participated in. On information and belief, Brown is personally responsible for the actions and decisions of those entities. Therefore, demand is excused as to Plaintiff's derivative claims against Brown.

36. Brown could not have made a disinterested decision to initiate a lawsuit against C3 Limo because he or his immediately family directly controls that entity and personally benefits from the tortious acts, as alleged herein, that they and it

participated in. On information and belief, either Brown and/or his immediate family is personally responsible for the actions and decisions of that entity. Further, the beneficiary of the tortious acts was either Brown or his immediate family and could lead to a judgment against Brown or his immediate family. Therefore, demand is excused as to Plaintiff's derivative claims against Brown.

37. Pursuant to Cal. Corp. Code § 800(b)(2), Plaintiff has either informed JGH, or its board, comprised solely of Brown, in writing of the ultimate facts underlying the causes of action set forth in this SAC. Such writings have consisted of, among others, pre-lawsuit correspondence, meetings and communications, prior complaints, motions, declarations (including Plaintiff's Declaration at ECF No. 16-3) filed in this matter and extensive written exchanges between the parties and their counsel, including those described in this SAC.

## FACTUAL ALLEGATIONS

~~**APPLICABLE TO ALL CLAIMS**22. JGH was formed in California in 2016 and started operating in 2017 to offer a technical business-to-business logistics platform servicing the private aviation industry. JGH's founders are Plaintiff Stanz, Defendant Brown,~~ and non-party Alexander Wolf ~~("Shareholder Wolf"), a childhood friend of Brown. Stanz and Brown were both 49.5% shareholders, and Shareholder Wolf was a 1% shareholder. Brown always has been JGH's CEO.~~

~~23. Plaintiff Stanz was~~ the Chief Technology Officer ("CTO") ~~of JGH as he uniquely possesses the technical expertise on setting up, architecting, developing, and managing development for innovative technologies~~ that simplify and accelerate ~~business processes for~~ aircraft charter brokering, ~~which made up JGH's "GRID" logistics platform (the "Technical Expertise"). Plaintiffs Technical Expertise enabled JGH's GRID technology platform to significantly decrease~~ time and costs associated with buy-side and sell-side actions ~~required to~~

~~complete complex transactions for brokering and provisioning a chartered aircraft, at all stages of a transaction, from seeking interested clients (lead collection), initial~~

client contact, quoting available aircraft options, obtaining beneficial pricing, generating contracts, sending contracts, contract signing, facilitating and recording several substages of financial transactions (including pre-flight ground transportation, and post-flight ground transportation), provisioning an aircraft to be available at a specific location and time, correlating post-flight feedback and post-flight marketing for future flights, and creating internal software controls to monitor staff and resources to achieve maximum business output, measure staff responsiveness, monitor staff throughput capacity, track and record financial transactions, generate contracts, send contracts, list global aircraft inventory, and more (collectively, the "JGH Platform" and/or the "GRID").

24. Stanz believed that all was well with business until the summer of 2018 when Shareholder Wolf informed Plaintiff that the company had unpaid FET despite having adequate capital to pay FET at the time it was due. The unpaid FET owed was approximately $935,000 in May 2018, and has ballooned to over $6,721,350 since then.

25. After discovering that Defendant Brown was illegally not remitting the owed FET to IRS, Plaintiff and Shareholder Wolf sought to have JGH's financials audited, and received proposals from various firms, including one from Barnthouse & Associates on July 23, 2018 and KPMG LLP on August 3, 2018. When the Board was presented with these audit proposals, at an August 22, 2018 shareholder meeting Brown admonished Stanz and Shareholder Wolf for bringing up the audit issue, said that this criminal act was his decision alone and stated - while quoting what Defendant Brown said were the words of Mark Zuckerberg - "I'm CEO, B*tch!" and abruptly left the meeting shortly thereafter.

26. At an August 29, 2018 shareholder meeting, despite having two proposals for audits from additional firms, at the demand of Defendant Brown all shareholders acquiesced to vote in favor of an audit with a firm Defendant Brown favored, Lavine, Lofgren, Morris & Engelberg, LLP ("FEME").

27. Plaintiff notified Defendant Brown at the August 29, 2018 shareholders meeting that Brown's actions could bankrupt the company. In response, Brown admitted that his actions were improper and selfish. Shareholder Wolf offered to find $300K to remedy the problem, and Plaintiff warned Brown that JGH's Directors and shareholders could be exposed to the IRS for Brown's failure to pay the FET. Plaintiff admonished Defendant Brown that "they [IRS] are going to come after you." After Plaintiff Stanz and Shareholder Wolf confronted Brown of his bad actions, he pretended to proceed with the audit process through LLME in order to quiet Stanz and Shareholder Wolfs persistence on the audit issue. An engagement with LLME was scheduled to commence on September 10, 2018 as reported in the September 5, 2018 Board minutes, confirmed in the September 12, 2018 Board minutes that LLME was engaged, and recorded in the September 19, 2018 Board minutes that LLME had been retained for the audit with retainer wire transfer.

28. After the shareholders initially confronted Brown about the FET, he became verbally abusive and hostile, and threatened to disrupt business to the point of bankrupting the company. Stanz believed these threats and feared Brown's volatile nature and potential for violent outbursts, especially with his predilection to maintain firearms in the JGH workplace. Stanz believed that if Brown followed through on his threat to bankrupt the company, there would be no facility left to pay the FET owed to the IRS, potentially exposing the JGH shareholders - including Stanz - to personal liability to the IRS.

29. Throughout the negotiations surrounding the audit and the attempt by the shareholders to wrest control of JGH from Brown in the late summer and fall of 2018, Plaintiff and JGH discussed a modification to the corporate structure which would implement controls to protect the shareholders and address the FET. Under duress, on November 7, 2018 Plaintiff Stanz entered into the Shareholder Agreement (attached hereto as a true and correct copy as **Exhibit "A")** and its contemporaneously executed assignment of intellectual property by Plaintiff to JGH

(attached hereto as a true and correct copy as **Exhibit "B")** wherein Stanz would relinquish almost half his shares (lowering him from a 49.5% shareholder to a 25% shareholder) on the condition that revenue would be used to pay the taxes owed to the IRS, that valuable intellectual property including the JGH Platform would not be transferred without proper documentation or compensation to Plaintiff, and that of the 24.5% share reduction by Plaintiff, 10% of the shares would be allocated for a properly constructed employee equity incentive plan. As part of the Shareholder Agreement, Brown required Plaintiff Stanz and Shareholder Wolf to no longer serve on the Board of Directors, under the false promise by Brown and JGH to fill the vacancies with two new independent Directors (the "Board Coup").

30. After consummating Brown's power grab in the Board Coup, Brown ignored the corporate formalities and requirement to fill vacancies, as provided for in the Article III Section 4 of the Bylaws of Jet Genius Holdings, Inc. dated January 20, 2017 signed by Defendant Brown, (hereinafter "Bylaws" attached hereto as a true and correct copy as **Exhibit "C")** Defendant Brown - the invalidly sole remaining Director of JGH - ignored the requirement in the Bylaws to fill the vacancies of JGH's Board, and both Brown and JGH subsequently disregarded the corporate formalities of the Bylaws and California law for a corporation to maintain a Board of Directors of at least three persons, which was never rectified. Brown and JGH further failed to maintain the accurate reporting of JGH's invalid Board in contravention of the requirement in Article VII Section 7 of the Bylaws to file accurate statements with the Secretary of State of California listing the Directors and business addresses of the Directors, since no such filings would reflect the three requisite Directors required in California Corporations Code Section 212 for a corporation with three shareholders.

31. Brown then used the invalidly structured JGH to assist in his architecture of a criminal enterprise to enrich himself and his family to the detriment of JGH and its shareholders. The financial audit by LLME - an integral part of the

negotiations of the Shareholder Agreement which was in progress and which had been agreed to by Stanz, Shareholder Wolf, Brown, and JGH to track Brown's activities - was never completed, and upon information and belief was cancelled by Brown almost immediately after the Board Coup.

32. Brown's complete and fraudulent control of JGH through the false promises under the Shareholder Agreement and Bylaws by Defendants Brown and JGH thus set the stage to allow

38. Plaintiff is the creator and developer of the software and systems that simplify and accelerate aircraft charter brokering, including JetXchange, The Grid, and the Charter Flight Group website, which are also supported by custom applications, reports, lead generations tools, databases, business analytics, and certain client lists (the "JGH Platform"). The JGH Platform allows a charter aviation brokerage company to operate more efficiently by facilitating more trips per staff member than any charter brokerage competitor.

39. In 2016, Plaintiff partnered with Brown and non-party Alexander Wolf to form JGH, doing business as Charter Flight Group, to provide air charter broker services to the private aviation market. Plaintiff contributed the JGH Platform to JGH and received a 49.5% ownership interest in the company. Brown agreed to act as CEO and received a 49.5% ownership interest. Wolf received the remaining 1% interest.

40. JGH adopted its bylaws on January 20, 2017 (the "Bylaws").

41. The Bylaws provide for the election of directors at annual shareholder meetings and the procedure to fill Board vacancies.

42. The Bylaws also require JGH to defend and indemnify its directors and officers for any expenses incurred by the director or officer as a result of the individual's work for the company. Article VI provides in relevant part:

> The Corporation shall, to the maximum extent permitted by the General Corporation Law of California, indemnify each of its directors and officers against expenses, judgments, fines, settlements and other amounts actually and reasonably incurred in connection with any proceedings arising by reason of the fact any

> such person is or was a director or officer of the Corporation and shall advance to such director or officer expenses incurred in defending any such proceeding to the maximum extent permitted by such law. For purposes of this Article VI, a "director" or "officer" of the Corporation includes any person who is or was a director or officer of the Corporation, or is or was serving at the request of the Corporation as a director or officer of another corporation, . . . .

43. At formation, JGH had a three-member Board of Directors, comprised of Plaintiff, Brown, and Wolf.

44. Plaintiff served as the Chief Technology Officer ("CTO"), as he had the technical expertise to operate, enhance, and optimize the performance of the JGH Platform. His work enabled JGH to significantly decrease the time and costs associated with buy-side and sell-side actions to complete complex broker transactions to charter aircraft at all stages, including initial client contact, aircraft availability, pricing, contract generation, financial transactions (including pre-flight ground transportation, and post-flight ground transportation), and more. Plaintiff's work was integral to the success of the business.

45. The company succeeded at obtaining significant market share and demonstrating growth.

46. As a business that collected payment for commercial domestic transportation of persons, JGH was subject to an assessment of federal excise tax ("FET"). *See* 26 U.S.C. § 4261; *see also* 26 C.F.R. pt. 49.

47. As CTO, Plaintiff played no part in the collection or distribution of revenues of JGH, nor did he have a role in ensuring payment of or compliance with JGH's FET obligations, and instead he was solely tasked with the software development and operations.

48. In fact, when forming the business, Brown demanded that Plaintiff have no involvement with the financial affairs of JGH, but rather that Plaintiff would agree to leave that to Brown so Plaintiff could focus solely on the technical/software side of the company. Plaintiff agreed to Brown's demand, as that naturally fit his skillset and

he relied on Brown to handle the business and financial side of the company.

49. While Plaintiff had no control of or involvement with the financial operations of the business, soon after forming the company, Brown asked Plaintiff to accept an appointment as the company's "Secretary," so that Plaintiff could assist with opening an urgently needed bank account. Through the assistance of JGH's corporate counsel, JGH removed Wolf as JGH's Secretary and appointed Plaintiff to that role for the sole purpose of opening a bank account. On December 19, 2016, while Brown was on vacation, Brown directed Plaintiff to open a bank account for JGH. But after opening the bank account, Plaintiff did not oversee or handle JGH's finances, and continued with the plan to handle the technical side of the business.

50. Plaintiff thought JGH was operating successfully until the summer of 2018, when Plaintiff learned that JGH had incurred significant unpaid FET. FET is required tax when a customer books a chartered flight, including through a broker like JGH. Plaintiff learned that JGH was either collecting the FET associated with purchased flights, but was not then paying it to the IRS, or was simply not adding the FET to the purchase price and was not collecting it from the customer. Plaintiff was surprised that JGH had unpaid taxes given that he understood and believed that it had adequate capital to pay the FET at the time such became due.

51. The revelation that JGH had unpaid FET obligations alarmed Plaintiff, and it caused Plaintiff and Wolf to investigate. In doing so, they learned of confusing financial transactions and accounting issues, so they obtained proposals from auditors for performing a professional audit of the business.

52. In August 2018, Plaintiff and Wolf confronted Brown about his management of the company and the questions they had about the financial issues.

53. In particular, Plaintiff questioned Brown about a loan that was on JGH's books, which Brown admitted that he had taken for "personal reasons." Plaintiff and Wolf discovered other transactions that seemed to drain resources from JGH with no legitimate business purpose, which they asked Brown about.

54. As Plaintiff and Wolf continued asking questions about the company's operations and finances, Brown grew hostile, and assured them he would "take care of it." The situation between the parties grew more tense.

55. Brown said that he would address the FET issue and other financial and operating questions of the company. To do so, he asked for more control of the company. In part, he said Plaintiff's service as a director complicated fundraising and operations, because Plaintiff had a prior SEC order against him. Plaintiff was willing to agree to reduce his role in the company if it would lead to better business prospects and based on Brown's assurances that he would perform his leadership duties effectively and properly.

56. Plaintiff, Brown and Wolf began negotiating a way to provide Brown more control, but still protect Plaintiff's interests. Plaintiff's primary concerns were (1) ensuring that the FET would be collected and paid, (2) ensuring that the assets of the company, i.e., the JGH Platform and financial resources, remained with the company, and (3) ensuring that Plaintiff would be appropriately compensated for his significant contribution to the business, including ensuring that he would be paid properly if the business was sold to a third party, which was an event he eventually anticipated.

57. Plaintiff would not agree to a contract that reduced his ownership of JGH without these protections and without commitment from Brown that he intended to operate the business properly and effectively. As Plaintiff and Brown discussed a potential agreement, Brown repeatedly assured Plaintiff that he would ensure the FET was collected and paid so that none of the shareholders would risk personal liability, and that Brown would operate the business for the benefit of all its shareholders. He also repeatedly assured Plaintiff he would not form another entity or business in an effort to transfer JGH operations or assets to it, or somehow leave JGH as an empty shell with only liabilities, like the FET.

58. In August 2018, the company retained legal counsel to formalize the

arrangement between the parties. Plaintiff again clarified that any agreement needed to protect his stated priorities, and Brown repeated his assurances that Plaintiff had no reason to be concerned and that Brown would efficiently operate the company for the benefit of all shareholders and not take the actions Plaintiff voiced concern about. Brown made statements:

- "Just trust me";
- "Don't worry about it";
- "Why are we wasting time with lawyers negotiating this, there is no reason to worry"; and
- "I won't do those things," specifically avoid paying FET, form entities or transfer assets or money out of JGH.

59. Based on Brown's emphatic reassurances and representations that he would operate the business properly and effectively and in the best interests of the shareholders, Plaintiff reasonably relied on Brown's statements, and they eventually reached agreement on the discussed terms.

60. On information and belief, Brown's statements, including his reassurances and representations to Plaintiff, were false when made, and he had no intention of ever respecting the terms he said he would. On information and belief, Brown intended to do the exact opposite of what he promised Plaintiff he would not do—effectively raid the company for his own benefit. Further, Brown did not intend to collect and pay the FET, because he intended to use those funds for his own personal purposes.

61. Based entirely on Brown's false representations, Plaintiff agreed to effectively reduce his ownership interest in JGH, based on assurances he would still (1) be adequately compensated for his contributions to the company, and (2) would ensure that the company—not the individual shareholders or officers—would pay off the FET then owing and going forward.

62. In exchange. Plaintiff agreed to significant concessions, including

(1) transferring 1,485,385 shares of his stock in JGH back to the company, thereby reducing his stake from 49.5% to 25%; (2) stepping down from JGH's Board of Directors (Wolf also resigned from the Board at that time); and (3) assigning rights in the JGH Platform to JGH.

63. The results of the negotiations between Plaintiff and JGH (through Brown and company counsel) was a document that was signed on November 7, 2018 (the "Letter Agreement"). A true and correct copy of the Letter Agreement is attached as Exhibit 1.

64. The Letter Agreement had several clauses aimed at protecting Plaintiff's interests and imposing obligations on Brown and JGH in exchange.

65. First, the Letter Agreement prohibited certain actions without Plaintiff's written consent:

> 2. **Required Approval**. The Company will refrain from taking any of the following actions without your prior written consent:
>
> a. reserve or issue greater than 383,846 shares of the common stock of the Company pursuant to an equity incentive plan;
>
> b. authorize or issue additional shares of common stock or any other class or series of capital stock in the Company, other than shares issued to investors in a bona fide financing conducted to raise capital at a share price based on a pre-money valuation of at least $5,000,000 (a "Qualified Financing");
>
> . . .
>
> d. create or hold securities in an entity other than a wholly-owned subsidiary, other than a company or joint venture established with one or more partners for the primary purpose of owning and operating aircraft;
>
> e. loan money to or accept loans from a shareholder or its assigns; or
>
> f. amend this Agreement, terminate this Agreement without Cause (as defined below), or take corporate action intended to circumvent or adversely affect your rights pursuant to this Agreement.

66. The Letter Agreement also contained a "Corporate Event Payment" clause that required payment to Plaintiff of specified amounts upon the occurrence of certain events, which included a corporate merger or consolidation with another entity or the transfer or exclusive licensing of the company's technology (including the JGH

Platform) to any other party:

4. **Corporate Event Payment**. Upon the closing of a Corporate Event on or before November 1, 2023, the Company will make a lump sum payment to you in accordance with the following:

| Closing Date of Corporate Event | Payment Amount |
|---|---|
| Date of this Agreement – November 1, 2019 | $909,451.00 |
| November 2, 2019 – November 1, 2020 | $727,561.00 |
| November 2, 2020 – November 1, 2021 | $545,671.00 |
| November 2, 2021 – November 1, 2022 | $363,780.00 |
| November 2, 2022 – November 1, 2023 | $181,890.00 |
| On or after November 2, 2023 | $0.00 |

"Corporate Event" means (i) the consummation of a merger or consolidation of the Company with or into another entity or (ii) the sale, transfer, or exclusive license of significant assets of the Company outside the ordinary course of business, in whole or in part, including but not limited to its developed technology (such as desktop applications, web applications, mobile applications, backend applications, machine-learning applications and database structures), and data derived from or contributed to the Company (such as client data, pricing data, inventory data, industry directory data, aircraft data, company performance data, and other data contributing to Company revenue generation). The foregoing notwithstanding, a merger or consolidation of the Company shall not constitute a "Change in Control" if immediately after such merger or consolidation a majority of the voting power of the capital stock of the continuing or surviving entity, or any direct or indirect parent corporation of such continuing or surviving entity, will be owned by the persons who were the Company's shareholders immediately prior to such merger or consolidation in substantially the same proportions as their ownership of the voting power of the Company's capital stock immediately prior to such merger or consolidation. In no event shall a Qualified Financing constitute a Change in Control.

67. The Letter Agreement specified that any personal property that JGH had paid for would become Plaintiff's personal property. This clause applied to Plaintiff's cell phone, which became his personal property:

5. **Personal Property**. In the event that the Company purchased all or a portion of any items of personal property that are in your possession as of the date of this Agreement, such items are hereby deemed your personal property subject to any applicable withholding taxes and other deductions. For clarity, the foregoing does not include intangible or intellectual property or the Tesla Model X that you are currently using

(the "Company Car").

68. Critically to Plaintiff, the Letter Agreement required the establishment of a separate bank account dedicated for the purpose of collecting and holding funds to pay the FET (the "FET Clause"):

> Brown to continue his illegal history of failing to pay owed FET (which he agreed to segregate and collect in dedicated accounts) and provided him the resources and control to begin swiftly misappropriating the assets and intellectual property of Plaintiff and JGH. Brown attempted to accomplish this when he promptly began directing the agents and attorneys of JGH to improperly establish subsidiaries and third-party companies to further dilute JGH shareholder value by misappropriating the JGH Platform including the GRID, further enabling him to commence a plethora of self-dealing transactions and contracts all in violation of the Shareholder Agreement. Brown did such at all times as a fiduciary, and his self-dealing and evasion of FET and hiding of assets from the IRS through the new companies and recipients of JGH assets - among which are Brown's co-defendants - was done in contravention of his duties to protect the interests of the minority shareholders of JGH, and in contravention of his wrongfully and invalidly constituted position on the Board of JGH. All of this was done in violation of the Shareholder Agreement, Section 6, which states that "6. **Excise Taxes**. As the Company receives revenue subject to federal excise taxes, the Company will estimate in good faith the amount of federal excise taxes anticipated to be due on such revenue and will hold such estimated tax amount in a separate bank account. Funds from such account will only be used to pay federal excise taxes. The Company will continue to work toward a settlement with the IRS related to past excise taxes that avoids personal liability of the Company's past and current officers and directors in connection therewith."

69. As a part of the Letter Agreement, Plaintiff and Wolf each resigned from JGH's Board of Directors.

70. Upon execution of the Letter Agreement, Brown became the sole director of JGH and continued to act as its CEO. Further, due to Plaintiff transferring approximately half of his shares back to JGH, Brown became the majority shareholder in JGH, owning 63.7% of JGH's shares.

71. Having consolidated his power and control over JGH, Brown proceeded to operate JGH like his personal piggy bank to fund his extravagant lifestyle at the expense of the company and the shareholders. As detailed below, Brown proceeded to leverage the company and use the cash for personal purposes, made loans to his family

members on terms favorable to those family members, and authorized exorbitant commission payments to himself. Further, he authorized $1.9 million in distributions to himself as a shareholder, while only distributing $23,000 to the other two shareholders, in wild disproportion to their respective actual shareholder percentages.

72. Simultaneously, Brown and JGH breached the Letter Agreement by establishing other entities and transferring JGH's assets to those companies, breaking every promise made to Plaintiff.

73. All the while, Brown continued to fail and refused to pay the FET, in blatant disregard of the contractual and statutory obligation to do so. Brown never allocated funds to pay the company's FET nor did he set up the separate bank account for that purpose that he promised he would. Thereafter, JGH's outstanding FET obligation ballooned to more than $5 million.

74. On information and belief, after execution of the Letter Agreement to approximately December 2019, Brown used assets properly belonging to JGH to fund personal loans that he never repaid.

75. On information and belief, after execution of the Letter Agreement up to approximately December 2019, Brown took excessive commissions from JGH's sale of brokered aircraft trips and its sales of aircraft. The commissions from aircraft sales are particularly substantial given the high value of the transactions. In these circumstances, on information and belief, Brown simply kept the entire profit without accounting to the company or the shareholders.

76. On August 6, 2019, on information and belief, while still CEO and the only director of JGH, Brown (acting for himself and/or for JGH) formed an identically named entity, Jet Genius Holdings, Inc., as a Florida corporation. This new entity was not a wholly owned subsidiary of JGH as JGH did not own 100% of the stock of the new entity.

33. Rather than fulfilling his duties as a fiduciary, from the moment Defendant Brown obtained Plaintiffs signature on the Shareholder Agreement and

seized control of the improperly constituted Board of Directors of JGH (and in contravention of the agreed upon plan by the Board of JGH and its advisors to proceed to pay IRS under a plan for an amount equal to roughly $1,300,000 which JGH owed for its previously unpaid FET) Brown chose to conspire with the Defendants and the CFG Personnel as defined below to drain the value of JGH by misappropriating Plaintiffs and JGH's intellectual property and trade secrets such as the JGH Platform including the GRID and the JGH Intellectual Property defined below. The JGH Platform including the GRID rightfully belong to Plaintiff, and only were agreed to be assigned to JGH alongside of 24.5% of Plaintiff s rightful 49.5% equity shareholdings in a valid assignment to his own company which he co-founded. Brown instead oversaw the invalid transfer of assets in breach of the Shareholder Agreement under an invalidly constituted Board, which purportedly enabled him to invalidly establish **new** companies to siphon JGH's shareholder value, while illegally ignoring the FET obligations and hiding assets and obligations from the IRS in the new companies represented by the Defendants. This was done while the business generated over $125,000,000 in revenue, yet saw its unpaid FET balance balloon to nearly $7,000,000 collected from clients but unremitted to IRS.

34. Despite Brown and JGH having a path agreed to by its shareholders and advisors to satisfy the $1,300,000 in FET owed to the IRS, following the Board Coup and each year thereafter Brown failed to meet the FET obligations. Less than one year after the Board Coup, during the time which Defendant Brown should have been fulfilling his fiduciary duties to the shareholders of JGH, Defendant Brown breached his obligations under the Shareholder Agreement and his fiduciary duties by improperly incorporating Defendant JGFH in the State of Florida on August 27, 2019 to serve as a "shell" which Defendant Brown could solidify his efforts from the Board Coup by creating a **new** entity which would have absolutely no oversight or accountability to the shareholders of JGH.

35. This scheme, which JGH lacked the requisite corporate formalities to

authorize due to the vacancies on JGH's Board, enabled Brown to siphon JGH's assets, intellectual property (such as the JGH Platform including the GRID and the JGH Intellectual Property defined below), as well as the business accounts, employees, client lists, and domain names into JGFH without visibility to the JGH shareholders. Many of the assets in the JGH Intellectual Property were purportedly transferred by Brown in a surreptitious manner to hide the assets from the IRS.

36. This scheme was orchestrated not to benefit JGH's shareholders, but to instead benefit the Defendants. For instance, when establishing the share structure for JGFH, not only did Defendant Brown fail to allocate 10% of Plaintiff s relinquished shares to an employee equity incentive plan as agreed to with Plaintiff and JGH in the Shareholder Agreement, Brown extended this improper "mirroring" of JGH shares to allocate 10% of the JGFH shares not to an employee equity incentive plan but instead to Brown individually, thus enabling Brown to wrongfully allocate his shareholdings to Defendant Brown Family Trust, which upon information and belief both Defendant Brown and his wife Stacy are Trustees of. No valid employee equity incentive plan was established.

37. Following the Board Coup, any effective effort which could be afforded by Plaintiff or the JGH shareholders to seek recourse was futile, as Defendant Brown improperly constituted the entirety of JGFFs Board in contravention of California Corporate Law and the Bylaws. Notice to the Board for JGFH further was futile, as the JGH shareholders and Plaintiff were not provided with executed copies of the governance documents or structure of JGFH, it was incorporated without Plaintiffs or the JGH shareholders' knowledge, it's Board was comprised of parties unknown to Plaintiff which upon information and belief is solely Brown, and Defendant Brown substituted new shareholders and classes of shares within JGFH in conflict of the original structure of JGH and the Shareholder Agreement.

38. Once Brown's control in JGFH was solidified following the Board Coup, he continued his conspiracy to defraud the Plaintiff and the shareholders of

JGH by structuring the GRID, the JGH Platform, Plaintiffs Technical Expertise, the software architecture and source codes, websites, technology infrastructure, business models, web-servers, domain names (such as jetcharter.com, jetagency.com, and flycfg.com), business methods, client lists, proprietary designs, and trade secrets (collectively the "JGH Intellectual Property") all underneath JGFH in a series of **undocumented** sham transactions, despite the plan for JGH to account for the JGH Intellectual Property, and in violation of the Shareholder Agreement Section 4. Brown misappropriated the JGH Intellectual Property through JGFH, C3 Jets, Jet Agency, Bowman Aviation, and C3 Limo.

39. The misappropriation of the JGH Intellectual Property was conducted without any valid license and created over $125,000,000 in unjustly enriched revenue to JGFH and its codefendants without any valid compensation to Plaintiff or JGH. The sham nature of any supposed transfers of the JGH Intellectual Property is supported by the fact that transfers were not disclosed to the IRS despite the unpaid FET assessments against JGH and the requirements to disclose assets of JGH, as well as the fact that none of the compensation rightfully owed to Plaintiff under Shareholder Agreement Section 4 for any **permissible** transfer was made. The JGH Intellectual Property was continually misappropriated to unjustly enrich third-party companies which were hidden from the JGH shareholders and structured solely with Defendant Brown and his family in control positions, but most brazenly it was misappropriated to defraud the clients of JGH and JGFH even after Brown agreed to rectify the FET situation. None of the exploitation of the JGH Intellectual Property by third parties without license was ever authorized by the Plaintiff, and he certainly did not consent to any usage by Brown or his co-defendants in a scheme to defraud the clients of JGH and JGFH.

40. Defendant Brown created additional schemes to defraud the JGH shareholders, the Plaintiff, the JGH and JGFH clients, and the Federal Government by making millions of dollars of fraudulent undocumented "loans" to Defendants

Brown individually, C3 Jets, Jet Agency, C3 Limo, and Bowman Aviation with the fraudulently obtained revenue to expand this enterprise. The undocumented loans include at least $3,536,036 to Defendant Brown individually, $343,329 to Jet Agency, $135,571 to Bowman Aviation, $54,791 to C3 Limo, and $861,018 to C3 Jets (collectively the "Undocumented Multi-million Dollar Loans") all while hiding this activity from the IRS while it continued to increase its attempts to assess and collect its unpaid FET against JGH, and all while Brown improperly remained the sole control person, Director, fiduciary, and CEO of JGH. In addition to the Undocumented Multi-million Dollar Loans, JGFH lists as a liability $177,437 of C3 Elmo's American Express account in the name of Chasen Dobos, Defendant Brown's stepson and JGFH's VP of Operations, despite an outstanding undocumented loan from JGFH to C3 Limo.

41. Defendant Brown's fraudulent scheme generated more than $125,000,000 revenue without benefit to JGH or Plaintiff despite utilizing the GRID, the JGH Platform and JGH Intellectual Property without authorization, all while Brown falsely promised the JGH shareholders and Plaintiff that these actions were for the benefit of JGH and its shareholders and would be properly documented. Defendant Brown made these promises, and indeed JGH's professionals such as Chis Popov of Watkins Firm, APC ("Attorney Popov") indicated to Plaintiff and JGH's outside tax advisors that JGH was proceeding towards a plan for repayment to the IRS as required in the Shareholder Agreement Section 6. Defendant Brown instead willfully ignored the previous $1,300,000 existing FET and repayment plan as obligated in the Shareholder Agreement to be paid in conjunction of the Board Coup, and secretly incurred nearly $5,200,000 **in additional** unpaid FET to the IRS, despite unjustly enriching himself with a base salary of at least $1,000,000 per year in addition to the commissions he charged the JGH and JGFH clients, and despite JGH's effective insolvency and multi-million tax debt to the IRS.

42. In June of 2021, the pressure from the IRS for its unpaid FET began to

escalate, and through a series of discussions Defendants Brown and JGFH approached the Plaintiff with a **new** shareholder agreement which purported to give the Plaintiff shareholdings in JGFH (the "JGFH Draft"). The JGFH Draft was materially different than the existing Shareholder Agreement and contained numerous provisions which sought Plaintiffs indemnification of Defendant Brown for actions in violation of his fiduciary duties, for malfeasance, for fraud, and for failure to pay FET: in other words, the JGFH Draft attempted to force Plaintiff to waive the very rights he preserved in the instant case by not signing the JGFH Draft. Defendants Brown and JGFH presented Stanz with the JGFH Draft in the atmosphere of mounting pressure from the IRS against Plaintiff individually.

77. Two weeks later, on August 20, 2019, Brown changed the new entity's name to

43. In or around October of 2021, the IRS, through its Revenue Officer Cindy Neville ("RO Neville") commenced contacting the Plaintiff regarding JGH's unpaid $1,300,000 in FET (which Defendants Brown and JGH already were obligated to pay and further confirmed during the Board Coup and as part of the Shareholder Agreement) and informed Plaintiff that several million additional FET was owed and assessed, and that Plaintiff bore individual responsibility as a shareholder. Plaintiff was informed by IRS that he would bear responsibility, despite the $1,300,000 figure for FET greatly exceeding the entirety of Plaintiff s historical compensation from JGH yet representing only a single year's worth of Brown's compensation he designated to himself. IRS informed the Plaintiff his responsibility stemmed from his name being listed on the initial bank account signature card prior to 2018.

44. Plaintiff was surprised and shocked to learn that he was being held responsible, since he had only been placed on the bank account signature card in 2017 under duress at Defendant Brown's direction when JGH's operations were under threat of shutting down while Defendant Brown was vacationing in the

Caribbean: Defendant Brown directed the Plaintiff and ex-Controller John Oxide to arrange for an emergency bank account opening, and Brown directed former company staff accountant Laurie Rector to place Brown's signature stamp on the bank account documents, and further directed Plaintiff to sign since he was the only shareholder who would be physically present at the bank given Brown's impromptu Caribbean vacation. Plaintiff only agreed to sign the bank signature card so JGH's operations would not shut down immediately and did so only under duress at the direction and instruction to do so while Defendant Brown was trapsing about the Caribbean instead of tending to critical JGH operations. Defendant Brown directed Plaintiff to take no part in the financial affairs of JGH and Plaintiff agreed that Defendant Brown would have sole responsibility for the financial affairs and operations of JGH. Notwithstanding this agreement throughout the company's existence, when the IRS inquired about the unpaid FET Defendant Brown wrongfully directed the attention of IRS to Plaintiffs signature on the JGH bank card, despite knowing that Plaintiff had no participation or involvement with any of the company's financial affairs, and omitted the fact that Defendant Brown had directed Plaintiff to agree to such an arrangement under the immediate threat of JGH's business operations being shut-down.

45. After discovering the ongoing unpaid FET and tax matters, all discussions regarding the JGFH Draft were ceased by Plaintiff, who informed the Defendants that the most important issue was to resolve the past due FET. Defendants Brown, JGFH, and JGH, however, persisted in pressuring Plaintiff to accept the JGFH draft despite the threats against Plaintiff from IRS, and Plaintiff futilely requested JGH to provide him counsel and representation in the IRS proceedings. Defendants Brown and JGH refused to provide Plaintiff with legal representation or reimbursement for representation as required by the Bylaws of JGH, leaving Plaintiff to fend for

himself before the IRS despite JGH's requirement to provide Plaintiff with such

representation. Not only did they leave Plaintiff without representation, they instead continued to pressure Plaintiff to acquiesce to the JGFH Draft despite, as Plaintiff subsequently learned, JGFH's incorporating documents' substitution of additional shareholders into JGFH who were not identical to JGH's shareholders in contravention of the Shareholder Agreement, including Defendant Brown Family Trust, and the establishment of a new class of shares that did not match the existing share structure of JGH.

46. Defendant Brown was fully aware that the IRS was incorrectly looking at Plaintiff as a responsible person for FET despite having no control or participation in JGH's finances other than the agreement under duress to sign the bank card while Defendant Brown retreated to the Caribbean on the brink of JGH's collapse, and yet Brown informed the IRS that Plaintiff was in fact a responsible party despite knowing this was not true. Brown used this opportunity to direct IRS to look towards Plaintiff as a responsible party, whilst simultaneously ensuring that Plaintiff would not have the adequate resources or representation to appear and defend himself before the IRS, or to protest the FET assessment against Plaintiff individually, by denying Plaintiff access to company counsel or reimbursement for independent counsel, in direct violation of JGH's Bylaws. When confronted about the FET, Defendant Brown admitted on November 4, 2021 **"Iam responsible for the FET mess. I will have to answer to this. GET OVER IT. Who gives af*ck. We can raise the money tomorrow to cover it. I would do it again. It's what I did to get the company to this point, please stop bringing it up!"**

47. Plaintiff, however, would not "get over it" nor stop bringing it up, because he did not believe (correctly so) that Defendant Brown was capable of "rais[ing] the money tomorrow to cover it" from outside parties, and realized that Defendant Brown's admission that he "would do it again" regarding Defendant Brown's willful and criminal failure to pay both the past due FET and continually accrued FET was directly in contradiction to his obligations as a fiduciary as

Chairman of the Board, Director, and CEO of JGH to take care of the FET as agreed in the Shareholder Agreement. This was the entire substance of the Shareholder Agreement negotiated
following the Board Coup, and Plaintiffs relinquishment of 24.5% of Plaintiff s equity in his own company and seat on the Board would never occurred had Plaintiff known that Brown intended to deviated from the plan to address the FET situation in good faith.

48. Plaintiff further would not "get over it" or stop bringing it up, because he had firsthand knowledge that Defendant Brown had taken millions of dollars in compensation and selfdealing undocumented "loans" from JGFH and JGH instead of paying the FET, including the Defendants' Undocumented Multi-million Dollar Loans, and subsequent to Defendant Brown's creation of JGFH in August of 2019 over $125,000,000 in revenue had been unjustly generated in JGFH through the JGH Intellectual Property while JGH was left effectively insolvent. Brown let FET further accrue interest and fees remaining unpaid, with no meaningful revenue or assets other than the JGH Intellectual Property which had been misappropriated by Brown and his codefendants, yet JGFH at all times possessed the resources and revenue to adequately address the FET. The misappropriation of the JGH Intellectual Property was done in dereliction of Defendant Brown's fiduciary duties despite the JGH Intellectual Property being the most likely source of revenue for the effectively insolvent JGH through the licensing or sale of the JGH Intellectual Property on the open market.

49. On February 2, 2022, Plaintiff received an enterprise valuation report prepared on behalf of Defendant JGFH by professional aviation industry valuation firm Avicor Aviation, Inc. of Beaverton, Oregon ("Avicor"). The report, prepared by Lilliam Tamm of Avicor at Defendant JGFH's election and own expense, provided a fair market valuation for JGFH of $14,368,000 (the "First Avicor Valuation" attached hereto as a true and correct copy as **Exhibit "D").** On March 28, 2022,

Plaintiff received a **second** valuation report prepared by Lilliam Tamm of Avicor on behalf of JGFH, this time inclusive of a separate valuation analysis related specifically to the technology and JGH Intellectual Property such as the JGH Platform including the GRID, which derived a fair market value of $66,710,000 (the “Second Avicor Valuation” attached hereto as a true and correct copy as **Exhibit “Id').**

50. In or around March of 2022, RO Neville increased her outreach to Plaintiff Stanz, and informed him that the IRS intended to individually assess him for Defendant JGH’s unpaid FET. Shortly thereafter, Plaintiff through his counsel, John Kirk (“Attorney Kirk”, who’s **pro hac vice** motion is forthcoming), proposed to JGFH’s corporate counsel in Florida, Kyle Louramore (“Attorney Louramore”) and Sarah Klee (“Attorney Klee”) of Steams Weaver Miller Weissler Alhadeff & Sitterson, P.A. (“Stearns Weaver”) as well as JGH and Brown’s counsel in California, Mitchell Dubick of Higgs Fletcher & Mack LLP (“Attorney Dubick”) that the IRS would be receptive to a payment towards the proposed assessed JGH Corporate Trust Fund recovery account with IRS in the amount of $125,000 which would tentatively allow the IRS to defer seeking an individual assessment for the unpaid FET against the Plaintiff as a shareholder of JGH (the “First IRS FET Proposal”). On March 23, 2022, Plaintiff, through Attorney Kirk, provided notice to the Board of JGH that since payment would be coming from JGFH on behalf of JGH, a possible way for structuring such a payment could be done via a license agreement for the JGH Intellectual Property which would allow JGH to make a payment for the unpaid FET (the “JGH Intellectual Property Proposal”), and further informed JGH’s Board of its obligations to pay for Plaintiffs legal expenses as required by the Bylaws for Plaintiffs dealings with the IRS regarding the FET. Defendants failed to respond to Plaintiffs JGH Intellectual Property Proposal and Defendant Brown and JGH ignored the First IRS FET Proposal and refused to provide Plaintiff with counsel or reimbursement for counsel to appear before as

required by the Bylaws, despite consenting to Shareholder Wolf receiving such representation as required.

51. On April 26, 2022 Plaintiff received a surprised mailing from Steams Weaver sent via Certified Mail enclosing a stock certificate for 959,615 Class A Shares of JGFH (the "JGFH Stock Certificate") issued in Plaintiffs name, and issued despite Plaintiff never having executed the JGFH Draft. The shares were sent unsolicited to Plaintiff and appeared to represent 24.5% of the outstanding shares of JGFH, yet there was a new class of shares listed on the JGFH Stock Certificate, which is in contravention of the Shareholder Agreement Section 2(b) that without prior written consent, the company shall not "authorize or issue additional shares of common stock or any other class or series of capital stock in the Company". Defendant Brown further established new shareholders in contravention of the Shareholder Agreement substituting Defendant Brown Family Trust for Brown's own shareholdings, thus allocating shares which were agreed to be provided for an employee equity incentive plan under the Shareholder Agreement to Brown personally instead of the employees. At no point did Defendants indicate to Plaintiff that he was already listed as a shareholder when negotiating the JGFH Draft, and Plaintiff was not provided with the official incorporation documents, Bylaws, or Board resolutions, which further made any attempts by Plaintiff to provide demand to the Board of JGFH futile since Plaintiff was never informed he was a shareholder or that such governance documents existed, and only was provided the mailed the JGFH Stock Certificate.

52. In or around May of 2022, Plaintiff discovered the existence of Defendant C3 Limo. C3 Limo is an agent of Defendant JGFH, and its Officers up to on or around April 14,

2022 included Defendant Brown's wife, Stacy Brown, and it's current Manager, Chasen Dobos, is Defendant Brown's stepson as well as JGFH's VP of Operations. C3 Limo utilized the official JGFH and JGH company address in Florida as its own

registered office from its formation in September 2020 until April 14, 2022 and it continues to utilize the JGH Intellectual Property, for instance its official email on file with the State of Florida for the business to receive official annual report filings from the State of Florida remains a "FlyCFG.com" domain owned email address, which is part of the JGH Intellectual Property defined herein.

53. Upon information and belief, Defendant C3 Limo received an undocumented loan for more than $54,000 from Defendant JGFH, in violation of Defendant Brown's obligations under the Shareholder Agreement, and Defendant Brown conspired with C3 Limo through its agents Stacy Brown and Chasen Dobos to utilize company resources of JGH and JGFH to provide C3 Limo with undocumented loans, and to utilize JGFH staff and the JGH Intellectual Property for C3 Limo's purposes without benefit to JGFH, JGH or their respective shareholders. For instance, in July and August of 2021, C3 Limo sent marketing emails through the JGH email distributions lists without "opt-in" from JGH clients, and these client lists are explicitly part of the JGH Intellectual Property. JGFH staff confirmed on the official company staff messaging platform that Brown personally directed staff to email JGFH clients to inform them they could book private car services through C3 Limo throughout Florida. And when asked on the same official company messaging platform about the terms of the undocumented loans to C3 Limo from JGFH, Controller Roya Arabi ("Ms. Arabi") confirmed she was "not aware of any terms or expectation of pay back at this time - this is an accumulation of of [sic] activities between the companies." (emphasis added) Undocumented loans without terms or the expectation of payback, sent from JGFH to C3 Limo with revenue and resources rightfully belonging to JGH, and derived from proceeds of Brown's illegal enterprise are sham loans and unauthorized disbursements without benefit to JGH or JGFH shareholders.

54. In or around May 3, 2022, after being previously informed that the Defendants had ignored the JGH Intellectual Property Proposal which would allow a

payment for the First IRS FET Proposal, RO Neville notified Plaintiff that the IRS had individually assessed Plaintiff for $1,300,000 of Defendants' unpaid FET. In order around May 10, 2022 Plaintiff proposed to Defendants that a possible solution to the unpaid FET, the JGH Intellectual Property Proposal, the JGFH Draft, and the "subsidiaries" of Defendants JGH and JGFH (Defendant C3 Jets and Jet Agency), would be possible by way of a merger between Defendants JGH, JGFH, C3 Jets, and Jet Agency (the "Proposed Merger").

55. In or around June 2,2022, California counsel for JGH Attorney Popov confirmed that the Proposed Merger structure was ready, and introduced his colleague at Watkins Firm,

APC, Dominick Severance ("Attorney Severance") who would be assisting Attorney Popov with the Proposed Merger. On June 9, 2022 Attorney Popov sent the Proposed Merger drafts for Plaintiff, Shareholder Wolf, and all Defendants to review, along with Attorneys Popov, Dubick, Louramore, Klee, and Kirk.

56. In or around June 22, 2022 Plaintiff was informed that Shareholder Wolf and the Defendants had signed the definitive documents for the Proposed Merger, and was asked why he had not signed the same. On June 22, 2022 Plaintiff - while being asked why he had not signed the definitive documents on the Proposed Merger - received a call from RO Neville, who informed Plaintiff that the IRS intended to immediately file a lien against Plaintiff for the $1,300,000 IRS had personally assessed against Plaintiff for Defendants' unpaid FET. Plaintiff, Attorney Kirk, and RO Neville negotiated an extension by IRS to allow time for the Proposed Merger and a payment plan by Defendants for their unpaid FET to be created, and RO Neville tentatively agreed for a forty-five (45) day extension to allow the Proposed Merger to advance, which would extend until August 8, 2022 as the date which IRS would refrain from filing the assessed lien for JGH's unpaid FET against Plaintiff individually.

57. After speaking with RO Neville and reviewing the Proposed Merger

documents, Plaintiff began reviewing the balance sheet (attached hereto as a true and correct copy as **Exhibit "F")** and profit and loss documents of JGFH which he had been provided in or around May 11, 2022, and Plaintiff observed more than $10,000,000 of balance sheet items which were not addressed in the Proposed Merger, which included and are collectively referred to as the "Balance Sheet Items" as follows: over $3,300,000 in loans issued to Defendant Brown personally; over $343,329 issued to Defendant Jet Agency, over $135,571 in loans issued to Defendant Bowman Aviation, Inc.; $861,018,000 in loans issued to Defendant C3 Jets; $54,000 in loans issued to Defendant C3 Limo as well as an apparent liability for unknown reasons which purports that JGFH owes as a liability $177,437 on an American Express card in the name of C3 Limo managing member and Defendant Brown's stepson Chasen Dobos; $125,000 of loans **owed to** Shareholder Wolf - who subsequently informed Plaintiff that Defendants in fact owe Shareholder Wolf hundreds of thousands more than the $125,000 listed; an additional loan **owed to** Premium Merchant funding in excess of $574,000; and a loan **owed to** the Small Business Administration Payroll Protection Program in excess of $572,000.

58. On or about June 29, 2022 Plaintiff, through Attorney Kirk made inquiry to the Balance Sheet items, and followed up on July 14, 2022 and July 20, 2022 on the status of explanation for the Balance Sheet items. On July 8, 2022 Plaintiff, Defendants, Shareholder Wolf, and Attorneys Louramore, Popov, Klee, and Kirk discussed the Proposed Merger status along with Defendant JGFH's Controller Ms. Arabi and Plaintiff reiterated his need to review the Balance Sheet Items and other customary diligence requests.

59. On July 14, 2022, Ms. Arabi informed the Plaintiff that she was not aware of **"any formal agreements/document** regarding the loans between companies and [Brown], The balances are created by transfers and payment from said accounts" (emphasis added). Less than three minutes later, Defendant Brown suggested that he desired to "file bankruptcy and split all the assets" to which

Shareholder Wolf reminded Defendant Brown that bankruptcy would not resolve the IRS FET obligations that were being personally assessed against the shareholders of JGH.

60. Despite requesting documentation for diligence that Plaintiff wished to conduct on the Balance Sheet Items, at no point prior to July 14, 2022 did Plaintiff realize that out of the millions of dollars **that Plaintiff knows** q/'in loans issued by Defendant Brown in violation of the JGH Shareholder Agreement to Defendant Brown individually, or to entities controlled by Defendant Brown such as C3 Jets, Jet Agency, and Bowman Aviation, or held by his immediate family such as C3 Limo, that none of the loans had been documented or formalized, and yet Brown repeatedly pressured Plaintiff to sign the Proposed Merger documents as prepared by Defendants under duress and without the ordinary and customary shareholder rights Plaintiff was entitled to.

61. On or about July 29, 2022 Plaintiff received indication from RO Neville that the IRS would accept a revised version of the First IRS FET Proposal, wherein the IRS would accept a payment of $100,000 instead of $125,000, and if the Defendants did such the IRS would refrain from filing the lien assessed against the Plaintiff, (the "Second IRS FET Proposal") Plaintiff proposed the Second FET Proposal, Defendant Brown indicated that the Defendants could pay such, and the Defendants subsequently disavowed any intention to pay the Second IRS FET Proposal.

62. On August 5, the Plaintiff discussed the unpaid FET and imminently pending lien from IRS with RO Neville, who agreed to extend a deadline for payment of the Second IRS FET Proposal or a plan that the Proposed Merger was substantially completed, which created the imminence of the irreparable injury faced by Plaintiff at the time of filing his original complaint,

with such imminence only obviated after filing when he was informed by the IRS that his assessment and file would be transferred to the IRS' Kansas office before

new action would be taken. There has been no indication that Defendants will satisfy the Second IRS FET Proposal, and the Defendants have failed entirely to present any Proposed Merger given the Undocumented Multi-million Dollar Loans and wrongfully misappropriated JGH Intellectual Property, and all Defendants continue to benefit from the JGH Intellectual Property and the JGH Platform despite JGH's assessment by the IRS and the imminent injury still faced by Plaintiff for the IRS' threatened lien.

63. Following the filing of his complaint, Plaintiff further learned of Brown's actions harming the business. Throughout the summer of 2021 when researching proposed funding sources for JGH, and during the summer of 2022 when discussing the Proposed Merger with Defendants, Plaintiff had conducted research and outreach on potential acquisition partners and/or licensees of the JGH Intellectual Property. One of the most readily identifiable candidates was Executive Charter Services, Inc., ("ECS") led by CEO Jason Johnson ("Johnson").

64. Plaintiff had been familiar with ECS and Johnson in a business capacity for several years, knowing that Johnson had previously led and sold for acquisition a very successful charter platform known as CharterPad, and that Johnson had started ECS following the acquisition of CharterPad. Johnson understood the technology, and Plaintiff had discussed high level possible arrangements for licensing the JGH Intellectual Property or potentially acquiring some of Plaintiffs shareholdings or the entirety of JGH to satisfy the FET debt. Plaintiff believed Johnson capable of the sophistication needed to grow and exit companies in the private aviation industry, and knew that he had an appreciation for the potential of technology and intellectual property developed to create lasting shareholder value following Johnson's success with CharterPad and continued success through ECS. Discussions were positive albeit preliminary, but took a dark turn in summer of 2022.

65. Johnson expressed interest in the JGH Intellectual Property. The likelihood of ECS rescuing JGH from its tax debt (and thus effective insolvency) was

severely harmed, however, as was Plaintiffs interests in the JGH Intellectual Property through Brown's actions against Mr. Johnson which Plaintiff learned the details of after filing his initial complaint. While Plaintiff and Defendants were discussing the Proposed Merger, JGFH was in litigation with ECS over a former employee. In the midst of this litigation, and during the events of the Proposed Merger, Plaintiff learned that Brown called Mr. Johnson in the early morning hours after midnight in late July 2022 threatening his life, and threatening the life of another of the employee's of ECS if the litigation between ECS and JGFH continued. Brown threatened that he had people who would do his "wet work" for him (alluding to murder-for-hire) and that when people are pushed far enough, they could "become a school shooter".

66. Brown then sent pictures and texts to Mr. Johnson showing the exterior of the ECS employee's residence, which Brown had sent someone outside of, and in the texts from the person at the ECS employee's residence the statement that the "residence is the best plan of action no way out with 2 guys in it." Johnson believed the threats to his employee and immediately contacted law enforcement and the Federal Bureau of Investigation, who subsequently opened an investigation into Brown's threats. None of the Defendants disclosed these actions during the discussions of the Proposed Merger. Following Brown's threats of murder in late July, the discussions about ECS potentially licensing or acquiring the JGH Intellectual Property ceased, as Johnson expressed to Plaintiff that he could not work with a deal where Brown was leading the company after threatening his life while he was in the middle of litigation with Brown.

67. Plaintiff further learned through discussions with Xavier Williamson ("Williamson"), who had joined ECS after previously being one of the highest producing sales personnel of JGH and JGFH - that Brown was trying to allocate the resources of JGH and JGFH into Jet Agency. After filing Plaintiffs initial complaint, Stanz and Mr. Williamson discussed the structure of JGFH's sales staff, and Mr.

Williamson expressed his surprise in Plaintiffs complaint that the Plaintiff had required his surrendered shares be allocated to an employee equity incentive plan. Williamson informed Plaintiff that no such plan existed, and that despite growing in size of sales personnel, Brown was attempting to further reduce the productivity of sales personnel by

directing them towards a "jet card" subscription model which would be underneath the Jet Agency banner.

68. Contrary to providing employees with equity incentive, the jet card model offered larger up-front commissions based on larger pre-paid travel bookings by JGFH clients, but once under the jet card model the clients would be further kept away from the sales personnel and they would likely forfeit their commissions. Williamson informed Plaintiff that Brown was attempting to channel the clients of JGFH into Jet Agency underneath this jet card model, further diluting Plaintiffs value.

## FACTUAL ALLEGATIONS REGARDING RICO

69. Defendant Brown has spent his entire career in the private aviation business and is intimately familiar with its applicable rules and regulations. While most of the factual allegations above regarding all Defendants relate to events and conduct alleged with the internal affairs, contracts, and intellectual property of JGH and JGFH, Plaintiff Stanz has also been harmed through the criminal actions of the Defendants in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO").

70. JGH and JGFH as air charter brokers are required by 26 U.S.C. § 4281(a) to pay FET of 7.5% of the transportation price imposed on the transportation of persons by air. The tax obligation is imposed upon the person making the payment for the transportation under 26 U.S.C. § 4281(d). Unless the aircraft operator collects and pays the FET on behalf of JGH or JGFH, the obligation falls to the clients of

JGH and JGFH and subjects them to FET. Failure to pay FET is a criminal violation of 26 U.S.C § 7202, which provides that the willful failure to collect, account for, and pay over such tax is a felony subject to imprisonment up to 5 years.

71. While the obligation is on JGH and JGFH's clients to pay the FET, charter brokers like JGH and JGFH are supposed to collect the tax from clients to hold in trust on their behalf, as to ensure clients are not committing felonies by failing to pay the FET. In addition to 7.5% of the amount of the airfare owed by the person purchasing the air transportation, FET includes a flat fee for each "domestic segment" (defined as 1 takeoff and 1 landing) of the travel. The combined 7.5% and domestic segment fees that make up FET are a "trust fund" tax, meaning that it is imposed on the **purchaser** of the transportation but is collected and held "in trust" for the IRS by the seller of the transportation. Once the FET is collected, the person or company collecting it is required to account for and pay over the tax to the IRS on a regular basis and required to report and account for it on Form 720 with IRS filed quarterly.

72. Due to the length of time Defendant Brown worked in the private jet charter industry, at all times pertinent to this matter he was familiar with the air transportation FET, understood how the tax was calculated and collected, and understood that he was the primary person responsible for causing the FET to be collected and for truthfully accounting for and paying the collected tax to IRS. Moreover, Defendant Brown was intimately familiar with the requirements for collecting and reporting FET accurately, and that purchasers and passengers were ultimately responsible for FET which is why it was a "trust fund" tax. The collection and remittance on behalf of the clients of JGH and JGFH was critically important, since failure to remit would expose clients for potential violations of 26 U.S.C. § 4281 if the tax was not remitted to the IRS. For these reasons, Brown ensured that **att** of the contracts that went to clients of JGH and JGFH through the JGH Platform utilizing the JGH Intellectual Property informed the clients that the price they were

given in the Client Contract, defined below, "includes all applicable fees including Federal Excise Tax and segment fees" (emphasis added) or directly lists FET as a line item for the client in the pricing.

73. Brown was intimately familiar that willfully failing to remit the tax to IRS is a felony after a prominent criminal case involving the failure to accurately report FET was filed by the United States Government against the CEO of a well-known air charter broker, Wayne John Rizzi, who waived the indictment by the government and agreed to a prison sentence for his violations of 26 U.S.C § 7202 for charging but not reporting or paying FET to the IRS, as detailed in the Plea Agreement in **US.** v. **Rizzi.** No. CR 14 00102 (C.D. Cal. 2014).

74. While Brown's unpaid FET scheme dates back to a minimum of JGH's incorporation as assessed by the IRS, over the past five years Defendant Brown orchestrated a scheme to use the JGH Intellectual Property to defraud the passengers purchasing air transportation from JGH and JGFH of more than $5,000,000 in FET the clients were charged for and which Defendant Brown instead pocketed for the enterprise and invested in its growth rather than remitting to the IRS. The structure of the investment and retention of these fraudulently charged taxes to clients enabled the enterprise to grow, which thus enabled Brown to siphon funds from the unlawfully obtained revenue for his own personal enrichment, as well as the growth and investment in the enterprise through C3jets, C3 Limo, Bowman Aviation, and Jet Agency such as the Undocumented Multi-million Dollar Loans.

75. Defendant Brown made the ultimate decisions regarding the collection, handling, and payment of the FET to IRS. Brown coordinated with his subordinates in the enterprise to facilitate the contracts being sent to collect the FET from clients, and did so through the enterprise's agents including Ryan Sargent, Chasen Dobos, and Roya Arabi. The finance, operations, and booking staff of the Defendants would regularly enter into written agreements with the charter air operators who provided the aircraft JGH and JGFH customers would fly on, and these written contracts would further specify that JGH or JGFH - not the jet providers - were responsible for collecting, accounting for, and paying FET to the IRS. The enterprise's agents, at the direction of Brown, sent the client contracts for the passengers through the JGH Platform utilizing the JGH Intellectual Property. The contracts omitted the fact that

FET is imposed on **purchasers** for air transportation and ultimately the responsibility of these clients as purchasers/passengers, and instead provided them with written assurances that the prices **included all FET and segment fees.** Brown thus orchestrated a scheme that enabled the enterprise to use the JGH Platform and JGH Intellectual Property to send contracts for the clients of JGH and JGFH which would charge clients for FET and account for the tax as a "trust fund" tax owed to IRS as required by 26 U.S.C § 4281, but instead of remitting the payment to IRS Brown willfully directed it to enrich himself and his family, and invest in expanding the enterprise in a felonious violation of 26 U.S.C § 7202.

76. Defendant Brown structured the enterprise with multiple companies and operations processes which utilized the JGH Intellectual Property to further this conspiracy through the JGH Platform, and directed the personnel and resources of the enterprise to optimize a process where passengers would be charged FET, the FET would be reported to the IRS, but the FEE proceeds collected would be placed as revenue inside the enterprise's accounts. Once in these accounts, the proceeds were then routed throughout the enterprise to derive income to Brown and his family, as well as investing in the enterprise's growth through loans and investments such as the Undocumented Multi-million Dollar Loans. Brown's enterprise includes at a minimum JGH, JGFH, C3 Jets, C3 Limo, Bowman Aviation, and Jet Agency, operating under the banner of "Charter Flight Group" (hereinafter the "CFG Enterprise"). The CFG Enterprise was structured in a way that allowed Brown to willfully evade over $5,000,000 FET payments owed over nearly 5 years, a felony violation of 26 U.S.C § 7202, which was then used to derive income from the CFG Enterprise and invest in the CFG Enterprise's growth.

77. Brown directed the employees of JGH and JGFH to help facilitate the scheme that grew the CFG Enterprise (an organizational chart showing the employees and structure of JGH, JGFH, C3 Jets, and Jet Agency as part of the CFG Enterprise is attached hereto as a true and correct copy as **Exhibit "G").** After his

control was consolidated following the Board Coup, Brown set about to establish JGFH, C3 Limo, and Jet Agency. He then linked Bowman Aviation and C3 Jets to further service and grow the CFG Enterprise. Brown communicated regularly with Chief Operating Officer Ryan Sargent to structure the collection of payments and money movement between the various entities in the CFG Enterprise, and directed him to route funds between the various companies including the funds from the unpaid FET. Once funds were in accounts controlled by Brown, he routed payments and loans to himself and his family held entities such as C3 Limo with Chasen Dobos. Brown also directed Deb Fouts, the payroll manager of JGH and JGFH to route funds, including FET proceeds to allow Brown to disburse funds and commissions to himself, and further directed Controller Ms. Arabi to oversee the flow of finances including the Undocumented Multi-million Dollar Loans and disbursements made from funds collected including those from unlawful FET proceeds.

78. JGFH's VP of Operations Chasen Dobos was directed by Brown to maintain client services relationships on "day of flight" travel, to send the operator contracts to the CFG Enterprise's third-party operators which confirmed the CFG Enterprise would pay FET, and to suggest ground transportation to the CFG Enterprise's clients through C3 Limo despite the client lists and customers being part of the JGH Intellectual Property. Ryan Sargent, Deb Fouts, Chase Dobos, and Roya Arabi (collectively the "CFG Personnel") were all instructed to route the payments and account for FET by Defendant Brown. The technical booking process Brown orchestrated to run this scheme to defraud clients involved using the JGH Intellectual Property including the JGH Platform, which are rightfully Plaintiffs intellectual property misappropriated by the Defendants, and Brown architected this fraud and misappropriation to be conducted through the CFG Personnel.

79. The scheme for the CFG Enterprise's felonious "harvesting" of FET payments from clients to invest into and derive income from the enterprise instead of

remitting as required to IRS used seemingly innocuous business processes which make up the JGH Platform and JGH Intellectual Property, as further detailed. First, there is a booking process, where a client makes a trip request to a broker such as an agent of JGH, JGFH, C3 Jets, or Jet Agency through the JGH Platform ("Broker"). The Broker sources available aircraft pricing from several operators such as C3 Jets and others, and generates multiple quotes to send to the client ("Client Quote"). The client receives the Client Quotes and chooses a final quote to sign as a contract (hereinafter "Client Contract" which the CFG Enterprise Client Contracts from Q2 2017-Q1 2019, Q2 2019-Q1 2020, and Q2 2020-Present are attached hereto as true and correct copies in **Exhibit "H").**

80. The Broker secures aircraft with a contract to the operator ("Operator Contract"). The Broker may cancel the Operator Contract in favor of a new contract with upgraded aircraft features, and the Client Contract may get updated with additional line items. Similarly, the Operator Contract may get updated with additional line items. The Broker pays for the flight, and then the client pays the Broker, via credit card and a digital signature form, via credit card through a digital booking form, or starting in 2019 for JGH and JGFH through a wire submission via digital signature form or digital booking (the "Client Payment Methods").

81. All of the Client Payments Methods utilize the internet, electronic mail, and banking systems within the United States and throughout interstate commerce. Client Contracts always listed FET explicitly listed either as a line item inclusive in the price, or in the contract terms stating pricing includes FET, and Operator Contracts provide either Net pricing - where the operator will pay FET - or Net Net pricing - where the Broker will pay FET. For Net Net transactions, the Operator may or may not explicitly state Broker pays FET in an Operator Contract, and where the Operator Contract often will list $0.00 as a line item for taxes and/or FET, it indicates the Operator will **not** pay FET and or taxes and that the Broker is

responsible for collecting tax from the client and remitting FET to the IRS.

82. Defendant Brown, as the responsible person for FET, and sole control person of the finances of JGH directed JGH to allow unpaid FET to accrue while fraudulently collecting such payments from passengers as early as the first quarter of 2017. In 2017, Brown left an unpaid FET balance of $93,005.77 in the first quarter, $274,260.29 in the second quarter, $519,727.88 in the third quarter, and $717,114.76 in the fourth quarter. Despite FET owed and accrued, Defendant Brown willfully caused the enterprise to send documents to the JGH passengers and utilized the JGH Intellectual Property and the JGH Platform to send passengers and operators Operator Contracts and Client Contracts that falsely stated charges for FET were included from JGH, and sent these fraudulent documents to collect payment through the Client Payment Methods (the "Fraudulently Charged FET"). The Fraudulently Charged FET in 2017 amounted to $93,005.77 in the first quarter, $181,254.52 in the second quarter, $245,467.59 in the third quarter, and $197,386.88 in the fourth quarter. The totals of the Fraudulently Charged FET in 2017 amounted to $717,114.76.

83. Defendant Brown, as the responsible person for FET, and sole control person of the finances of JGH continued to direct JGH to allow unpaid FET to accrue while fraudulently collecting such payments from passengers throughout 2018. In 2018, Brown left an unpaid FET

balance of $943,190.72 in the first quarter, $1,136,607.51 in the second quarter, $1,331,038.54 in the third quarter, and $1,554,019.40 in the fourth quarter. Despite FET owed and accrued, Defendant Brown willfully caused the enterprise to send documents to the JGH passengers and utilized the JGH Intellectual Property and the JGH Platform to facilitate the Fraudulently Charged FET. The Fraudulently Charged FET in 2018 amounted to $226,075.96 in the first quarter, $193,416.79 in the second quarter, $194,431.03 in the third quarter, and $222,980.86 in the fourth quarter. The totals of the Fraudulently Charged FET in 2018 amounted to $836,904.64.

84. Defendant Brown, as the responsible person for FET, and sole control person of the finances of JGH and JGFH continued to direct the CFG Enterprise and CFG Personnel to allow unpaid FET to accrue while fraudulently collecting such payments from passengers throughout 2019, both through JGH and JGFH after its incorporation. In 2019, Brown left an unpaid FET balance of $1,759,943.57 in the first quarter, $2,002,537.08 in the second quarter, $2,249,398,47 in the third quarter, and $2,507,387.60 in the fourth quarter. Despite FET owed and accrued, Defendant Brown willfully caused the CFG Enterprise to send documents to the CFG Enterprise's passengers and utilized the JGH Intellectual Property and the JGH Platform to facilitate the Fraudulently Charged FET. The Fraudulently Charged FET in 2019 amounted to $177,869.29 in the first quarter, $250,648.39 in the second quarter, $266,861.13 in the third quarter, and $207,989.13 in the fourth quarter. The totals of the Fraudulently Charged FET in 2019 amounted to $903,368.20.

85. Defendant Brown, as the responsible person for FET, and sole control person of the finances of JGH and JGFH continued to direct the CFG Enterprise and CFG Personnel to allow unpaid FET to accrue while fraudulently collecting such payments from passengers throughout 2020, both through JGH and JGFH after its incorporation. FET calculations within the JGH Platform, unbeknownst to Plaintiff, were directed by Brown to be changed in 2020 to disable FET calculations on quotes and contracts, and the industry was impacted by COVID-19 which made difficulty ascertaining the full numbers for 2020. during the COVID-19 outbreak affecting the travel industry. In 2020, Brown left an unpaid FET balance of $2,667,750.96 in the first quarter, $2,792,750.96 in the second quarter, $2,992,750.96 in the third quarter, and $3,192,750.96 in the fourth quarter. Despite FET owed and accrued, Defendant Brown willfully caused the CFG Enterprise to send documents to the CFG Enterprise's passengers and utilized the JGH Intellectual Property and the JGH Platform to facilitate the Fraudulently Charged FET. The Fraudulently Charged FET in 2020 Plaintiff believes amounts to around $135,363.36 in the first quarter, which

due to the changes to the JGH Platform which were rolled back in December 2020 is the only quarter Plaintiff has totals for, but the totals for 2020 Fraudulently Charged FET are believed by Plaintiff to be an amount in excess of $732,110.25.

86. Defendant Brown, as the responsible person for FET, and sole control person of the finances of JGH and JGFH continued direct the CFG Enterprise and CFG Personnel to allow unpaid FET to accrue while fraudulently collecting such payments from passengers throughout 2021, both through JGH and JGFH after its incorporation. In 2021, Brown left an unpaid FET balance of $3,585,292.53 in the first quarter, $4,163,662.06 in the second quarter, $5,082,066.92 in the third quarter, and $5,484,896.60 in the fourth quarter. Despite FET owed and accrued, Defendant Brown willfully caused the CFG Enterprise and CFG Personnel to send documents to the CFG Enterprise's passengers and utilized the JGH Intellectual Property and the JGH Platform to facilitate the Fraudulently Charged FET. The Fraudulently Charged FET in 2021 amounted to $395,794.68 in the first quarter, $578,369.53 in the second quarter, $405,723.11 in the third quarter, and $790,511.73 in the fourth quarter. The totals of the Fraudulently Charged FET in 2021 amounted to $2,170,399.05.

87. Defendant Brown, as the responsible person for FET, and sole control person of the finances of JGH and JGFH continued to direct the CFG Enterprise and CFG Personnel to allow unpaid FET to accrue while fraudulently collecting such payments from passengers throughout 2022 and continues to let FET accrue through JGFH. This year, Brown left an unpaid FET balance of $6,178,643.10 in the first quarter. Plaintiff does not have access to the records and payment beyond the first quarter, but during 2022 and upon information and belief, despite FET owed and accrued, Defendant Brown willfully caused the CFG Enterprise and CFG Personnel to send documents to the CFG Enterprise's passengers and utilized the JGH Intellectual Property and the JGH Platform to facilitate the Fraudulently Charged FET. The Fraudulently Charged FET that Plaintiff knows of so far this year

amounted to $546,627.94 in the first quarter.

88. In total, the Fraudulently Charged FET from the first quarter of 2017 up until the most recent quarter Plaintiff has records for of this year has totaled at least $5,581,789.81, and was collected at the direction of Defendant Brown throughout interstate commerce and through the wires over the course of **thousands** of flights chartered through the JGH Platform and utilizing the JGH Intellectual Property and CFG Personnel, all with the intention to derive income from and invest in the expansion of the CFG Enterprise. Plaintiff will provide evidence of over 3,000 instances of Fraudulently Charged FET as part of his forthcoming RICO Case Statement as required by local rules of this Honorable Court. Due to the voluminous nature of the predicate acts alleged which will be included in Plaintiffs RICO Case Statement, Plaintiff alleges the following examples of Fraudulently Charged FET from January 2017 to present, all of which were on contracts personally overseen by Defendant Brown. All of the clients below are CFG Enterprise clients whom are part of Defendant Brown's personal broker book, meaning he was the actual Broker with the Client Contract for each trip, and he received commission for each trip in addition to his $1,000,000 base salary, commission which further derived from charging FET to the client which was not remitted to IRS. All of the Client Contracts (and many of the Operator Contracts) specifically reference inclusion of FET, and all of the Operator Contracts were structured to require the CFG Enterprise to collect FET. Willful non-payment of collected but unremitted FET is a felonious violation of 26 U.S.C § 7202. Brown as Broker maintained relationships directly with each of the below listed clients, each of whom the CFG Enterprise informed on the Client Contract (which included Brown as Broker) that the client pricing included all FET, and the clients were all charged for FET through the Client Payment Methods, and the charges were directed into the CFG Enterprise to enable Brown and the CFG Enterprise to derive income from the scheme and invest in the growth of the CFG Enterprise. FET was not segregated into a separate account as required by the

Shareholder Agreement and was further not disbursed to the IRS trust fund accounts. Defendant Brown admitted to the Plaintiff that he is responsible for the unpaid FET when he stated: **"I am responsible for the FET mess. I will have to answer to this. GET OVER IT. Who gives a f*ck. We can raise the money tomorrow to cover it. I would do it again. It's what I did to get the company to this point. Please stop bringing it up!"** Instances from the first quarter of 2017 through the most recent quarter of this year include the following:

a. In the first quarter of 2017, client Dan Hennelly booked a flight through the JGH Platform from Fort Lauderdale, FL to Marathon, FL and back on February 2, 2017 for $11,697.80 of which $814.98 was FET collected and unpaid, and which the Client Contract specified FET as a line item, the Operator Contract with Red Wing Aeroplane Co. required FET to be paid by JGH, and Defendant Brown signed the Operator Contract. The Client Contract falsely specified that FET would be paid, FET was charged through a Client Payment Method and unremitted to IRS, and Defendant Jordan Brown personally was paid a commission for this trip as the Broker for the trip.

b. In the second quarter of 2017, client Judy Schuda booked a flight through the JGH Platform from Van Nuys, CA to Scottsdale, AZ and back on April 13, 2017 for $9,826.07 of which $683.82 was FET collected and unpaid, and which the Operator Contract with Clay Lacy Aviation required FET to be paid by JGH, and Defendant Brown is named on the Operator Contract. The Client Contract falsely specified that FET would be paid, FET was charged to a Client Payment Method and unremitted to IRS, and Defendant Jordan Brown personally was paid a commission for this trip as the Broker for the trip.

c. In the third quarter of 2017, client David Rosenberg booked a flight through the JGH Platform from Cincinnati, OH to Westhampton Beach, NY on August 26, 2017 for $15,485.18 of which $1,080.08 was FET collected

and unpaid, and which the Client Contract specified that pricing included FET, and which the Operator Contract with Worldwide Jet required FET to be paid by JGH, and JGH d/b/a Charter Flight Group is named on the Operator Contract. The Client Contract falsely specified that FET would be paid, FET was charged to a Client Payment Method and unremitted to IRS, and Defendant Jordan Brown personally was paid a commission for this trip as the Broker for the trip.

d. In the fourth quarter of 2017, client David McKenzie booked a flight through the JGH Platform from Los Angeles, CA to Las Vegas, NV and back on on December 1, 2017 for $12,922.60 of which $897 was FET collected and unpaid, and which the Operator Contract with StarJet stated that the provided price excluded FET, and Defendant Brown is named on the Operator Contract. The Client Contract falsely specified that FET would be paid, FET was charged to a Client Payment Method and unremitted to IRS, and Defendant Jordan Brown personally was paid a commission for this trip as the Broker for the trip.

e. In the first quarter of 2018, client David Rosenberg booked a flight through the JGH Platform from Cincinnati, OH to Teterboro, NJ on March 25, 2018 for $8,753.03 of which $610.38 was FET collected and unpaid, and which the Client Contract specified that pricing included FET, and which the Operator Contract with Red Wing Aeroplane Co. required FET to be paid by JGH, and JGH d/b/a Charter Flight Group is named on the Operator Contract. The Client Contract falsely specified that FET would be paid, FET was charged to a Client Payment Method and unremitted to IRS, and Defendant Jordan Brown personally was paid a commission for this trip as the Broker for the trip.

f. In the second quarter of 2018, client Kirk Brown booked a flight through the JGH Platform from Westhampton Beach, NY to Portland, OR on

~~June 13, 2018 for $37,438.62 of which $2,609.95 was FET collected and unpaid, was a Net-Net transaction, and a JGH company representative is named on the Operator Contract with XO Jet. The Client Contract falsely specified that FET would be paid, FET was charged to a Client Payment Method and unremitted to IRS, and Defendant Jordan Brown personally was paid a commission for this trip as the Broker for the trip.~~

~~g. In the third quarter of 2018, client David Lipman booked a flight through the JGH Platform from Wadesboro, NC to Lewisburg, WV on July 18, 2018 for $15,499.40 of which $1,079.89 was FET collected and unpaid, and which the Client Contract specified that pricing included FET, and which the Operator Contract with Delta Private Jets required FET to be paid by JGH, and a JGH company representative is named on the Operator Contract. The Client Contract falsely specified that FET would be paid, FET was charged to a Client Payment Method and unremitted to IRS, and Defendant Jordan Brown personally was paid a commission for this trip as the Broker for the trip.~~

~~h. In the fourth quarter of 2018, client Bryan Hoffman booked a flight through the JGH Platform from Baton Rouge, LA to Raleigh, NC and back on November 6, 2018 for $31,968.52 of which $2,226.85 was FET collected and unpaid, and which the Client Contract specified that pricing included FET, and which the Operator Contract with Summit Aviation required FET to be paid by JGH, and a JGH company representative signed the Client Contract. The Client Contract falsely specified that FET would be paid, FET was charged to a Client Payment Method and unremitted to IRS, and Defendant Jordan Brown personally was paid a commission for this trip as the Broker for the trip.~~

~~i. In the first quarter of 2019, client Katherine Birdsall booked a flight through the JGH Platform from Provo, UT to Teterboro, NJ and then to~~

Boston, MA and back to Teterboro, NJ and then back to Provo, UT on February 7, 2019 for $73,713.30 of which $5,140.50 was FET collected and unpaid, and which the Client Contract specified that pricing included FET, and which the Operator Contract Delta Private Jets specified FET to be paid by JGH, and Defendant Brown is named on the Operator Contract. The Client Contract specified that FET would be paid, FET was charged to a Client Payment Method, and Defendant Jordan Brown personally was paid a commission for this trip as the Broker on the trip. Plaintiff believes this trip falsely specified that FET was included, and that FET was charged and unremitted for the trip to IRS, because a total of $205,924.17 in FET was owed for this quarter and yet only $28,054.88 was paid, meaning over eighty-six percent of FET was charged but unremitted out of a total of 170 eligible trips.

j. In the second quarter of 2019, client Charlie McKinney booked a flight through the JGH Platform from Dallas, TX to San Antonio, TX, and back on April 1,

2019 for $15,954.22 of which $1,108.40 was FET collected and unpaid, and which the Client Contract specified that pricing included FET, and which the Operator Contract with Monarch Air specified FET to be paid by JGH, and Operator Contract is signed by a CFG Enterprise. The Client Contract falsely specified that FET would be paid, FET was charged to a Client Payment Method and unremitted to IRS, and Defendant Jordan Brown personally was paid a commission for this trip along with Ryan Sargent as Brokers for the trip.

k. In the third quarter of 2019, client Mark Elliot booked a flight through the JGH Platform from Atlanta, GA to Chicago, IL and back on August 15, 2019 for $20,466.62 of which $1,425.66 was FET collected and

unpaid, and which the Client Contract specified that pricing included FET, and which the Operator Contract with Flightworks specified Net-Net terms indicating FET to be paid by JGFH, and a CFG Enterprise representative is named on the Operator Contract. The Client Contract falsely specified that FET would be paid, FET was charged to a Client Payment Method and unremitted to IRS, and Defendant Jordan Brown personally was paid a commission for this trip as the Broker for the trip.

l. In the fourth quarter of 2019, client David Almeida booked a flight through the JGH Platform from Teterboro, NJ to Opa-Locka, FL and back on October 06, 2019 for $29,900.00 of which $2,038.12 was FET collected and unpaid, and which the Client Contract specified that pricing included FET, and which the Operator Contract with Century Jet specified FET to be paid by JGFH, and Operator Contract is signed by a CFG Enterprise representative. The Client Contract falsely specified that FET would be paid, FET was charged to a Client Payment Method and unremitted to IRS, and Defendant Jordan Brown personally was paid a commission for this trip as the Broker for the trip.

m. In the first quarter of 2020, client Russell Lindmark booked a flight through the JGH Platform from Kansas City, MO to Opa-Locka, FL and back on January 22, 2020 for $92,247.28 of which $6,428.24 was FET collected and unpaid, and which the Client Contract specified that pricing included FET, and which was a Net-Net transaction, and a JGFH company representative is named on the Operator Contract with United States Aviation. The Client Contract falsely specified that FET would be paid, FET was charged to a Client Payment Method and unremitted to IRS, and Defendant Jordan Brown personally was paid a commission for this trip as the Broker for the trip.

n. In the second quarter of 2021, client Donna Smith booked a

flight through the JGH Platform from Baltimore, MD to Jackson, WY on June 5, 2021 for $31,933.42 of which $2,226.41 was FET collected and unpaid, and which the Client Contract specified FET as a line item, and Defendant Brown is named on the Operator Contract with Fly Exclusive. The Client Contract falsely specified that FET would be paid, FET was charged to a Client Payment Method and unremitted to IRS, and Defendant Jordan Brown personally was paid a commission for this trip as the Broker for the trip.

o. In the third quarter of 2021, client Gary Kovacs booked a flight through the JGH Platform from Tuscaloosa, AL to Opa-Locka, FL on September 24, 2021 for $35,998.53 of which $2,510.93 was FET collected and unpaid, and which the Client Contract specified FET as a line item, and which the Operator Contract with VeriJet contains a clause stating that the undersigned **is not to collect FET** as FET will be remitted by the Operator, of which Defendant Brown signed the aforementioned clause, and Defendant Brown additionally signed the Operator Contract in its entirety. The Client Contract falsely specified that FET would be paid, FET was charged to a Client Payment Method and unremitted to IRS, and Defendant Jordan Brown personally was paid a commission for this trip as the Broker for the trip. Even more flagrant to the FET charged to a Client Payment Method and yet unremitted is the fact that the Operator Contract with VeriJet - seemingly to ensure that FET would be paid - required JGFH to **not** charge FET since the Operator would remit it to IRS, and Defendant Jordan Brown signed agreeing to such, and yet still charged Mr. Kovacs for FET even though the Operator was paying the FET, and even with this additional fraudulent collection of FET by Defendant Jordan Brown it **still** was unremitted to IRS and Brown took a direct commission.

p. In the fourth quarter of 2021, client David Ziebarth booked a flight through the JGH Platform from Tampa, FL to Binghamton, NY on

October 12, 2021 for $20,519.60 of which $1,431.00 was FET collected and unpaid, and which the Client Contract specified FET as a line item, and JGFH d/b/a Charter Flight Group is named on the Operator Contract with Executive Airlink. The Client Contract specified that FET would be paid, FET was charged to a Client Payment Method, and Defendant Jordan Brown personally was paid a commission for this trip as the Broker on the trip. Plaintiff believes this trip falsely specified that FET was included, and that FET was charged and unremitted for the trip to IRS, because a total of $915,511.73 in FET was owed for this quarter and yet only $125,000 was paid, meaning over eighty-six percent of FET collected was charged but unremitted out of a total of 478 eligible trips.

q. In the first quarter of 2022, client Catherine Oppenheimer booked a flight through the JGH Platform from Santa Fe, NM to Teterboro, NJ and back on February 28, 2022 for $82,498.05 of which $5,755.05 was FET collected and which the Client Contract specified FET as a line item, and a JGFH company representative is named on the Operator Contract with Maine Aviation Aircraft Charter. The Client Contract specified that FET would be paid, FET was charged to a Client Payment Method, and Defendant Jordan Brown personally was paid a commission for this trip as the Broker on the trip. Plaintiff believes this trip falsely specified that FET was included, and that FET was charged and unremitted for the trip to IRS, because a total of $955,377.03 in FET was owed for this quarter and yet only $272,118 was paid, meaning nearly two-thirds of total FET was charged but unremitted out of 444 eligible trips.

89. In total, the Fraudulently Charged FET from the first quarter of 2017 up until the

most recent quarter Plaintiff has data on for this year has totaled at least $5,581,789.81, far exceeding the amount the IRS has personally assessed against the

Plaintiff, and yet instead of satisfying the IRS debts assessed against the Plaintiff, Defendant Brown and the CFG Enterprise derived millions of dollars from the CFG Enterprise and invested millions of dollars in the CFG Enterprise's expansion, including co-defendants which Brown controls individually or through his family such as C3 Jets, Jet Agency, Bowman Aviation, and C3 Limo. The $5,581,789.81 was collected throughout interstate commerce and through Client Payment Methods sent through the wires over the course of **thousands** of flights chartered through the JGH Platform and utilizing the JGH Intellectual Property and CFG Personnel. After the CFG Personnel were instructed to route payments at Defendant Brown's direction, Brown allocated these funds throughout the CFG Enterprise, including to derive income and personal purchases to benefit Defendant Brown and his family.

90. Defendant Brown directed the CFG Personnel to mingle the finances of the various entities throughout the CFG Enterprise, including notes and payments wrongfully disbursed to C3 Limo and C3 Jets as well as the Undocumented Multi-million Dollar Loans, even though there were no terms or payment schedules or documentation for these "loans". When asked by Controller Ms. Arabi and staff member Lillian Tamm about the corporate loans and balance sheets, Brown instructed the CFG Personnel to "treat [C]ali and [F]lorida as [the] same company and [J]et [A]gency" but further that C3 Jets was on an "island". The Undocumented Multi-million Dollar Loans and disbursements were all part of the same CFG Enterprise operated by Brown, which was funded by the Fraudulently Charged FET, and extended beyond the "same company" which Brown treated JGH, JGFH, and Jet Agency as, with such extension by Brown routing the FET scheme proceeds to C3 Jets, C3 Limo, Bowman Aviation, and Brown individually. Ms. Arabi confirmed when asked about the financial structure among the CFG Enterprise Defendants that there were not "a«y **formal agreements/document** regarding the loans between companies and Jordan. The balances are created by transfers and payment from said accounts." (emphasis added)

91. Brown additionally used the JGH Intellectual Property and CFG Personnel to facilitate business to C3 Limo, and falsely claimed to the company that JGH owned a Hawker 800XP (which in fact Brown placed in C3 Jets and funded with the Fraudulently Charged FET through the undocumented loan from JGFH to C3 Jets) and additionally utilized the CFG Personnel to participate in the design and marketing of a restaurant purchased at the Van Nuys Airport - Mavericks - which upon information and belief is a redesign of an existing airport restaurant and bar which has been invested in by Defendant Brown and which CFG Enterprise staff and resources have been used to advance the deal and further the CFG Enterprise.

**FIRST CAUSE OF ACTION**

**RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO)**

**(AGAINST ALL DEFENDANTS)**

**CLAIM 1**

**18 U.S.C. § 1962(c)**

92. Plaintiff realleges and incorporates by reference Paragraphs 1-91 as if set forth fully herein.

93. Defendants Brown, Jet Genius Holdings, Inc., Jet Genius Florida Holdings, Inc., C3jets LLC, Bowman Aviation, Inc., Jet Agency Global LLC, and C3 Limo LLC (collectively the "CFG Enterprise Defendants") associated together for the common purpose - led by Brown - to create fraudulent schemes to misappropriate the JGH Platform and JGH Intellectual Property, which rightfully belong to the Plaintiff, throughout interstate commerce as actionable under 18 U.S.C. § 1836(b) as alleged by Plaintiff in his Second Cause of Action, to collect more than $5,000,000 in charged but unpaid FET from the CFG Enterprise's clients. The misappropriation is actionable under 18 U.S.C. § 1836(b) and is a crime actionable

and predicate act under RICO in this jurisdiction.

94. The CFG Enterprise Defendants had a formal or informal organization where

Defendant Brown used the JGH Platform to create Operator Contracts and Client Contracts which Defendant Brown would direct CFG Personnel to send to collect FET from CFG Enterprise clients with these fraudulent documents, and then route the funds from these proceeds throughout the various entities under the control of the CFG Enterprise.

95. There are thousands of instances in this pattern of the CFG Enterprise charging FET to clients under Client Contracts set through the wires which stated FET was included in the pricing in addition to the Operator Contracts which the CFG Enterprise falsely agreed it would collect and remit FET under, a pattern detailed above in Paragraph 88(a)-(q) from at least January 2017 to this current year. The CFG Enterprise pattern used Plaintiffs misappropriated intellectual property in the JGH Intellectual Property and JGH Platform to then enable Brown and the CFG Personnel to send these fraudulent documents throughout interstate commerce informing the clients that their charges included FET which was owed to the IRS on behalf of the clients, but which Defendant Brown instead routed to benefit the CFG Enterprise in a felonious violation of 26 U.S.C § 7202.

96. Defendant Brown and the CFG Enterprise Defendants were aware of at least the general existence of the CFG Enterprise and knew that it extended beyond each of their individual roles.

97. The Fraudulently Charged FET documents were sent electronically throughout interstate commerce and purported to collect required tax excised by the IRS for air transportation governed by the Federal Aviation Administration, and the scheme effected interstate commerce. The misappropriated JGH Platform and JGH Intellectual Property were used in interstate commerce by the CFG Enterprise Defendants to coordinate the scheme.

98. Defendant Brown and the CFG Enterprise Defendants individually and with the CFG Personnel and through entities controlled by the CFG Enterprise Defendants and Defendant Brown participated in the conduct, affairs, or operation of the enterprise through a pattern of racketeering activity over more than five years involving the scheme to fraudulently use the JGH Intellectual Property including the JGH Platform to collect FET from clients of the CFG Enterprise for the benefit of the CFG Enterprise Defendants, and they sent these fraudulent documents which stated FEE would be collected on behalf of clients to the clients electronically via the wire, thereby constituting wire fraud under 18 U.S.C §§ 1341 and 1343, and did so from at least January of 2017 throughout the present year.

99. Defendant Brown knowingly participated in and furthered this scheme through thousands of acts of wire fraud, having devised a scheme or artifice to defraud and obtaining money or other property by a means of false or fraudulent pretenses or representations, for the purpose of executing such scheme or artifice or attempting to do so, and directed the CFG Personnel and the CFG Enterprise to send thousands of Client Contracts falsely stating that the pricing for payment collected from clients included FEE, which instead generated over $5,000,000 in illegal proceeds to benefit the CFG Enterprise Defendants.

100. Ehe thousands of transmittals of fraudulent misrepresentations about the nature of the FEE payment collected poses a continued threat of fraudulent activity with continuing this scheme, and in fact Defendant Brown and the CFG Enterprise Defendants have continued this scheme as recently as this summer. Brown himself admitted that he "was responsible for the FEE mess, [he] will have to answer to this...[he] would do it again." Ehese acts are interrelated by distinguishing characteristics and are not isolated events.

101. Alternatively, the acts above are a regular way of conducting Defendant Brown and the CFG Enterprise Defendants' business. Ehe CFG Enterprise utilizes

the CFG Personnel to regularly send Client Contracts to the clients to collect FEE through the JGH Platform and utilizing the JGH Intellectual Property, seemingly as a regular manner of conducting business.

102. Ehe scheme by Defendant Brown and the CFG Enterprise Defendants has involved and does still involve the misappropriated JGH Intellectual Property and JGH Platform, which rightfully belong to the Plaintiff.

103. Plaintiff has suffered injury derivatively to his reputation and business in the harm to his reputation and the disruption of his business activities. Plaintiffs business has been damaged and his interests derivatively as a shareholder have been damaged for all instances of fraudulent FET charged through the JGH Platform and JGH Intellectual Property by the CFG Enterprise Defendants. The fraudulent collection of FET from clients and then felonious failure to remit to IRS have subjected Plaintiff as a shareholder derivatively to damage of his shareholdings in JGH and JGFH being subject to criminal charges. Plaintiff has further suffered damage to his shareholdings derivatively through these actions by his shareholdings to civil liability from shareholders assessed FET responsibility individually by IRS, which is not a speculative injury but a concrete injury as evidenced by IRS already assessing shareholders of JGH for personal liability of the FET, thereby exposing Plaintiff as shareholder to diluted value derivatively for exposure for Contribution and Indemnity sought from JGH shareholders for the CFG Enterprise Defendants' criminal actions. Plaintiff has further suffered injury to his business derivatively by the CFG Enterprise Defendants' criminal actions in the damage to the JGH Intellectual Property and JGH Platform being used to commit crimes, which has damaged the valuable intellectual property already valued independently over $50,000,000.

104. Plaintiff has suffered injury to his reputation and business in the harm to his reputation and the disruption of his business activities. Plaintiff has suffered injury individually in his property and business in the more than $1,300,000 of

assessments by the IRS against Plaintiff for the fraudulently charged FET which have negatively impacted Plaintiffs business and property with such assessment publicly listed as a liability of Plaintiff and which will further subject him to harm when the IRS issues its lien on the assessment. This harm is the direct result of the FET fraudulently charged to JGH clients by the CFG Enterprise Defendants to clients from their criminal actions from January 1, 2017 through December 31, 2019. Plaintiff has further suffered injury to his business by the CFG Enterprise Defendants' criminal actions in the damage to the JGH Intellectual Property and JGH Platform - which are rightfully the property of the Plaintiff - in their misappropriation by the CFG Enterprise Defendants, and the subsequent use of this property to commit crimes, which has damaged the valuable intellectual property already valued independently over $50,000,000.

**18 U.S.C. § 1962(b)**

105. Plaintiff realleges and incorporates by reference Paragraphs 1-104 as if set forth fully herein.

106. Through the above pattern of racketeering activity dating back to at least 2017, Defendant Brown and the CFG Enterprise Defendants acquired and have maintained an interest or control in an enterprise engaged in interstate commerce that was connected to the pattern of racketeering activity

107. Plaintiff has suffered injury to his reputation and business in the harm to his reputation and the disruption of his business activities, both in the damage done to the JGH Platform and JGH Intellectual Property by the damage caused by using them in Defendant Brown's criminal enterprise, but also in the damage of the more than $1,300,000 in assessments by the IRS against Plaintiff individually despite Defendant Brown and the CFG Enterprise Defendants' collection of more than $5,000,000 in charged FET payments which instead were routed to the benefit of the CFG Enterprise. This injury was caused by Defendant Brown and the CFG Enterprise Defendants' acquisition or control of the CFG Enterprise, and is

independent from the injury caused by the pattern of racketeering.

108. This injury was proximately caused by the racketeering activity engaged in by Defendant Brown and the CFG Enterprise Defendants in that the acts described above forced Plaintiff to expend substantial sums of money and resources to address the IRS' assessment against him individually for the unpaid FET, sever disruptions to his business activities and operations as a technologist whose intellectual property has been misappropriated to orchestrate this enterprise, and significant risk to his reputation by directly involving the companies which he is a rightful owner of to the involvement of the criminal actions described above.

**18 U.S.C. § 1962(a)**

109. Plaintiff realleges and incorporates by reference Paragraphs 1-108 as if set forth fully herein.

110. Defendant Brown and the CFG Enterprise Defendants derived millions of dollars in income from the above pattern of racketeering activity. Defendant Brown and the CFG Enterprise Defendants took millions of dollars in distributions, loans, commissions, and salary from the more than $5,000,000 in fraudulently charged but unpaid FEE collected from the clients of JGHand JGFH.

111. Defendant Brown and the CFG Enterprise Defendants invested the income from the racketeering activities into the enterprise and/or used such income to operate the enterprise, including to expand the enterprise through the Undocumented Multi-million Dollar Loans to C3 Jets, Bowman Aviation, Jet Agency, and C3 Limo, to expand the CFG Enterprise into additional enterprise activities such as acquiring aircraft, acquiring luxury rental vehicles, brokering private jet travel, introducing and expanding a jet card business model in Jet Agency with the JGH Intellectual Property, directing JGH Intellectual Property to arrange luxury ground transportation for CFG Enterprise Clients through C3 Limo, and purchasing a restaurant and bar at the Van Nuys airport in California, as well as development of luxury waterfront real estate in North Palm Beach, Florida through

the Brown Family Trust.

112. Plaintiff has suffered injury to his reputation and business in the harm to his reputation and the disruption of his business activities, both in the damage done to the JGH Platform and JGH Intellectual Property by the damage caused by using them in the CFG Enterprise, but also in the damage of the more than $1,300,000 in assessments by the IRS against Plaintiff individually despite Defendant Brown and the CFG Enterprise Defendants' collection of more than $5,000,000 in charged FEE payments which instead were routed to the benefit of the CFG Enterprise. This injury was caused by the CFG Enterprise Defendants' investment of income derived from the CFG Enterprise through the criminal collection without remission of FET from the CFG Enterprise clients, and the investment of the income into the expansion of the CFG Enterprise such as the Undocumented Multi-million Dollar Loans and the investment of the income derived from the CFG Enterprise criminal scheme into the expansion of the CFG Enterprise to the "loans" to C3 Jets, Bowman Aviation, Jet Agency, and C3 Limo. This injury is independent from the injury caused by the pattern of racketeering and the CFG Enterprise Defendants' acquisition or control of the CFG Enterprise.

113. This injury was proximately caused by the racketeering activity engaged in by Defendant Brown and the CFG Enterprise Defendants in that the acts described above forced Plaintiff to expend substantial sums of money and resources to address the IRS' assessment against him individually for the unpaid FET, sever disruptions to his business activities and operations as a technologist whose intellectual property has been misappropriated to orchestrate this enterprise, and significant risk to his reputation by directly involving the companies which he is a rightful owner of to the involvement of the criminal actions described above.

**CLAIM 4**

**18 U.S.C. § 1962(d)**

114. Plaintiff realleges and incorporates by reference Paragraphs 1-113 as if set forth fully herein.

115. Defendant Brown and the CFG Enterprise Defendants knowingly and willfully became members of the aforementioned conspiracy in that they agreed to participate, directly or indirectly, in the affairs of the enterprise to accomplish the objective of the enterprise - to defraud the clients of JGH and JGFH out of millions of dollars collected over the course of several years in proceeds under fraudulent documents directed by Defendant Brown to those clients, which misrepresented the collection of FET owed to IRS and which went to further the CFG Enterprise. The CFG Enterprise Defendants benefited from the criminally misappropriated JGH Platform and JGH Intellectual Property, which rightfully belong to the Plaintiff, to further the criminal scheme to defraud clients of FET payments described above.

116. The thousands of predicate acts of wire fraud and misappropriation of the JGH Platform and JGH Intellectual Property conducted by the CFG Enterprise to further the conspiracy were part of a pattern of racketeering activity, and Defendant Brown and the CFG Enterprise Defendants and CFG Personnel knowingly took part in the commission of these acts to further the scheme described above. Specifically, Defendant Brown created or caused to be created false documents which misrepresented the collection of FET, and sent or caused those documents to be sent by CFG Personnel electronically through the JGH Platform containing the false statements about the collection of FET, and then took the proceeds from the FET lawfully owed on behalf of the CFG Enterprise Clients to the IRS and used the proceeds to invest in and operate the CFG Enterprise.

117. Defendant Brown was well aware throughout January of 2017 to the present that failure to collect FET was a felony offense and was directly

knowledgeable of the facts of **US. v. Rizzi** which held a charter broker criminally liable for failure to remit less than $500,000 in collected but unpaid FET to the IRS. Defendant Brown further was aware and agreed to allocate FET to dedicated accounts for the trust fund after signing the Shareholder Agreement. Despite knowledge that the collection of FET and use of FET to fund the enterprise was a crime, Defendant Brown caused more than tenfold the amounts of FET which was undisputed in the **Rizzi** case to be directed to benefit the CFG Enterprise Defendants.

118. Plaintiff has suffered injury to his reputation and business in the harm to his reputation and the disruption of his business activities, both in the damage done to the JGH Platform and JGH Intellectual Property by the damage caused by using them in the CFG Enterprise Defendants' criminal enterprise, but also in the damage of the more than $1,300,000 in assessments by the IRS against Plaintiff individually despite Defendant Brown and the CFG Enterprise Defendants' collection of more than $5,000,000 in charged FET payments which instead were routed to the benefit of the enterprise. This injury was caused by Defendant Brown and the CFG Enterprise Defendants' acquisition or control of the enterprise, and is independent from the injury caused by the pattern of racketeering.

119. Plaintiffs injury was proximately caused by the racketeering activity engaged in by Defendant Brown and the CFG Enterprise Defendants in that the acts described above forced Plaintiff to expend substantial sums of money and resources to address the IRS' assessment against him individually for the unpaid FET, sever disruptions to his business activities and operations as a technologist whose intellectual property has been misappropriated to orchestrate this enterprise, and significant risk to his reputation by directly involving the companies which he is a rightful owner of to the involvement of the criminal actions described above.

**SECOND CAUSE OF ACTION**

**DEFEND TRADE SECRETS ACT 18 U.S.C. § 1836(b)(1)**

**(AGAINST DEFENDANTS JORDAN BROWN, JET GENIUS HOLDINGS, INC., JET**

**GENIUS FLORIDA HOLDINGS, INC., C3JETS LLC, BOWMAN AVIATION, INC., JET AGENCY GLOBAL LLC, AND C3 LIMO LLC)**

120. Plaintiff realleges and incorporates by reference Paragraphs 1-119 as if set forth fully herein.

121. Plaintiff, individually or alternatively on behalf of Jet Genius Holdings, Inc. is the rightful and legal owner of the trade secrets referenced in this complaint as the JGH Intellectual Property, which includes the JGH Platform and the technology developed by Plaintiff known as the GRID. The JGH Intellectual Property is material to JGH's business and services used in interstate commerce, specifically the technology software and JGH Platform architected and built by Plaintiff which has enabled his company to grow and expand JGH clients throughout the United States, allowing them to book private air travel throughout the United States, by matching these clients with air charter operators throughout the United States.

122. The JGH Platform, Plaintiffs Technical Expertise, software architecture and source codes, websites, technology infrastructure, business models, web-servers, domain names such as jetcharter.com, jetagency.com, and flycfg.com, business methods, client lists, proprietary designs, and trade secrets in the JGH Intellectual Property are precisely the type of Trade Secrets Congress sought to protect when it enacted the Defend Trade Secrets Act of 2016 in May of 2016.

123. In December of 2018, shortly after the events of the Board Coup and the creation of the Shareholder Agreement, Defendant Brown and the Plaintiff discussed the JGH Intellectual Property in great detail with JGH's advisors. The JGH Intellectual Property was material and relevant to the Shareholder Agreement, which is why Defendant Brown and JGH fraudulently induced Plaintiff to assign to JGH rights for the JGH Intellectual Property contemporaneously along with the Shareholder Agreement. **See Exhibits "A" and "B"** Any such assignment has been voided by the conduct of the Defendants, and the JGH Intellectual Property and JGH

Platform are the intellectual property of the Plaintiff, and alternatively of JGH, which at no point could have made a valid transfer of the JGH Intellectual Property without a properly formed Board, without notifying shareholders, without issuing payment to Plaintiff, without notifying IRS, and without any valid licensing agreement.

124. Plaintiff was not opposed to signing the Shareholder Agreement along with assignment of rights of the JGH Intellectual Property, because he believed it would be assigned to JGH for the purposes of JGH, and Defendant Brown had bound JGH to honor the payment of past due FET to the IRS. But Defendant Brown had other plans, and by August 27, 2019, less than three years from the date of filing Plaintiff s complaint, Brown purportedly incorporated Defendant JGFH, despite JGH lacking the requisite corporate formalities to establish such, and in contravention of the Shareholder Agreement.

125. As soon as Defendant JGFH was created, Defendant Brown and JGFH conspired to misappropriate the JGH Intellectual Property even though no valid license or business justification for its use was in place, no consent of the shareholders was received, and no listing of the JGH Intellectual Property with the IRS as part of JGH's value was disclosed. Defendant Brown has additionally misappropriated the JGH Platform and JGH Intellectual Property without cause for the benefit of Defendants C3 Jets, Bowman Aviation, and Jet Agency, and C3 Limo (together with Defendants Brown and JGFH the "IP Defendants"). The JGH Intellectual Property had tremendous value, and since Defendant Brown's initial misappropriation of the JGH

Intellectual Property, it has been used to create more than $125,000,000 in revenue derived from the JGH Intellectual Property and JGH Platform, just in the period from August 2019 to the present, all without a valid transfer, license, payment, or agreement for the JGH Intellectual Property, and all while the IP Defendants knew that JGH and Plaintiff personally were assessed by the IRS for $1,300,000 in unpaid FET.

126. Rather than fulfilling his obligations as a fiduciary to the shareholders of JGH, Defendant Brown instead conspired with the CFG Personnel to unjustly enrich the IP Defendants, while allowing JGH and the Plaintiff to face increased pressure by the IRS for the unpaid $1,300,000 in FET, all while knowing that either Plaintiff or alternatively JGH were the rightful and owner of the JGH Intellectual Property which had been misappropriated to create hundreds of millions of dollars in revenue for the IP Defendants without a valid license to use, and without a valid payment to JGH, Plaintiff, or to the IRS, all of which were payments which Defendant Brown explicitly agreed to make.

127. Defendant JGFH's own independent aviation industry valuation firm, Avicor, engaged by Defendant Brown and JGFH to determine the enterprise value of the Defendants concluded that the value of the JGH Intellectual Property represented a multiplier that was more than $50,000,000 out of the nearly $67,000,000 enterprise valuation as demonstrated by the disparity between the First Avicor Valuation and Second Avicor Valuation.

128. Plaintiff suggested to the Defendants that the JGH Intellectual Property had not been properly accounted for and proposed that a payment towards a license in the amount of $125,000 which would be allocated to the IRS unpaid FET as suggested by RO Neville in the First IRS FET proposal would be acceptable, and the Defendants Brown and JGFH ignored Plaintiffs proposal despite having no legal rights to the JGH Intellectual Property. No document, license, or agreement similar to Plaintiffs JGH Intellectual Property Proposal was created between the IP Defendants and JGH, and no payment for any transfer owed to Plaintiff as provided for in Section 4 of the Shareholder Agreement was ever discussed or proposed, because no such permissible transfer ever occurred. No permissible transfer in the ordinary course of

JGH's business could plausibly be claimed when any such transfer was not disclosed to the shareholders, was not referenced for the Section 4 Shareholder Agreement

obligations, was not documented, was not disclosed to the IRS when already assessing JGH for unpaid FET, nor was proper consideration provided by any of the IP Defendants who benefited from the misappropriation of the JGH Intellectual Property.

129. JGH further lacked the requisite corporate formalities to validly license the JGH Intellectual Property - the most significant asset JGH possessed - due to an improperly constituted Board solely controlled by Brown. JGH could not possibly have entered into any valid license while it was effectively insolvent without providing a similar license on the open market or to potential licensees as would be required if a license was valid or using effective business judgment or justification with any plausible basis, and no such license could have rationally occurred without disclosing such intention to license the most significant asset JGH possessed while it was already subject to IRS liens without disclosure to IRS.

130. The IP Defendants each are also culpable in the misappropriation of the JGH Intellectual Property, because without use of the JGH Intellectual Property they would not have been able to receive the unauthorized loans from JGFH, nor would they have received their shares in the more than $125,000,000 revenue generated by JGFH which ensured hundreds of thousands of dollars each in revenue received from JGFH to Bowman Aviation and C3 Jets, nor would they have received the proceeds and revenues they directly benefited from by using the JGH Intellectual Property to receive clients lists and jet agency membership models, in the case of C3 Jets, nor receive commissions from client lists in the case of Bowman Aviation, nor would any IP Defendants benefit from the client lists and with direct revenue benefit to each.. The IP Defendants have further each directly used the JGH Intellectual Property without a valid license: from booking trips through the JGH Platform for JGFH, Bowman Aviation, and C3 Jets; to Jet Agency utilizing the JGH Intellectual Property to offer jet card subscriptions to CFG Enterprise clients; to C3 Limo utilizing the JGH Intellectual Property to market its ground transportation services to

CFG Enterprise clients and utilize CFG Personnel to arrange transportation through the JGH Platform as well as utilizing the JGH Intellectual Property on C3 Limo's official State of Florida records as its official contact information.

131. The IP Defendants have been unjustly enriched by the misappropriation of the JGH Intellectual Property, and the Plaintiff has already been harmed by this misappropriation given his individual assessment by the IRS for $1,300,000 in JGH's unpaid FET, an assessment which Defendants Brown and JGFH would have been able to prevent had they provided a payment towards a license of $125,000 to IRS' satisfaction and agreement that such payments would allow it to refrain from assessing the Plaintiff individually for Defendants' unpaid FET.

132. Plaintiff was further harmed by the Defendants' misappropriation of the JGH Intellectual Property when he relinquished both his Board seat and 24.5% of the equity and shareholdings in his company based upon the false promises that the JGH Intellectual Property would be properly documented and that the FET would be paid as set forth in the plan by FEME and the IRS and as required by law for Defendant Brown to not commit criminal collection and non-payment of FET. Had Plaintiff known that rather than fulfilling his obligations as a fiduciary and party binding JGH to the Shareholder Agreement, that Defendant Brown would instead conspire to misappropriate the JGH Intellectual Property to create new value for the IP Defendants and Brown individually, Plaintiff would not have surrendered his Board seat or relinquished his rightful claim for the 24.5% of the company under the Shareholder Agreement.

**THIRD CAUSE OF ACTION**

**CALIFORNIA UNIFORM TRADE SECRETS ACT**

**(CAL. CIV. CODE § 3426, ETSEQ.)**
**(AGAINST DEFENDANTS JORDAN BROWN, JET GENIUS HOLDINGS, INC., JET GENIUS FLORIDA HOLDINGS, INC., C3JETS LLC, BOWMAN AVIATION, INC., JET AGENCY GLOBAL LLC, AND C3 LIMO LLC)**

133. Plaintiff realleges and incorporates by reference Paragraphs 1-132 as if set forth fully herein.

134. Plaintiff, individually or alternatively on behalf of Jet Genius Holdings, Inc. is the rightful and legal owner of the trade secrets referenced in this complaint as the JGH Intellectual Property, which includes the JGH Platform and the technology developed by Plaintiff known as the GRID. The JGH Intellectual Property is material to JGH's business and services lawfully belonging in the State of California, specifically the technology software and JGH Platform architected and built by Plaintiff which has enabled his company to grow and expand JGH clients, allowing them to book private air travel by matching these clients with air charter operators.

135. The JGH Platform, Plaintiffs Technical Expertise, software architecture and source codes, websites, technology infrastructure, business models, web-servers, domain names such as jetcharter.com, jetagency.com, and flycfg.com, business methods, client lists, proprietary designs, and trade secrets in the JGH Intellectual Property are precisely the type of Trade Secrets the Legislature sought to protect when it enacted the Uniform Trade Secrets Act of 1984. The JGH staff led by Plaintiff as CTO who were employed to develop the JGH Platform including the GRID developed the majority of the software in the State of California.

136. In December of 2018, shortly after the events of the Board Coup and the creation of the Shareholder Agreement, Defendant Brown and the Plaintiff discussed in California the JGH Intellectual Property in great detail with JGH's advisors. The JGH Intellectual Property was material and relevant to the Shareholder Agreement, which is why Defendant Brown and JGH fraudulently induced the Plaintiff to assign to JGH rights for the JGH Intellectual Property contemporaneously along with the Shareholder Agreement, and required such to occur as part of the internal affairs of JGH in the State of California. **See Exhibits "A " and "B".** Any such assignment has been voided by the conduct of the Defendants, and the JGH Intellectual Property and JGH Platform are the intellectual property of the Plaintiff, and alternatively of

JGH, which at no point could have made a valid transfer of the JGH Intellectual Property without a properly formed Board, without notifying shareholders, without issuing payment to Plaintiff, without notifying IRS, and without any valid licensing agreement.

137. Plaintiff was not opposed to signing the Shareholder Agreement along with

assignment of rights of the JGH Intellectual Property, because he believed it would be assigned to JGH for the purposes of JGH, and Defendant Brown had bound JGH to honor the payment of past due FET to the IRS. But Defendant Brown had other plans, and by August 27, 2019, less than three years from the date of filing Plaintiffs complaint, Brown purportedly incorporated Defendant JGFH, despite JGH lacking the requisite corporate formalities to establish such, and in contravention of the Shareholder Agreement.

138. As soon as Defendant JGFH was created, Defendant Brown and JGFH conspired to misappropriate the JGH Intellectual Property even though no valid license or business justification for its use was in place, no consent of the shareholders was received, and no listing of the JGH Intellectual Property with the IRS as part of JGH's value was disclosed. Defendant Brown has additionally misappropriated the JGH Platform and JGH Intellectual Property without cause for the benefit of the IP Defendants. The JGH Intellectual Property had tremendous value, and since Defendant Brown's initial misappropriation of the JGH Intellectual Property, it has been used to create more than $125,000,000 in revenue derived from the JGH Intellectual Property and JGH Platform, just in the period from August 2019 to the present, all without a valid transfer, license, payment, or agreement for the JGH Intellectual Property, and all while the IP Defendants knew that JGH and Plaintiff personally were assessed by the IRS for $1,300,000 in unpaid FET.

139. Rather than fulfilling his obligations as a fiduciary to the shareholders of JGH, Defendant Brown instead conspired with the CFG Personnel to unjustly

~~enrich the IP Defendants, while allowing JGH and the Plaintiff to face increased pressure by the IRS for the unpaid $1,300,000 in FET, all while knowing that either Plaintiff or alternatively JGH were the rightful and owner of the JGH Intellectual Property which had been misappropriated to create hundreds of millions of dollars in revenue for the IP Defendants without a valid license to use, and without a valid payment to JGH, Plaintiff, or to the IRS, all of which were payments which Defendant Brown explicitly agreed to make.~~

~~140. Defendant JGFH's own independent aviation industry valuation firm, Avicor, engaged by Defendant Brown and JGFH to determine the enterprise value of the Defendants concluded that the value of the JGH Intellectual Property represented a multiplier that was more than $50,000,000 out of the nearly $67,000,000 enterprise valuation as demonstrated by the disparity between the First Avicor Valuation and Second Avicor Valuation.~~

~~141. Plaintiff suggested to the Defendants that the JGH Intellectual Property had not been properly accounted for and proposed that a payment towards a license in the amount of $125,000 which would be allocated to the IRS unpaid FET as suggested by RO Neville in the First IRS FET proposal would be acceptable, and the Defendants Brown and JGFH ignored Plaintiffs proposal despite having no legal rights to the JGH Intellectual Property. No document, license, or agreement similar to Plaintiffs JGH Intellectual Property Proposal was created between the IP Defendants and JGH, and no payment for any transfer owed to Plaintiff as provided for in Section 4 of the Shareholder Agreement was ever discussed or proposed, because no such permissible transfer ever occurred. No permissible transfer in the ordinary course of JGH's business could plausibly be claimed when any such transfer was not disclosed to the shareholders, was not referenced for the Section 4 Shareholder Agreement obligations, was not documented, was not disclosed to the IRS when already assessing JGH for unpaid FET, nor was proper consideration provided by any of the IP Defendants who benefited from the misappropriation of~~

the JGH Intellectual Property.

142. JGH further lacked the requisite corporate formalities to validly license the JGH Intellectual Property - the most significant asset JGH possessed - due to an improperly constituted Board solely controlled by Brown. JGH could not possibly have entered into any valid license while it was effectively insolvent without providing a similar license on the open market or to potential licensees as would be required if a license was valid or using effective business judgment or justification with any plausible basis, and no such license could have rationally occurred without disclosing such intention to license the most significant asset JGH possessed while it was already subject to IRS liens without disclosure to IRS.

143. The IP Defendants each are also culpable in the misappropriation of the JGH

Intellectual Property, because without use of the JGH Intellectual Property they would not have been able to receive the unauthorized loans from JGFH, nor would they have received their shares in the more than $125,000,000 revenue generated by JGFH which ensured hundreds of thousands of dollars each in revenue received from JGFH to Bowman Aviation and C3 Jets, nor would they have received the proceeds and revenues they directly benefited from by using the JGH Intellectual Property to receive clients lists and jet agency membership models, in the case of C3 Jets, nor receive commissions from client lists in the case of Bowman Aviation, nor would any IP Defendants benefit from the client lists and with direct revenue benefit to each. The IP Defendants have further each directly used the JGH Intellectual Property without a valid license: from booking trips through the JGH Platform for JGFH, Bowman Aviation, and C3 Jets; to Jet Agency utilizing the JGH Intellectual Property to offer jet card subscriptions to CFG Enterprise clients; to C3 Limo utilizing the JGH Intellectual Property to market its ground transportation services to CFG Enterprise clients and utilize CFG Personnel to arrange transportation through the JGH Platform as well as utilizing the JGH Intellectual Property on C3 Elmo's

~~official State of Florida records as its official contact information.~~

~~144. The IP Defendants have been unjustly enriched by the misappropriation of the JGH Intellectual Property, and the Plaintiff has already been harmed by this misappropriation given his individual assessment by the IRS for $1,300,000 in JGH's unpaid FET, an assessment which Defendants Brown and JGFH would have been able to prevent had they provided a payment towards a license of $125,000 to IRS' satisfaction and agreement that such payments would allow it to refrain from assessing the Plaintiff individually for Defendants' unpaid FET.~~

~~145. Plaintiff was further harmed by the Defendants' misappropriation of the JGH Intellectual Property when he relinquished both his Board seat and 24.5% of the equity and shareholdings in his company based upon the false promises that the JGH Intellectual Property would be properly documented and that the FET would be paid as set forth in the plan by FEME and the IRS and as required by law for Defendant Brown to not commit criminal collection and non-payment of FET. Had Plaintiff known that rather than fulfilling his obligations as a fiduciary~~

~~and party binding JGH to the Shareholder Agreement, that Defendant Brown would instead conspire to misappropriate the JGH Intellectual Property to create new value for the IP Defendants and Brown individually, Plaintiff would not have surrendered his Board seat or relinquished his rightful claim for the 24.5% of the company under the Shareholder Agreement.~~

**~~FOURTH CAUSE OF ACTION~~**
**~~BREACH OF CONTRACT~~**
**~~(AGAINST JORDAN BROWN, JET GENIUS HOLDINGS, INC., AND JET GENIUS~~**
**~~FLORIDA HOLDINGS, INC., AND BROWN FAMILY TRUST)~~**

~~146. Plaintiff realleges and incorporates by reference Paragraphs 1-145 as if set forth fully herein On November 7, 2018, Plaintiff Stanz and Defendant Brown~~

entered into a contract, the Shareholder Agreement consummated in Del Mar, California. **See Exhibit "A**

147. Plaintiff Stanz relinquished 24.5% of his 49.5% stake in Jet Genius Holdings, Inc. as well as Plaintiffs seat on JGH's Board of Directors, to Defendant Brown, CEO and Chairman of JGH. In return, Defendant Brown agreed to ensure that as JGH received revenue that the company would in good faith withhold the revenue in a separate bank account to be used to pay past due federal excise taxes as required in Section 6 of the Shareholder Agreement.

148. Other important parts of the Shareholder Agreement were that:

(1) Defendant Brown would not take money from the company for himself without written consent from Plaintiff Stanz, Section 2(e),

(2) Defendant Brown would not take any loans from the company without written consent from Plaintiff Stanz, Section 2(e),

(3) Upon the closing of a "corporate event" Section 4, Plaintiff would receive the following amounts:

| | |
|---|---|
| November 7, 2018 - November 1, 2019 | $909,451.00 |
| November 2, 2019 - November 1, 2020 | $727,561.00 |
| November 2, 2021 - November 1, 2022 | $363,780.00 |

149. "Corporate event" is described in Section 4. Corporate Event Payment.

150. To date, Defendant Brown has failed to set aside funds in a separate bank account. Defendant Brown has failed to make payments towards the FET owed to the IRS, failed to disclose any transfer of the JGH Intellectual Property to the IRS, and failed to make payments to Plaintiff for any purported permissible transfers of the JGH Intellectual Property as required by Section 4, because such purported transfers were undocumented and fraudulent.

151. Defendant Brown and JGH created Defendants JGFH, C3 Jets, and Jet Agency in violation of Section 2(d) of the Shareholder Agreement. Brown and JGH

lacked the requisite corporate formalities to establish JGFH, and JGFH is an **alter ego** of JGH and equitable successor in interest to the Shareholder Agreement. Defendant Brown Family Trust is subject to the Shareholder Agreement for the improper transfer of the 10% shareholdings allocated to an employee equity incentive plan that it instead received from Defendant Brown, who was aware of the fraudulent nature of the transfer in his capacity as Chairman of JGH, his knowledge that JGH did not have a properly constituted Board at the time of JGFH's creation, and in his capacity as purported CEO of JGFH at the time of incorporation, and as a Trustee of the Brown Family Trust.

152. Defendant Brown, JGFH, and JGH created a new class of shares listed within JGFH, which is in contravention of the Shareholder Agreement Section 2(b) that without prior written consent, the company shall not "authorize or issue additional shares of common stock or any other class or series of capital stock in the Company"

153. Defendant Brown loaned millions of dollars to himself individually, in violation of Section 2(e) of the Shareholder Agreement.

154. Defendant Brown loaned hundreds of thousands of dollars to Defendants C3 Jets and Bowman Aviation and C3 Limo, all of which are entities wholly owned by Defendant Brown or his assigns, in violations of Section 2(e) of the Shareholder Agreement.

155. Although demand has been made that Defendant Brown, JGH, and JGFHset aside monies to pay the IRS, they failed to do so.

156. Defendant Brown and Defendant JGH further breached a contract by failing to adhere to the Bylaws. The Bylaws are undisputed by the parties to be an enforceable contract.

The Bylaws require JGH to provide counsel for Plaintiff, or alternatively to reimburse Plaintiff for counsel's fees for any action before a tribunal or agency such as the IRS for actions relating to the operations or management or governance of the

corporation. **See Exhibit "C"** Plaintiff is covered in the Bylaws as a former Director or Officer and was entitled for immediate reimbursement at the time of the IRS proceedings for such representation or reimbursement for representation. Plaintiff has incurred over $75,000 in legal fees in his dealings with the IRS without reimbursement by JGH, and when Plaintiff requested such representation or reimbursement Defendant Brown and JGH refused to provide counsel even though no such refusal was given for Shareholder Wolf, and Brown and JGH further refused reimbursement for Plaintiffs fees.

157. Defendant Brown and JGH further have failed to adhere to the Bylaws by failing to fill the vacancies of Directors Brown as required by Article III Section 4 of the Bylaws. **See Exhibit "C"** Defendant Brown invalidly remained as the sole Director of JGH and ignored the requirements of the Bylaws to fill vacancies of JGH's Board. As a corporation with 3 shareholders, JGH was required to maintain a Board of three persons per the California Corporations Code Section 212. JGH and Brown failed to do such, and accordingly failed to maintain the requirements of Article VII Section 7 of the Bylaws to file accurate statements with the Secretary of State of California listing the Directors and business addresses of the Directors, since no such filings following the Board Coup properly reflected the three requisite Directors.

158. Plaintiff is entitled to recission of all corporate actions taken by JGH and every Defendant formed after the Board Coup, as JGH lacked the requisite corporate authority to take any such actions.

159. Plaintiff is entitled to $1,300,000, the amount of monies that the IRS is threatening to lien against him personally because no reasonable payments have been made to the IRS nor have any monies been set aside in a separate account by JGH to pay the IRS, and is entitled for such payment to be made directly to the IRS FET trust fund on his behalf. Plaintiff is further entitled to $75,000 plus all additional fees owed by Plaintiff to counsel for Plaintiffs dealings with the IRS as required by the

Bylaws.

160. Plaintiff is entitled to recission of any intellectual property assignment purported for the JGH Intellectual Property including the JGH Platform including the GRID, which was materially part of the Shareholder Agreement due to Defendants' breach of the Shareholder Agreement.

161. Plaintiff is entitled to the 24.5% of JGH that was relinquished as part of the Shareholder Agreement, and 24.5% of JGFH for any mirroring of shares purported, inclusive of the 10% of shareholdings by JGFH held by the Brown Family Trust.

162. Plaintiff is entitled to appoint a representative to a seat on JGH's Board of Directors, which was relinquished as part of the Shareholder Agreement and is equitably entitled to appoint a representative to JGFH's Board of Directors which should reflect that JGFH is an **alter ego** of JGH and constitutes a subsidiary which must have governance similarly reflected to that of JGH.

163. Plaintiff is entitled to attorneys' fees per contract for all fees related to the instant case according to California Civil Code §1717, **See Section 14. of the Contract, Exhibit "A".**

**FIFTH CAUSE OF ACTION**
**BREACH OF FIDUCIARY DUTY**
**(AGAINST JORDAN BROWN, JET GENIUS HOLDINGS, INC., AND JET GENIUS**
**FLORIDA HOLDINGS, INC.)**

164. Plaintiff realleges and incorporates by reference Paragraphs 1-163 as if set forth fully herein.

165. At all times relevant, Defendant Brown was the Chairman of the Board, CEO, and Director of Defendants JGH and JGFH.

166. Plaintiff is the rightful owner of 49.5% of the equity value of Defendants JGH and

JGFH, and is the current owner of 25% of the equity value and shareholdings of

Defendants JGH and JGFH.

167. Defendant Brown as Director, Chairman, and CEO of Defendants JGH and JGFH owed fiduciary duties to the shareholders of JGH and JGFH.

168. Defendant Brown, as fiduciary to the shareholders of JGH and JGFH was prohibited from taking actions in dereliction of those duties, including misappropriation of assets of another, self-dealing, co-mingling funds, and failing to administer tax obligations to the IRS.

169. Defendant Brown, as fiduciary to the shareholders of JGH and JGFH was prohibited from taking actions in dereliction of those duties, including the commission of felonies and fraud upon the Federal Government, the clients of the CFG Enterprise, and the charter Operator partners and Brokers which the CFG Enterprise depends on for revenue, and he breached these duties when he willfully violated 26 U.S.C § 7202 in the fraudulent collection without remission of FEE from CFG Enterprise clients.

170. Defendant Brown knowingly conspired to take the JGH Intellectual Property for the benefit of JGFH with no benefit to the JGH shareholders, whilst the shareholders were subject to individual assessments and liens by the IRS for Defendant Brown's willful actions not to pay the IRS for the unpaid $1,300,000 FEE already in place at the time of the Shareholder Agreement's execution.

171. At the time of the Shareholder Agreement's execution, JGH and Defendant Brown had already agreed to a payment strategy and audit by FEME to the IRS, and after December 2018 Defendant Brown was the sole director of JGH.

172. After the Shareholder Agreement was executed, Defendant Brown cancelled the audit with LLME, and disregarded the previously existing plan to satisfy the IRS' $1,300,000 FEE assessment.

173. After the Shareholder Agreement was executed, Defendant Brown created third- party entities such as JGFH, C3 Jets, and Jet Agency which were not wholly owned subsidiaries in contravention of the Shareholder Agreement and in

contravention of his duty of loyalty to the shareholders of JGH.

174. After the Shareholder Agreement was executed, Defendant Brown caused the JGH Intellectual Property to be misappropriated by JGFH, C3 Jets, Jet Agency, C3 Limo, and Bowman Aviation, in dereliction of his duty of loyalty to the shareholders of JGH, and did so while knowingly hiding the JGH Intellectual Property from the IRS and not disclosing such actions, all while subject to the $1,300,000 in unpaid FET and continually accruing millions in additional unpaid FET.

175. Defendant Brown admitted to the Plaintiff that he is responsible for the unpaid FET when he stated: "I am responsible for the FET mess. I will have to answer to this. GET OVER IT. Who gives a f*ck. We can raise the money tomorrow to cover it. I would do it again. It's what I did to get the company to this point. Please stop bringing it up!"

176. Defendant Brown owed a duty of loyalty to the employees who were equitable shareholders of JGH and JGFH which the Shareholder Agreement required 10% of the shareholdings relinquished by Plaintiff to JGH to be established for under a valid employee equity incentive plan. Defendant Brown established no such plan and further breached his fiduciary duty by failing to establish such a plan upon the incorporation of JGFH.

177. Defendant Brown issued more than $3,300,000 in personal loans to himself from JGFH while JGH was subject to millions of dollars in unpaid FET, in violation of the Shareholder Agreement and in dereliction of his duties of loyalty and care to the shareholders of JGH and JGFH. **See Exhibit "F".**

178. Defendant Brown issued hundreds of thousands of dollars of loans to entities he controlled individually or through his assigns, from JGFH while JGH was subject to millions of dollars in unpaid FET, in violation of the Shareholder Agreement and in dereliction of his duties of loyalty and care to the shareholders of

JGH and JGFH. **See Exhibit "F".**

179. At all times as a fiduciary, Defendant Brown's actions were imputed to the corporations and Defendants JGH and JGFH are further responsible for all of the above- mentioned actions by Defendant Brown, and Defendant Brown has admitted his responsibility for the failure to pay FET as his own obligation.

180. Defendants JGH and JGFH are vicariously liable for all actions of Brown in breach of his fiduciary duties, as he is the control person of JGH and JGFH, improper sole director, chairman, and CEO of each.

181. Plaintiff has been harmed by Defendants' actions by having the $1,300,000 in unpaid FET to the IRS assessed against himself individually, and the harm was proximately caused by Defendant Brown's actions, inactions, and self-dealing, in dereliction of his fiduciary duties, all of which were substantial factors in the harm to Plaintiff.

**SIXTH CAUSE OF ACTION**
**FRAUD**
**(AGAINST ALL DEFENDANTS)**

182. Plaintiff realleges and incorporates by reference Paragraphs 1-181 as if set forth fully herein.

183. Defendant Brown represented to Plaintiff that he would pay the FET on multiple occasions and admitted his responsibility for the failure to pay FET.

184. Once control in JGFH was solidified following the Board Coup and Defendant Brown had installed himself as the sole director and executive of JGFH, Defendant Brown continued his conspiracy to defraud the Plaintiff as a shareholder of JGH by taking the JGH Intellectual Property in a series of **undocumented** sham transactions despite the advice to JGH by advisors that the JGH Intellectual Property must be properly accounted for. No document, license, or agreement similar to Plaintiffs JGH Intellectual Property Proposal was created between the IP Defendants and JGH, and no payment for any transfer owed to Plaintiff as provided for in Section 4 of the Shareholder Agreement was ever discussed or proposed, because no

such permissible transfer ever occurred. No permissible transfer in the ordinary course of JGH's business could plausibly be claimed when any such transfer was not disclosed to the shareholders, was not referenced for the Section 4 Shareholder Agreement obligations, was not documented, was not disclosed to the IRS when already assessing JGH for unpaid FET, and was not given any valid consideration for by any of the Defendants. **See Exhibits "A " and "B ".**

185. Defendant Brown continued to misappropriate the JGH Intellectual Property into JGFH, and then started processes with the JGH Intellectual Property which would create over $125,000,000 in unjustly enriched revenue to JGFH without any licensing or compensation to JGH, and then used this unjustly enriched revenue to establish **even more** third-party companies such as Defendant C3 Jets which were hidden from the JGH shareholders and structured solely with Defendant Brown and his family in control positions. Once in these control positions, Defendant Brown created additional schemes to defraud the JGH shareholders and the Plaintiff by making millions of dollars of fraudulent Undocumented Multi-million Dollar Loans to the third- party companies controlled by Defendant Brown or his family from its unjustly enriched revenue, as well as more than $3,300,000 to himself individually, all while hiding this activity from the IRS while it continued to increase its attempts to assess and collect its unpaid FET against JGH, and all while Defendant Brown remained the sole control person, Director, fiduciary, and CEO of JGH. **See Exhibit "F".**

186. As defined in Plaintiffs First Cause of Action above, the CFG Personnel were involved with the business and operations of all CFG Enterprise Defendants. Defendants C3 Jets, C3 Limo, Bowman Aviation, and Jet Agency each were recipients of undocumented "loans" created and authorized by Defendant Brown through JGFH and the JGFH Personnel which enabled Defendant Brown's continued conspiracy to defraud the Plaintiff and the JGH shareholders. They were recipients through fraudulent "loans" derived from fraudulently collected FET as described in

Plaintiffs First Cause of Action, in the CFG Enterprise which allowed the CFG Enterprise Defendants' collective operations and businesses servicing the private aviation industry to generate in excess of $125,000,000 revenue. The CFG Enterprise Defendants did such while fraudulently promising the JGH shareholders and Plaintiff that these actions were for the benefit of JGH and would be properly documented.

187. Defendant Brown made these promises, and indeed JGH's counsel Chis Popov of Watkins Firm, APC ("Attorney Popov") confirmed with the Plaintiff and JGH's outside counsel that JGH would proceed with the plan for repayment to the IRS as required in the Shareholder Agreement Section 6, despite Defendant Brown willfully ignoring the previous $1,300,000 existing FET and repayment plan as obligated in the Shareholder Agreement to be paid in conjunction of the Board Coup, and instead while secretly incurring an additional $7,000,000 in unpaid FET to the IRS despite unjustly enriching himself with millions of dollars through JGFH.

188. Defendant Brown's intentions from the beginning were to never pay the FET, and Defendant Brown has admitted his culpability for failure to pay the FET and stated that if given the chance to do such over again, he would, despite knowing that the collection without remission of FET through the Fraudulently Charged FET was a felony.

189. The Shareholder Agreement was a document intended to fraudulently induce Plaintiff to relinquish his shareholdings and assign his intellectual property rights to the JGH Intellectual Property. Brown immediately canceled the audit in progress, failed to properly constitute a valid Board for JGH, and began siphoning the assets and the JGH Intellectual Property for the benefit of the CFG Enterprise Defendants. This fraudulent inducement further caused Plaintiff to relinquish shareholdings which were agreed to be allocated to an employee equity incentive plan of 10% of the shareholdings of JGH, and which Defendant Brown instead allocated to himself and the Brown Family Trust. Upon fraudulently incorporating JGFH as **alter ego** of JGH, Brown transferred equity which would rightfully be

subject to the same employee equity incentive plan to the Brown Family Trust, and transferred such with fraudulent intent given his signature on the Shareholder Agreement, his capacity as a fiduciary of JGH as Director and CEO, his capacity as a fiduciary of JGFH as its purported sole Director, and his capacity as a fiduciary of the Brown Family Trust as a Trustee. Such a transfer was done with the intent to defraud Plaintiff and the JGH shareholders, and as Trustee of the Brown Family Trust the Trust is equally culpable for participating in this fraud due to the fraudulent actions and conveyance carried out by its Trustee.

190. All of the Defendants materially benefitted from the fraud against the Plaintiff.

191. Plaintiff relied on the representations of Defendant Brown and did so until the IRS threatened to file a lien against him personally on August 8, 2022.

192. Plaintiffs reliance on Defendant Brown's representation was a substantial factor in causing him substantial harm.

**SEVENTH CAUSE OF ACTION**
**CONSPIRACY**
**(AGAINST ALL DEFENDANTS)**

193. Plaintiff realleges and incorporates by reference Paragraphs 1-192 as if set forth fully herein.

194. The CFG Personnel were involved with the business and operations of all of the CFG Enterprise Defendants. Defendants C3 Jets, Bowman Aviation, Jet Agency, and C3 Limo are agents of JGFH, JGH, and Defendant Jordan Brown. Defendant Brown, the CFG Personnel, and the CFG Enterprise Defendants all conspired to send the Client Contracts informing clients of the CFG Enterprise that FET was included in the contract pricing they received, and the CFG Enterprise successfully collected over $5,000,000 in FET paid for by the CFG Enterprise clients which was not remitted to the IRS, in violation of 26 U.S.C § 7202.

195. Defendant Brown caused JGFH to be formed after seizing control of JGH and after agreeing to the Shareholder Agreement following the Board Coup and

did such without a properly constituted Board for JGH.

196. After securing control of JGH, Defendant Brown coordinated with the invalidly incorporated JGFH and the CFG Personnel to benefit from the misappropriated JGH Intellectual Property, enabling JGFH to begin accruing more than $125,000,000 which should have been revenue of JGH. Defendant Brown further created C3 Jets and Jet Agency to benefit from its business relationship with JGFH, and continued to invest the proceeds of revenue from the misappropriated JGH Intellectual Property as well as the Fraudulently Charged FET to into Defendants C3 Jets, Jet Agency, Bowman Aviation and C3 Limo. Defendant Brown further conspired with the Brown Family Trust to transfer shares obtained through fraudulent inducement of the Plaintiff instead of establishing a valid employee equity incentive plan.

197. Using the misappropriated JGH Intellectual Property, Defendant Brown caused Undocumented Multi-million Dollar Loans to be disbursed to himself individually, C3 Jets, C3 Limo, Jet Agency and Bowman Aviation, with no reciprocal benefit from JGFH or the Defendants to Plaintiff or JGH, and the IP Defendants used the misappropriated JGH Intellectual Property to unjustly enrich themselves while JGH and Plaintiff were left to fend for themselves with the IRS. No document, license, or agreement similar to Plaintiffs JGH Intellectual Property Proposal was created between the IP Defendants and JGH, and no payment for any transfer owed to Plaintiff as provided for in Section 4 of the Shareholder Agreement was ever discussed or proposed, because no such permissible transfer ever occurred. No permissible transfer in the ordinary course of JGH's business could plausibly be claimed when any such transfer was not disclosed to the shareholders, was not referenced for the Section 4 Shareholder Agreement obligations, was not documented, was not disclosed to the IRS when already assessing JGH for unpaid FET, and was not given any valid consideration owed to Plaintiff or JGH by any of the Defendants. **See Exhibit "A".**

~~198. The IP Defendants were aware that the JGH Intellectual Property was misappropriated and were aware that it's misappropriation would unjustly enrich the Defendants.~~

~~199. The IP Defendants were aware and knew that Plaintiff and JGH would be harmed with the continued assessment for FET by IRS which Defendant Brown was ignoring, and they misappropriated the JGH Intellectual Property while hiding the same value from the IRS.~~

~~200. All Defendants knowingly benefited from the misappropriated JGH Intellectual Property and monies rightfully belonging to the Plaintiff by way of his shareholdings in JGH, at all times knowing that there already had been in excess of $1,300,000 in unpaid FET assessed by IRS which the JGH Intellectual Property could have been utilized to generate revenue to pay towards. Defendants instead coordinated an elaborate scheme to generate revenue to pay themselves millions of dollars and ignore the unpaid FET.~~

**~~EIGHTH CAUSE OF ACTION~~**

**~~ACCOUNTING~~**

**~~(AGAINST DEFENDANTS JET GENIUS HOLDINGS, INC., AND JET GENIUS FLORIDA HOLDINGS, INC.)~~**

~~201. Plaintiff realleges and incorporates by reference Paragraphs 1-200 as if set forth fully herein.~~

~~202. Plaintiff has a contractual relationship with Defendant Brown.~~ **~~See Exhibits "A " and "B".~~**

~~203. Monies are due to Plaintiff because of Defendant Brown's breach of this contract.~~

~~204. Additionally, both Plaintiff Stanz and Defendant Brown are current shareholders of JGHand JGFH.~~

~~205. Plaintiff had no knowledge that he was a shareholder of Defendant JGFH until it mailed him unsolicited shares in JGFH, and Plaintiff has almost no~~

visibility into the business accounts, financial health, contractual obligations, indebtedness, or loans issued by Defendant JGFH.

206. Plaintiff has already been subject to IRS assessment for unpaid FET to the IRS by Defendants for his shareholdings in JGH, and his recently discovered shareholding in JGFH may further expose Plaintiff to similar exposure especially in light of Defendant Brown's past failure to pay FET.

207. Defendant JGFH's accountant Ms. Arabi admitted that she was not aware of (emphasis added)

208. The loans Ms. Arabi and other CFG Personnel admitted they were not aware of formal agreements or documentation to include transfers of funds from JGFH to Defendants Brown, C3 Jets, Jet Agency, Bowman Aviation, C3 Limo, whose managing member is Defendant Brown's stepson and which up until April of 2022 had Defendant Brown's wife Stacy as a member.

209. All of the loans Ms. Arabi admitted she was not aware of formal agreements or documentation to involve transfers in violation of the Shareholder Agreement.

210. Monies are due to Plaintiff because of the breach of this Shareholder Agreement as well.

211. A balance is due to Plaintiff and can only be ascertained by an accounting.

**NINTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(AGAINST DEFENDANTS JORDAN BROWN, JET GENIUS HOLDINGS, INC., JET GENIUS FLORIDA HOLDINGS, INC., C3JETS LLC, BOWMAN AVIATION, INC., JET AGENCY GLOBAL LLC, AND C3 LIMO LLC)**

212. Plaintiff realleges and incorporates by reference Paragraphs 1-211 as if set forth fully herein.

213. The IP Defendants were unjustly enriched by the misappropriation of

JGH's and Plaintiffs trade secrets contained in the JGH Intellectual Property. No document, license, or agreement similar to Plaintiffs JGH Intellectual Property Proposal was created between Defendants and JGH, and no payment for any transfer owed to Plaintiff as provided for in Section 4 of the Shareholder Agreement was ever discussed or proposed, because no such permissible transfer ever occurred. No permissible transfer in the ordinary course of JGH's business could plausibly be claimed when any such transfer was not disclosed to the shareholders, was not referenced for the Section 4 Shareholder Agreement obligations, was not documented, was not disclosed to the IRS when already assessing JGH for unpaid FET, and was not given any consideration for by any of the Defendants.

214. Defendant JGFH generated in excess of $125,000,000 after its incorporation, all of which was generated utilizing the JGH Intellectual Property, and at no times which it had a license or agreement or share of revenue to JGH for.

215. Without the misappropriation of the JGH Intellectual Property, JGFH would not have been able to generate in excess of $125,000,000 revenue, would not have been able to make undocumented loans in excess of $3,300,000 to Defendant Brown, would not have been able to make undocumented loans in excess of $860,000 to Defendant C3 Jets, and would not have been able to make more than $135,571 in undocumented loans to Defendant Bowman Aviation nor $343,329 to Defendant Jet Agency, nor $54,791 to Defendant C3 Limo LLC. **See Exhibit "F".**

**TENTH CAUSE OF ACTION**

**EQUITABLE INDEMNITY**

**(AGAINST DEFENDANT JORDAN BROWN)**

216. Plaintiff realleges and incorporates by reference Paragraphs 1-215 as if set forth fully herein.

217. Jordan Brown applied for an Employer Identification Number ("EIN")

with the IRS for JGH. By applying for the EIN, Jordan Brown agreed to make all necessary payments to the IRS. Jordan Brown was granted the EIN on November 30, 2016. However, Brown failed to fulfill his obligation to the IRS and did not pay the FETs that he withheld for many years.

218. Plaintiff Stanz is part owner of JGH. Because of this, Plaintiff Stanz is currently being compelled by the IRS to make these late FET payments to them and continues to incur costs and attorneys' fees.

219. Plaintiff requests that Defendant Brown indemnify Plaintiff for all monies, taxes, fees, and/or costs incurred and continues to occur and/or levied on Plaintiff for Brown's failure to pay any FETs to which Brown is responsible.

220. Costs and fees are to be determined at trial.

**IMMINENT IRREPARABLE INJURY**

221. Plaintiff realleges and incorporates by reference Paragraphs 1-220 as if set forth fully herein.

222. The unpaid FET by the Defendants represents an imminent irreparable injury to the Plaintiff. The IRS has already assessed $1,300,000 in the Defendants' unpaid FET against the Plaintiff individually, and Defendant Brown has admitted his responsibility for all FET. Despite the Plaintiffs efforts to request Defendants to pay their existing FET obligations, or to make a good faith payment to IRS as proposed by the First IRS FET Proposal and Second IRS FET Proposal, Defendants have refused to pay the FET Defendant Brown has already admitted he owes, and which the IRS has already assessed against JGH and now its shareholders individually.

223. The amount of FET assessed individually against the Plaintiff by IRS is more than the entirety of his historical compensation at any time by the Defendants, which instead created a scheme to generate over $125,000,000 in revenue to enrich themselves while ignoring the FET obligations, including millions of dollars personally received by Defendant Brown.

224. Plaintiff has requested exhaustively that IRS extend him time before

filing the lien, and the IRS has made clear that proposals such as the First IRS FET Proposal and Second FET proposal would be acceptable to allow it to refrain from filing the lien against Plaintiff individually. The very fact that a corporation's unpaid FET are now being assessed against the individual shareholders thereto demonstrates the severity of the Defendants' conduct in allowing such an occurrence to transpire, especially in light of the hundreds of millions they generated while already subject to payment of $1,300,000 in FET.

225. The imminence and irreparable injury in Plaintiffs original complaint was given an extension when the IRS transferred Plaintiffs file to the Kansas division of IRS, but at any time the imminence may arise again and the Plaintiff reserves the right to seek redress by moving this Court to hold an emergency hearing should the need arise. The imminence and irreparable injury can be prevented entirely by the Defendant Brown, JGH, and JGFH, all of which are already responsible for the $1,300,000 FET and which only the Defendants can prevent. Should the IRS file the lien against the Plaintiff, the imminent irreparable injury will continue.

**RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

On the First Cause of Action:

Against All Defendants, Plaintiff demands judgment, jointly and severally, in an amount in excess of $1,300,000 for the IRS FET assessment against Plaintiff in addition to all amounts the IP Defendants are found liable for under Plaintiff's Second Cause of Action as a predicate act, together with treble damages, attorneys' fees, punitive damages, prejudgment interest and postjudgment interest, an award of costs of pursuing this suit, and all other damages recoverable under law as well as such other further relief as the Court deems proper.

On the Second Cause of Action:

1. Against the IP Defendants, jointly and severally, Plaintiff individually

or on behalf of Jet Genius Holdings, Inc., as shareholder thereto, seeks, in addition to damages, temporary, preliminary, and permanent injunctive relief to recover the JGH Intellectual Property, trade secret information, and other legitimate business interests of Plaintiff and Jet Genius Holdings, Inc and preclude Defendants further misappropriation.

2. Against the IP Defendants, Plaintiff seeks, in addition to damages, temporary, preliminary, and permanent injunctive relief in the form of an order to immediately pay $1,300,000 of its owed FET which has been personally assessed against Plaintiff with the IRS, with an immediate payment of $125,000 or such other amount as acceptable by IRS to refrain from filing a lien.

3. Against the IP Defendants, jointly and severally, Plaintiff individually or on behalf of Jet Genius Holdings, Inc., seeks, two times the more than $125,000,000 in unjustly enriched revenues rightfully belonging to Plaintiff and/or Jet Genius Holdings, Inc., as exemplary damages, or such other amounts to be determined at trial.

4. Against the IP Defendants, jointly and severally, Plaintiff individually and on behalf of Jet Genius Holdings, Inc., seeks, two times the more than $125,000,000 in unjustly enriched revenues rightfully belonging to Plaintiff and/or Jet Genius Holdings, Inc., as punitive damages, or such other amounts to be determined at trial.

5. Against Defendant Jordan Brown and Jet Genius Holdings, Inc., Plaintiff individually seeks, two times the 24.5% equity shareholdings in Jet Genius Holdings, Inc. rightfully belonging to Plaintiff that were relinquished unjustly at the Shareholder Agreement's execution as exemplary damages, or such amount to be determined at trial.

6. Against Defendants Jordan Brown and Jet Genius Florida Holdings, Inc., and Jet Genius Holdings, Inc., Plaintiff individually seeks, two times the 24.5% equity shareholdings in Jet Genius Florida Holdings, Inc. rightfully belonging to

Plaintiff, which should have been reflected in Jet Genius Florida Holdings, Inc., which were relinquished unjustly by Plaintiff at the Shareholder Agreement's execution as exemplary damages, or such amount to be determined at trial

7. Attorneys' Fees

On the Third Cause of Action:

1. Against the IP Defendants Jointly and severally, Plaintiff individually or on behalf of Jet Genius Holdings, Inc., seeks two times the more than $125,000,000 in unjustly enriched revenues rightfully belonging to Plaintiff and/or Jet Genius Holdings, Inc., as exemplary damages, or such amount to be determined at trial.

2. Against the IP Defendants, jointly and severally, Plaintiff individually or on behalf of Jet Genius Holdings, Inc., seeks two times the more than $125,000,000 in unjustly enriched revenues rightfully belonging to Plaintiff and/or Jet Genius Holdings, Inc., as punitive damages, or such amount to be determined at trial.

3. Attorneys'Fees

On the Fourth Cause of Action:

1. Against Defendant Jet Genius Holdings, Inc. Plaintiff seeks rescission of the Shareholder Agreement and restoration of Plaintiff's designee to the Board of Directors of Defendant Jet Genius Holdings, Inc., and restoration of Plaintiff s shareholdings representing the 24.5% equity value he wrongfully relinquished under the Shareholder Agreement.

2. Against all Defendants, recission of each and every agreement or contract entered after the Board Coup if this Court finds such agreement or contract could not have been properly entered into without a properly constituted Board for Jet Genius Holdings, Inc. Plaintiff seeks immediate elections in accordance of the Bylaws of Jet Genius Holdings, Inc., should this Court deem it necessary and proper.

3. Against Defendant Jet Genius Florida Holdings, Inc. Plaintiff seeks ascension of Plaintiffs designee to the Board of Directors of Defendant Jet Genius

Florida Holdings, Inc., and restoration of Plaintiff s shareholdings representing the 24.5% equity value he wrongfully relinquished under the Shareholder Agreement, without which Defendant Jet Genius Florida Holdings, Inc., would not exist.

4. Against Defendant Brown and Jet Genius Holdings, Inc., Plaintiff seeks damages of $909,451 for any purported transfer in breach of the Shareholder Agreement which is found to have occurred prior to November 1, 2019, $727,561 for any purported transfer in breach of the Shareholder Agreement which was found to have occurred prior to November 1, 2020, $545,671 for any purported transfer in breach of the Shareholder Agreement which was found to have occurred prior to November 1, 2021, and $363,780 for any purported transfer in breach of the Shareholder Agreement which was found to have occurred prior to November 1, 2022.

5. Against Defendant Brown Family Trust, Plaintiff seeks forfeiture of 10% of its equity shareholdings of JGFH to be reallocated as equitably determined by the Court.Jet Genius Florida Holdings, Inc. ("JGFH")

78. On April 27, 2020, JGFH filed its first annual report which disclosed that Brown was the President, Secretary, Treasurer, and sole Director of JGFH.

79. Plaintiff is informed and believes, and on that basis alleges, that Brown formed JGFH to pursue the identical business as JGH, and to continue or conduct such business operations using the JGH Platform.

80. Plaintiff is informed and believes, and on that basis alleges, that Brown formed JGFH to avoid liabilities of JGH, including with respect to the FET obligations and moneys owed to Plaintiff and Wolf.

81. By creating an entity that was not a wholly owned subsidiary of JGH and that also was not a company or joint venture established with one or more partners for the primary purpose of owning and operating aircraft, Brown breached the Letter Agreement and express promises he made to Plaintiff.

82. On September 16, 2019, on information and belief, Brown formed Jet

Agency in the State of Florida. The Article of Organization of Jet Agency identified Brown as Jet Agency's manager.

83. Every Annual Report to date filed by Jet Agency indicates that Brown is Jet Agency's manager. On information and belief, Brown is Jet Agency's sole member.

84. By creating an entity that was not a wholly owned subsidiary of JGH that also was not a company or joint venture established with one or more partners for the primary purpose of owning and operating aircraft, Brown breached the Letter Agreement and express promises he made to Plaintiff.

85. On August 29, 2019, all JGH employees received an email from JGH's Chief Financial Officer, Cindy Grotsky ("Grotsky"). In the email, Grotsky announced that all JGH employees would become employees of JGFH, such that the employee structure for the business remained identical and there would be no material changes to the operation of the business, except formalities in payroll. Grotsky's email to the staff stated: "Over the last several weeks it was decided that a new entity would be created -- Jet Genius Florida Holdings, Inc. d/b/a Charter Flight Group. This will occur on October 1, 2019, and beginning on that data all activity of Charter Flight Group will be recorded in the new entity."

86. On information and belief, at this time, Brown, as CEO and the sole Director of JGH, moved JGH's entire revenue stream to JGFH. He did so without any benefit to JGH or its shareholders. In doing so, Brown breached his fiduciary duties to the JGH shareholders, including Plaintiff.

87. On information and belief, at this time, as CEO and the sole Director of JGH, Brown purported to transfer ownership of or licensed rights in and to the JGH Platform to JGFH without adequate consideration, simply for the purpose of benefitting another entity for which he was, on information and belief, the sole shareholder. In doing so, Brown breached his fiduciary duties to the JGH shareholders, including Plaintiff.

88. Transferring the rights in and to the JGH Platform to another entity constituted a "Corporate Event" under the Letter Agreement. Since the Corporate Event took place before November 1, 2019, Plaintiff was due a lump sum payment of $909,451.00, yet he received nothing.

89. On information and belief, at this time, as CEO and the sole Director of JGH, Brown transferred ownership of or licensed rights in and to the JGH Platform to Jet Agency without adequate consideration simply for the purpose of benefitting another entity for which he was, on information and belief, the sole member. In doing so, Brown breached his fiduciary duties to the JGH shareholders, including Plaintiff.

90. Again, transferring the rights in and to the JGH Platform to another entity constituted a "Corporate Event" under the Letter Agreement. Since the Corporate Event took place before November 1, 2019, Plaintiff was due a lump sum payment of $909,451.00, yet he received nothing.

91. In December 2019, having been excluded from the company decision making for approximately one year, Plaintiff learned that JGH's FET obligation was still growing despite Brown's repeated assurances he would ensure it was paid.

92. On December 2, 2019, Plaintiff attended a call with Brown and Wolf, amongst several others. On the call, staff confirmed that JGH's outstanding FET liability was approximately $2.5 million. Brown stated that he had established a fund to pay the FET, but it only had $50,000 in it. Brown did not and would not explain where the rest of the money went.

93. On the same call, Brown said that he planned to move the company to Florida before the IRS could put a lien on JGH.

94. Thereafter, Brown continued to grow his shell game of entities that he used for only his benefit. On September 11, 2020, C3 Limo, LLC is formed with Stacy Brown, Brown's wife, listed as its manager. Six months later, they change the manager to Chasen Dobos, Brown's stepson.

95. On information and belief, at this time, as CEO and the sole Director of

JGH, Brown transferred ownership of or licensed rights in and to parts of the JGH Platform to C3 Limo, including the client data and purchase history, and conducted joint marketing with it, without paying adequate consideration to JGH, all for his and his family's sole benefit. In doing so, Brown breached his fiduciary duties to the JGH shareholders, including Plaintiff.

96. On information and belief, Brown transferred cash belonging to JGH or to which it was entitled in undocumented transactions to C3 Limo to fund C3 Limo's operations without any expectation of being repaid.

97. On April 23, 2021, on information and belief, Brown formed C3 Jets.

98. On information and belief, Brown transferred $100,000 per month (and potentially more), which was cash belonging to JGH or to which it was entitled, to C3 Jets to help fund its operations. On information and belief, Brown formed and pursued C3 Jets with the intent and plan to shift the customers, clients, opportunities, assets, and revenues, and other business interests to which JGH is rightfully entitled to C3 Jets.

99. On information and belief, JGH is not receiving any compensation for these payments.

100. On information and belief, throughout his control tenure, as Plaintiff has now learned, Brown has used the assets (tangible and intangible), bank accounts, and revenues of JGH, either directly or through JGFH, or the Alter Egos, to fund his extravagant lifestyle. He has done so in any number of ways that serve his personal interest and harm JGH.

101. On information and belief, Brown has used the assets rightly belonging to or originating from JGH, either directly or through JGFH, or the Alter Egos, including planes and vehicles, for personal use that did not serve any business purpose.

102. On information and belief, Brown has taken funds rightly belonging to or originating from JGH, either directly or through JGFH, or the Alter Egos, in undocumented transactions or improperly documented transactions for personal use.

103. On information and belief, Brown has made $1.9 million in distributions of JGH funds to himself while only distributing $23,000 to the other JGH shareholders, in wild disproportion to shares held by the shareholders of JGH.

104. On information and belief, Brown has taken excessive and indefensible commissions from sales made by or through JGH or which were corporate opportunities belonging to JGH. The commissions taken by Brown deprived JGH and its shareholders of their entitled interests in profits or benefits from the transactions and opportunities.

105. On information and belief, Brown has made undocumented or improperly documented "loans" to the Alter Egos from JGH to fund their respective operations. Brown has built these businesses to serve his own personal purposes. Brown has made these loans with no expectation that they would ever be repaid.

106. Brown has taken at least one loan for JGH, JGFH, and/or the Alter Egos, from his family members. On information and belief, that loan was repaid on terms that benefited Brown's family and was to the detriment of the company.

107. On information and belief, Brown has taken out loans on behalf of JGH, JGFH, and/or the Alter Egos, all of which involve money or assets rightly belonging to JGH, and used the funds for personal uses. On information and belief, Brown has not repaid such loans, and creditors have now asserted liens against JGH, or assets which it rightly has an interest in, to the detriment of JGH's shareholders.

108. On information and belief, Brown has used the funds that should have been used to pay the FET for personal use, including using the assets or funds of JGH, either directly or through JGFH and the Alter Egos, to subsidize his opulent lifestyle, including regularly taking vacations to the Caribbean, Monaco, Africa, Maldives, and St. Barts, attending Formula 1 races, indulging in the highest fashion, adorning himself with Louis Vuitton, Hermes, and high-end watches, and maintaining homes in locations like Palm Beach, Florida, Aspen, Colorado, and Del Mar, California.

109. In June of 2021, the IRS escalated pressure against JGH for its unpaid

FET. IRS agents contacted the original JGH shareholders, Brown, Plaintiff, and Wolf, and stated that JGH had an outstanding FET liability of over $5 million. Plaintiff worried that the IRS would attempt to collect this amount from the shareholders personally.

110. Brown attempted to use this opportunity to leverage Plaintiff to release Brown from his many breaches of fiduciary duties as the CEO and sole director of JGH.

111. By this time, Brown had breached his fiduciary duties to JGH and Plaintiff by effectively stripping JGH of its most meaningful and valuable asset by transferring or licensing the JGH Platform to other entities Brown owned and/or controlled, and by continuously moving the sources of revenue amongst his shell companies.

112. Brown attempted to cover his tracks by coercing Plaintiff to sign a new proposed shareholder agreement for JGFH (the "JGFH Agreement"). The JGFH Agreement would have awarded Plaintiff shares in JGFH, but those shares were not identical in value and corporate priority as his shares in JGH.

113. Moreover, the proposed JGFH Agreement contained a release of all claims that Plaintiff would have against JGH or its directors or officers, including Brown. Of course, Plaintiff refused to sign the JGFH Agreement.

114. In the following months, Plaintiff tried to resolve JGH's outstanding FET issues. Brown refused to discuss resolving the FET issues until Plaintiff signed the JGFH Agreement and released all claims against him.

115. Brown further sought to use the FET as leverage against Plaintiff by, on information and belief, attempting to influence (and potentially succeeding in influencing) the IRS to pursue collection of the FET from Plaintiff personally.

116. At this time, JGH had been contacted by an IRS Revenue Officer ("IRS RO"). Brown pointed to the period from the formation of JGH up to the Letter Agreement—when Plaintiff owned 49.5% of JGH—and Plaintiff's signature to open

the bank account as JGH's secretary to suggest Plaintiff had responsibility for JGH's finances during that time, even though Plaintiff did not truly serve in that role or have that responsibility.

117. In fact, Brown knew these suggestions were patently false. He knew that he excluded Plaintiff from having oversight over JGH's finances as Brown wanted and gained exclusive control over that role. Brown also knew that the only reason that Plaintiff opened the bank account was at Brown's request, claiming he could not do so since he had been on vacation (or purported to be). It was only due to Brown's request (whether based on truth or not) that Plaintiff had even been named Secretary of JGH for the technical and one-time purpose of opening the bank account.

118. In or around October of 2021, the IRS RO contacted Plaintiff regarding JGH's unpaid FET and informed Plaintiff that he could be held personally responsible for the uncollected and unpaid tax.

119. Plaintiff then sought protection of JGH. JGH had already provided counsel to Wolf with respect to the FET, and the counsel had succeeded in obtaining a final result that the IRS was not investigating Wolf for personal liability for the FET.

120. When Plaintiff confronted Brown about the FET, Brown admitted on November 4, 2021: "I am responsible for the FET mess. I will have to answer to this."

121. Plaintiff sought the same legal defense and indemnification from the company that it provided to Wolf and Brown. On a call with JGH's counsel on November 18, 2021, Plaintiff requested defense representation and indemnification for the tax dispute. Indisputably, JGH owed it to Plaintiff under its Bylaws to defend and indemnify Plaintiff for the tax liability because it was an "expense[], judgment[], fine[],settlement[] and other amount[]" that was actually incurred by reason of the fact Plaintiff was a director or officer of JGH. In blatant breach of the duty to defend and indemnify Plaintiff, Brown refused to provide the requested defense and denied Plaintiff's request for indemnification.

122. Without representation, Plaintiff had to fend for himself in his

negotiations with the IRS to try to avoid personal liability. That effort failed, and in or around May 2022, he was personally assessed a trust fund recovery penalty of $1.3 million.

123. On October 28, 2022, Brown formed Jetcharter and serves as its manager. The website domain www.jetcharter.com was and rightfully is an asset of JGH. On information and belief, JGH had purchased the domain for $50,000. On information and belief, Brown has now transferred or licensed the domain to Jetcharter, all to the detriment of JGH and its shareholders.

124. Brown's unscrupulous, belligerent, and devious behavior reached extraordinary new levels in late 2022.

125. On information and belief, Brown saw an opportunity to commandeer Plaintiff's cell phone and injure Plaintiff's reputation by impersonating him in cell phone communications.

126. When the parties formed JGH, Plaintiff was given a company cell phone. On information and belief, Brown purchased and registered the cell phone with the cell phone carrier under an account belonging to JGH.

127. Pursuant to section 5 of the Letter Agreement, that cell phone became Plaintiff's personal property upon execution of that agreement.

128. In or around December 2022, in the midst of the parties' disagreements over company operations, disputes over resolving the FET obligation, and this litigation, on information and belief, Brown convinced the cell phone carrier that Plaintiff's cell phone number actually belonged to Brown. On information and belief, Brown succeeded in convincing the carrier to transfer Plaintiff's cell phone account to a new cell phone that Brown possessed. This effectively gave Brown control over all the information in Plaintiff's cell phone, including text messaging services.

129. At the same time, Plaintiff's cell phone service stopped working. Plaintiff could not regain access to his phone account, so he purchased a new phone and was assigned a new phone number. Ever since, Plaintiff has used his new cell phone and

new number.

130. Late one night in December 2022, Wade A. Miller ("Miller"), Plaintiff's then-counsel in this litigation, received a call from Plaintiff's cell phone number. The caller identified himself as Plaintiff, which is what the caller-id showed. Miller thought the speaker sounded inebriated. Miller and the caller, who he still believed to be Plaintiff, spoke at length, including as to legal strategy and advice related to this litigation. Miller had never received a call from Plaintiff so late in the night, so the next morning, Miller contacted Plaintiff to make sure he was alright and to discuss the conversation they had the night prior. Plaintiff was surprised by Miller's description of the call since Plaintiff had not made that call.

131. On information and belief, Brown used Plaintiff's former cell phone number to call Miller and impersonated Plaintiff with the express purpose and intent of learning privileged and confidential information about Plaintiff and this litigation. Plaintiff was aghast upon learning of this violation.

132. In the following days and weeks, Plaintiff was contacted by various friends and colleagues who told him that they were receiving strange text messages purportedly from him. Some of these recipients engaged in exchanges or conversations with the person purporting to be Plaintiff. Some of these recipients eventually suspected (or affirmatively learned) they were not communicating with Plaintiff, and others eventually believed that they were texting with Brown using Plaintiff's cell phone number.

133. On information and belief, Brown texted and/or called Plaintiff's contacts from his cell phone while impersonating Plaintiff.

134. On information and belief, Plaintiff still does not know the full extent of Brown's text messages or impersonation efforts with his contacts.

135. Plaintiff has and continues to suffer emotional distress and extreme embarrassment, including when he has to contact or disclose to his friends and colleagues that he lost access to his phone and someone appears to have been

impersonating him. Further, Plaintiff fears further embarrassment and ridicule if forced to indiscriminately contact his contacts, friends and colleagues to ask if they have been contacted by a person impersonating him.

136. The stress and embarrassment caused by the phony conversations with Plaintiff's contacts, and the unknown extent of those acts which could still be occurring, has caused Plaintiff severe emotional distress and anxiety. Plaintiff further suffers stress, anxiety, and emotional distress and trauma because he does not know the full extent of unauthorized access to and use of his personal cell phone and data contained therein.

**FIRST CAUSE OF ACTION**

**Express Indemnity**

**(Against JGH)**

137. Plaintiff incorporates by reference each and every allegation contained in each paragraph above and below as though the same were set forth in full herein.

138. Pursuant to its Bylaws, JGH owes an obligation to indemnify Plaintiff for all expenses, judgments, fines, settlements and other amounts actually incurred by reason of the fact that Plaintiff was a director or officer of JGH.

139. The IRS assessed a $1.3 million tax liability against Plaintiff by reason of his past performance of his duties or service as a director or officer of JGH.

140. Plaintiff demanded that JGH indemnify him for the $1.3 million tax liability.

141. Plaintiff has incurred other expenses as a result of defending against the IRS and its FET collection efforts against JGH and Plaintiff personally.

142. JGH refused to indemnify Plaintiff for the $1.3 million tax liability.

143. As a direct and proximate result of JGH's breach of its duty, Plaintiff has been damaged, plus interest thereon, in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**

**Equitable Indemnity**

**(Against JGH and Brown)**

144. Plaintiff incorporates by reference each and every allegation contained in each paragraph above and below as though the same were set forth in full herein.

145. By reason of JGH's failure to pay the FET, which Brown intentionally avoided despite assurances he would arrange for its payment, Plaintiff has been assessed a $1.3 million tax liability by the IRS.

146. Brown and JGH's conduct, whether intentional or negligent, was a substantial factor, and the direct and proximate cause, of causing Plaintiff harm.

147. Brown is liable as, from the time that Brown was JGH's sole director and majority shareholder, Brown dominated, influenced and controlled JGH and made the decision for JGH to avoid paying the FET obligation it owed.

148. Brown is liable as, from the time that Brown was JGH's sole director and majority shareholder, there existed and now exists a unity of interest and ownership between Brown and JGH; the individuality and separateness of Brown and JGH have ceased to exist.

149. Brown is liable for JGH as, from the time that Brown was JGH's sole director and majority shareholder, JGH has been and now is a mere shell and naked framework which Brown used and continues to use as a conduit for the conduct of his personal business, property and affairs.

150. As a direct and proximate result of Brown's and JGH's acts, Plaintiff has been damaged, plus interest thereon, in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**

**Breach of Duty to Defend**

**(Against JGH)**

151. Plaintiff incorporates by reference each and every allegation contained in each paragraph above and below as though the same were set forth in full herein.

152. Pursuant to the Corporations Code and its Bylaws, JGH had an obligation to defend Plaintiff for all expenses, judgments, fines, settlements and other amounts actually incurred by reason of the fact that Plaintiff was a director or officer of JGH.

153. Plaintiff incurred expenses defending against the IRS efforts to collect JGH's unpaid FET.

154. Plaintiff demanded that JGH defend him for in the IRS collection action.

155. Plaintiff has incurred other expenses as a result of defending against the IRS and its FET collection efforts and will continue to incur expenses defending against the IRS and FET collection efforts.

156. JGH refused to defend Plaintiff against the IRS collection action.

157. ~~6.Exemplary and Punitive Damages~~ As a direct and proximate result of JGH breach of its duty, Plaintiff has been damaged, plus interest thereon, in an amount to be ~~determined at trial~~proven at trial.

**FOURTH CAUSE OF ACTION**

**Breach of Fiduciary Duty**

**(Plaintiff, Derivatively on behalf of JGH, Against Brown)**

158. Plaintiff incorporates by reference each and every allegation contained in each paragraph above and below as though the same were set forth in full herein.

159. As the CEO and Director of JGH, Brown had a fiduciary duty to act in the best interest JGH and its shareholders.

160. Plaintiff is informed and believes, and on that basis alleges, that Brown breached his fiduciary duties by:

a. failing to pay JGH's FET obligations;

b. transferring the revenue and profits of JGH to other entities or his personal accounts;

c. taking out loans from JGH for improper and personal purposes without adequate documentation;

d. taking excessive and exorbitant commissions, salaries, and bonuses, including after the sales of chartered flights or for aircraft sales;

e. making undocumented loans to other entities controlled by Brown, believed to include but perhaps not be limited to JGFH, C3 Jets, Bowman Aviation, Jet Agency Global, and C3 Limo; and

f. transferring, licensing or otherwise monetizing the JGH Platform to other entities controlled by Brown for the benefit of those other persons or entities and to the detriment of JGH and its shareholders.

161. As a direct and proximate result of the acts alleged above, Plaintiff has suffered damage, plus interest thereon, according to proof at trial.

162. In doing the acts alleged in this Cause of Action, Brown acted with oppression, fraud, malice and in conscious disregard of Plaintiff's rights. As a result, to the Court should award punitive damages according to proof at the time of trial.

**FIFTH CAUSE OF ACTION**

**Breach of Contract**

**(Against JGH and Brown)**

163. Plaintiff incorporates by reference each and every allegation contained in each paragraph above and below as though the same were set forth in full herein.

164. The Letter Agreement is a valid and enforceable contract.

165. Plaintiff fully performed under the terms of the Letter Agreement, or performance was excused.

166. JGH and Brown breached the Letter Agreement by:

a. creating securities in an entity other than a wholly-owned subsidiary, other than a company or joint venture established with one or more partners for the primary purpose of owning and operating aircraft without Plaintiff's written permission;

b. loaning money to or accepting loans from a shareholder;

c. failing to make a lump sum payment to Plaintiff after the occurrence of a corporate event as defined in Section 4 of the Letter Agreement;

d. failing to collect and hold revenue in a separate bank account dedicated towards all applicable FET; and

e. failing to continue to work towards a settlement with the IRS for FET that would avoid the personal liability of Plaintiff.

167. As a direct and proximate result of the breaches of the Letter Agreement, Plaintiff has been damaged in an amount to be proven at time of trial and is entitled to all reasonable attorneys' fees, expenses, and costs incurred pursuant to the Letter Agreement.

## SIXTH CAUSE OF ACTION

## Fraud

## (Against Brown)

168. Plaintiff incorporates by reference each and every allegation contained in each paragraph above and below as though the same were set forth in full herein.

169. Brown made intentionally false statements to Plaintiff to consolidate his control over JGH.

170. Brown made these statements in order to obtain Plaintiff's agreement to fundamentally change the ownership structure and management of JGH. Plaintiff was concerned that Brown may take advantage of his position to act to his benefit and to the detriment of Plaintiff.

171. Brown made false statements intending to address Plaintiff's concerns and convince him to sign the Letter Agreement. Brown's false statements to Plaintiff included saying:

- "Just trust me."
- "Don't worry about it."
- "Why are we wasting time with lawyers negotiating this, there is no reason to worry."

- "I won't do those things," specifically, avoid paying FET, form entities or transfer assets or money out of JGH.

172. On information and belief, at the time Brown made his statements, he knew they were false and Brown never intended to abide by his assurances and promises to Plaintiff, including to ensure that the FET was paid, that he would protect the assets of JGH to serve the interests of JGH's other shareholders, or otherwise act in JGH's best interests.

173. Brown made his statements with the intention of consolidating his control of JGH and intended to induce Plaintiff's reliance to agree to such terms.

174. Plaintiff reasonably relied on Brown's statements that he would do as promised, including that he would take all appropriate measures to pay the FET, protect JGH's assets, and serve the interest of JGH's other shareholders. As a consequence, Brown obtained Plaintiff's consent based on such reliance.

175. As a result of Brown's fraudulent statements, Plaintiff has been damaged in an amount to be proven at trial.

176. In doing the acts alleged in this Cause of Action, Brown acted with oppression, fraud, malice and in conscious disregard of Plaintiff's rights. As a result, to the Court should award punitive damages according to proof at the time of trial.

## SEVENTH CAUSE OF ACTION

### California Corporations Code § 316(a)

### (Plaintiff, Derivatively on Behalf of JGH, Against Brown)

177. Plaintiff incorporates by reference each and every allegation contained in each paragraph above and below as though the same were set forth in full herein.

178. Brown made corporate distributions to himself that violated California Corporations Code section 500(a).

179. Brown authorized loans that violate California Corporations Code section 315(a).

180. Due to Brown's unlawful conduct, JGH is entitled to recover the amount

of the illegal distributions or, to the extent Brown improperly transferred JGH's property, including the JGH Platform, the fair market value of that property at the time of the illegal distribution, plus interest thereon from the date of the distribution at the legal rate on judgments until paid, together with all reasonably incurred costs of appraisal or other valuation, if any, of that property or loss suffered by the corporation.

**EIGHTH CAUSE OF ACTION**

**Aiding and Abetting Breach of Fiduciary Duty**

**(Plaintiff, Derivatively on Behalf of JGH, Against the Alter Egos & C3 Limo)**

181. Plaintiff incorporates by reference each and every allegation contained in each paragraph above and below as though the same were set forth in full herein.

182. By the acts described herein, Brown breached his fiduciary duties to JGH.

183. Plaintiff is informed and believes, and on that basis alleges, that the Alter Egos had actual knowledge of the fiduciary duties owed by Brown to JGH and its shareholders.

184. Plaintiff is informed and believes, and on that basis alleges, that the Alter Egos substantially assisted and encouraged Brown's breach of fiduciary duties by taking out undocumented loans that benefited the Alter Egos, misappropriating and using JGH assets, misappropriating and using the JGH Software, and receiving cash payments that would never be returned to JGH that were used by the Alter Egos for purposes unrelated to the operations of JGH.

185. The Alter Egos's conduct was a substantial factor in causing harm to Plaintiff.

**NINTH CAUSE OF ACTION**

**Conspiracy to Breach Fiduciary Duty**

**(Plaintiff, Derivatively on Behalf of JGH, Against Brown, the Alter Egos & C3 Limo)**

186. Plaintiff incorporates by reference each and every allegation contained in each paragraph above and below as though the same were set forth in full herein.

187. Brown, the Alter Egos, and C3 Limo had a common purpose and design to benefit by the breach of Brown's fiduciary duties to JGH.

188. Plaintiff is informed and believes, and on that basis alleges, that collectively, Brown, the Alter Egos, and C3 Limo agreed to and acted in concert to achieve an unlawful plan of benefiting from the breach of Brown's fiduciary duties to JGH.

189. Plaintiff is informed and believes, and on that basis alleges, that Brown, the Alter Egos, and C3 Limo intentionally acted and achieved this plan by comingling funds, accepting and using the JGH Software, and accepting undocumented loans from Brown.

190. As a result of the conspiracy, Brown, the Alter Egos, and C3 Limo are all liable for Brown's breaches of his fiduciary duties.

191. As a direct and proximate result of the acts alleged above, Plaintiff has suffered damage, plus interest thereon, according to proof at trial.

192. In doing the acts alleged in this Cause of Action, Brown, the Alter Egos, and C3 Limo acted with oppression, fraud, malice and in conscious disregard of Plaintiff's rights. As a result, to the Court should award punitive damages according to proof at the time of trial.

**TENTH CAUSE OF ACTION**

**Unjust Enrichment**

**(Plaintiff, Derivatively on Behalf of JGH, Against Brown)**

193. Plaintiff incorporates by reference each and every allegation contained in each paragraph above and below as though the same were set forth in full herein.

194. Brown accepted money in the form of JGH assets, unauthorized commissions and loans that have not been repaid to JGH.

195. It would be inequitable for Brown to retain these assets without any compensation to JGH.

196. Justice requires JGH receive the value that Brown has taken from JGH at

an amount to be proven at trial.

## ELEVENTH CAUSE OF ACTION

## Quasi-Contract/Promissory Estoppel

## (Against Brown)

197. Plaintiff incorporates by reference each and every allegation contained in each paragraph above and below as though the same were set forth in full herein.

198. Brown made promises to Plaintiff that were clear and unambiguous in their terms. Brown promised that if Plaintiff entered into the Letter Agreement and ceded control of JGH to Brown, that Brown would ensure that JGH would handle payment of the FET obligations, not transfer JGH's assets to other entities, and act in the best interests of JGH's shareholders, including Plaintiff.

199. In reliance on Brown's promises, Plaintiff signed the Letter Agreement and otherwise agreed to Brown's demands to control JGH as CEO and sole director.

200. Plaintiff's reliance was both reasonable and foreseeable. In fact, Brown encouraged and induced that reliance and repeatedly assured Plaintiff that Brown was both capable of addressing the business issues that were the subject of his promises, but also that it would be to Plaintiff's benefit in doing so.

201. Plaintiff has been injured by his reliance on Brown's promises. Plaintiff has been assessed personal liability of $1.3 million in FET that Brown promised he would accept responsibility for paying and has been denied payments to which he was otherwise entitled, and denied other entitlements to which he is entitled.

202. As a direct and proximate result of Brown's acts and failures to act, Plaintiff has been injured in an amount to be proven at time of trial, which sum exceeds the jurisdictional amount of this Court.

## TWELFTH CAUSE OF ACTION

## Conversion

## (Plaintiff, Derivatively on Behalf of JGH, Against Brown)

203. Plaintiff incorporates by reference each and every allegation contained in

each paragraph above and below as though the same were set forth in full herein.

204. JGH owned the cash, money, revenue or other assets that was in the possession of or received by JGH.

205. Plaintiff is informed and believes, and on that basis alleges, that Brown converted JGH's cash, money, revenue or other assets by:

a. keeping revenue that should have been used to pay FET;

b. transferring the revenue and profits of JGH to other entities or his personal accounts;

c. taking out loans from the company for personal purposes;

d. taking excessive and exorbitant commissions, salaries, and bonuses, including after the sales of chartered flights or for aircraft sales; and

e. transferring, licensing or otherwise monetizing the JGH Platform to other entities controlled by Brown.

206. As a direct and proximate result of Brown's acts and failures to act, Plaintiff has been injured in an amount to be proven at time of trial.

**THIRTEENTH CAUSE OF ACTION**

**Conspiracy to Commit Conversion**

**(Plaintiff, Derivatively on Behalf of JGH, Against Brown, the Alter Egos & C3 Limo)**

207. Plaintiff incorporates by reference each and every allegation contained in each paragraph above and below as though the same were set forth in full herein.

208. Plaintiff is informed and believes, and on that basis alleges, that Brown, the Alter Egos, and C3 Limo had a common purpose and design to benefit by converting JGH's assets.

209. Plaintiff is informed and believes, and on that basis alleges, that collectively, Brown, the Alter Egos, and C3 Limo agreed to and acted in concert to achieve an unlawful plan of converting JGH's assets.

210. Plaintiff is informed and believes, and on that basis alleges, that Brown,

the Alter Egos, and C3 Limo achieved this plan by transferring assets, through multiple mechanisms, from JGH to themselves.

211. As a result of the conspiracy, Brown, the Alter Egos, and C3 Limo are all liable for the conversion of JGH's assets.

**FOURTEENTH CAUSE OF ACTION**

**Money Had and Received**

**(Plaintiff, Derivatively on Behalf of JGH, Against Brown, the Alter Egos & C3 Limo)**

212. Plaintiff incorporates by reference each and every allegation contained in each paragraph above and below as though the same were set forth in full herein.

213. As described herein, Brown, the Alter Egos and C3 Limo have received money which belongs to JGH.

214. Brown, the Alter Egos, and C3 Limo have not used these moneys for the benefit of JGH.

215. As a direct and proximate result of the acts alleged above, JGH has suffered damage, plus interest thereon, according to proof at trial.

**FIFTEENTH CAUSE OF ACTION**

**California Penal Code § 502**

**(Against Brown)**

216. Plaintiff incorporates by reference each and every allegation contained in each paragraph above and below as though the same were set forth in full herein.

217. California Penal Code, Section 502 states: any person who commits any of the following acts is guilty of a public offense: (1) Knowingly accesses and without permission alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data. (2) Knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer

network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network.

218. California Penal Code § 502(e) permits a private civil action by the owner of any computer, computer system, or other data who suffers loss by reason of a violation of section 502

219. Plaintiff was and is the rightful owner of his cell phone, which is a mobile device, including all data contained therein, which is a "computer system" as defined in California Penal Code section 502(b).

220. Brown knowingly accessed and used Plaintiff's cell phone and the data contained therein.

221. Brown knowingly used the computer systems on Plaintiff's cell phone.

222. Brown knowingly caused the disruption of the computer services on Plaintiff's cell phone.

223. Plaintiff is entitled to injunctive or other equitable relief as a result of these Penal Code violations. Further, any computer, computer network, computer system, or any software or data owned by Brown that is used in the commission of a public offense, or any computer impermissibly used as a repository for the storage of software or data illegally obtained in violation of Penal Code section 502 shall be subject to forfeiture.

224. By accessing and using Plaintiff's cell phone and the computer systems on the cell phone, Brown acted with oppression, fraud, or malice.

225. Due to Brown's conduct, Plaintiff is entitled to compensatory damages, punitive damages, injunctive relief and other equitable relief.

226. Penal Code section 502 also entitles Plaintiff to reasonable attorneys' fees.

## SIXTEENTH CAUSE OF ACTION

## Intentional Infliction of Emotional Distress

## (Against Brown)

227. Plaintiff incorporates by reference each and every allegation contained in each paragraph above and below as though the same were set forth in full herein.

228. Brown's conduct of convincing Plaintiff's cell phone carrier to transfer the cell phone account to a different phone in his possession was extreme and outrageous.

229. Brown's conduct of contacting Plaintiff's attorney and impersonating Plaintiff for the purpose of deceptively engaging in legal discussions with that attorney was extreme and outrageous.

230. Brown's conduct of contacting Plaintiff's friends, relatives, and colleagues and impersonating Plaintiff and engaging in personal discussions was extreme and outrageous.

231. In engaging in the above conduct, Brown intended to cause Plaintiff extreme emotional distress or recklessly disregarded the probability of causing Plaintiff extreme emotional distress.

232. After Brown's conduct, Plaintiff suffered extreme emotional distress.

233. In the above conduct, Brown acted with oppression, fraud, or malice.

234. Brown's conduct was a substantial factor in causing Plaintiff's extreme emotional distress.

## SEVENTEENTH CAUSE OF ACTION

## Intrusion into Private Affairs

## (Against Brown)

235. Plaintiff incorporates by reference each and every allegation contained in each paragraph above and below as though the same were set forth in full herein.

236. Plaintiff had a reasonable expectation of privacy in the information on his cell phone.

237. Brown intentionally intruded into Plaintiff's cell phone.

238. Brown's intrusion into Plaintiff's cell phone would be highly offensive to a reasonable person.

~~7. Attorneys' Fees as provided in the Shareholder Agreement~~

~~On the Fifth Cause of Action:~~

~~1. Against Defendants Jordan Brown, Jet Genius Holdings, Inc., and Jet Genius Florida Holdings, Inc., jointly and severally, exemplary and punitive damages in an amount to be determined at trial.~~

~~2. Attorneys' Fees~~

~~On the Sixth Cause of Action:~~

~~1. Against all Defendants, jointly and severally, exemplary and punitive damages in an amount to be determined at trial.~~

~~2. Attorneys' Fees~~

~~On the Seventh Cause of Action:~~

~~1. Against all Defendants, jointly and severally, exemplary and punitive damages in an amount to be determined at trial.~~

~~2. Attorneys' Fees~~

~~On the Eighth Cause of Action:~~

~~1. An accounting ordered by this Honorable Court, to provide Plaintiff with equitable relief by ordering the immediate fumishment to Plaintiff of all usual and customary information rights as a shareholder, or such other information Plaintiff may reasonably request or this Honorable Court see fit into the financial health, transactional history, books and records, bank statements, and accounts of Defendants Jet Genius Holdings, Inc., and Jet Genius Florida Holdings, Inc.~~

~~2. An accounting ordered by this Honorable Court, to provide Plaintiff with equitable relief by ordering the immediate furnishment to Plaintiff of all usual and customary information rights regarding any monies which egressed between the~~

accounts of Defendants Jet Genius Holdings, Inc., and Jet Genius Florida Holdings, Inc., which Plaintiff as shareholder of may reasonably request or this Honorable Court see fit into the transactional history, books and records, bank statements, of any monies from the accounts for Defendants Jet Genius Holdings, Inc., and Jet Genius Florida Holdings, Inc. egressing to those of all of the other Defendants.

On the Ninth Cause of Action:

1. Against the CFG Enterprise Defendants, jointly and severally, Plaintiff individually and/or as a shareholder of Jet Genius Holdings, Inc. seeks damages in the amount of the more than $125,000,000 in unjustly enriched revenue to be returned to Jet Genius Holdings, Inc. and such other exemplary and punitive damages in an amount to be determined at trial.

2. Against Defendant Jordan Brown, Plaintiff seeks damages in the amount of the more than $3,300,000 in unjustly enriched revenue to be returned to Jet Genius Holdings, Inc. and such other exemplary and punitive damages in an amount to be determined at trial.

3. Against Defendant C3jets EEC, Plaintiff seeks damages in the amount of the more than $861,018 in unjustly enriched revenue to be returned to Jet Genius Holdings, Inc. and such other exemplary and punitive damages in an amount to be determined at trial.

4. Against Defendant Bowman Aviation, Inc., Plaintiff seeks damages in the amount of the more than $135,571 in unjustly enriched revenue to be returned to Jet Genius Holdings,

239. Inc. and such other exemplary and punitive damages As a result of Brown's conduct, Plaintiff has been harmed in an amount to be determined at trial.proven at trial.

240. In the above conduct, Brown acted with oppression, fraud, or malice.

241. Brown's conduct was a substantial factor in causing Plaintiff's harm.

**EIGHTEENTH CAUSE OF ACTION**

**Accounting**

**(Against Brown and JGH and the Alter Egos)**

242. Plaintiff incorporates by reference each and every allegation contained in each paragraph above and below as though the same were set forth in full herein.

243. A relationship exists between Plaintiff and Brown by virtue of Plaintiff being a shareholder in JGH.

244. By virtue of Brown's relationship with the Alter Egos, Plaintiff has a relationship with the Alter Egos that requires an accounting.

245. The accounts and assets of JGH and the Alter Egos are so complicated that an ordinary action demanding a fixed sum is impracticable.

**NINETEENTH CAUSE OF ACTION**

**Declaratory Relief**

**(Against Brown and JGH and the Alter Egos)**

246. Plaintiff incorporates by reference each and every allegation contained in each paragraph above and below as though the same were set forth in full herein.

247. An actual controversy has arisen and now exists between the parties as to the operations of JGH, including with respect to the rights of shareholders, obligations of the company owed to directors and officers, and the use of company funds, distributions, Board management, and the present status or use or ownership of the JGH Platform.

248. A judicial declaration is necessary and appropriate at this time so Plaintiff may enforce his rights.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

a. For actual damages according to proof;

b. For special damages according to proof;

c. For punitive damages;

d. For restitution and/or disgorgement of ill-gotten gains;

e. For an accounting;

f. For interest at the maximum legally permissible rate;

g. For a judicial declaration that;

i. The Alter Egos are a single enterprise and there is no distinction among or between them; and

ii. The Alter Egos are the alter ego of Brown, and there is no distinction or separateness between the Alter Egos and Brown;

h. For all appropriate injunctive relief;

i. For interest at the maximum legally permissible rate;

j. For attorneys' fees and costs of suit incurred herein; and

k. For such other and further relief as the Court deems just and proper.

DATED: August 21, 2023

PROCOPIO, CORY, HARGREAVES & SAVITCH LLP

By: */s/Sean M. Sullivan*
Sean M. Sullivan
Justin M. Martin
Attorneys for Plaintiff
Aaron Stanz

## JURY DEMAND

Pursuant to the Federal Rules of Civil Procedure, Rule 38(b), and Civ.LR 38.1, Plaintiff requests a trial by jury on all claims and issues raised in the Complaint which are so triable.

DATED: August 21, 2023

PROCOPIO, CORY, HARGREAVES & SAVITCH LLP

By: /s/Sean M. Sullivan
Sean M. Sullivan
Justin M. Martin
Attorneys for Plaintiff
Aaron Stanz

5. Against Defendant C3 Limo LLC, Plaintiff seeks damages in the amount of the more than $54,791 in unjustly enriched revenue to be returned to Jet Genius Holdings, Inc., recission or cancellation of $177,437 in the credit card American Express account under the name Chasen Dobos purported to be a liability of JGFH, and such other exemplary and punitive damages in an amount to be determined at trial

6. Against Defendant Jet Agency Global LLC, Plaintiff seeks damages in the amount of the more than $343,329 in unjustly enriched revenue to be returned to Jet Genius Holdings,

Inc. and such other exemplary and punitive damages in an amount to be determined at trial.

7. Against all Defendants, jointly and severally, the cumulative sum of the total damages set forth above in this Ninth Cause of Action.

8. Attorneys' fees.

On the Tenth Cause of Action:

1. Against All Defendants, jointly and severally, exemplary and punitive damages in m amount to be determined at trial.

2. Plaintiff requests that Defendant Brown indemnify Plaintiff for all monies, taxes, fees, and/or costs incurred and continues to occur and/or levied on Plaintiff for Brown's failure to pay any FET to which Brown is responsible.

~~3. Attorneys' fees and costs to be determined at trial.~~

Respectfully submitted, Dated:

WADE MILLER LAW

By: / s / Wade A. Miller
Wade A. Miller, Esq.

-and-

John A. Kirk, Esq.
Pennsylvania #308436 (pro hac vice to be submitted)
Distributed Law Group

ATTORNEYS FOR PLAINTIFF AARON STANZ

March 2, 2023

Complaint Verification

I, Aaron ("Angel") Stanz, declare:

1. Iam the Plaintiff in the above-entitled matter.
2. I have read the foregoing (pleading, e.g., complaint) and know the contents thereof.
3. The same is true of my own knowledge, except as to those matters which are therein stated on information and belief, and, as to those matters, I believe it to be true.

Executed on March 2, 2023

I declare under penalty of perjury that the foregoing is true and correct.

~~Dated: March 2, 2023~~

~~By: / s / *Aaron Stanz*~~